UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - x
                                 :
UNITED STATES OF AMERICA         :
                                 :    SEALED INDICTMENT
    -v-                          :
                                 :    20 Cr.  497
                                 :
IVO BECHTIGER,                   :
BERNHARD LAMPERT,                :
PETER RÜEGG,                     :
RODERIC SAGE,                    :
ROLF SCHNELLMANN,                :
DANIEL WÄLCHLI, and              :
ALLIED FINANCE TRUST AG,         :
                                 :
            Defendants.  :
- - - - - - - - - - - - - - - x

**COUNT ONE**
**(Conspiracy to Defraud the United States)**

The Grand Jury charges:

**Introduction**

1.    From at least in or about 2008 through at least in

or about 2014, IVO BECHTIGER, BERNHARD LAMPERT, PETER RÜEGG,

RODERIC SAGE, ROLF SCHNELLMANN, DANIEL WÄLCHLI, and ALLIED FINANCE

TRUST AG, the defendants, and others known and unknown, conspired

to defraud the IRS by designing and implementing a fraudulent

scheme referred to by the conspirators as the "Singapore Solution,"

using the means and methods described below to conceal income and

assets of certain U.S. clients with undeclared bank accounts at

Privatbank IHAG Zurich AG in Switzerland.

## The Defendants and Related Entities

2.   At various times relevant to this Indictment:

a.   Privatbank IHAG Zurich AG ("IHAG") was a private bank based in Zurich, Switzerland.

b.   IHAG Holding AG ("IHAG Holding") was a holding company based in Zurich, Switzerland, that owned a diversified group of subsidiary companies, including IHAG.

c.   ALLIED FINANCE TRUST AG ("ALLIED FINANCE"), the defendant, was a financial services company in Zurich, Switzerland, which was part of the Allied Finance Group in Liechtenstein.

d.   "Hong Kong Firm-1" was a Hong Kong financial services firm co-owned by IHAG Holding, a Hong Kong affiliate of ALLIED FINANCE, and an offshore third-party entity.  Hong Kong Firm-1 also did business as and through at least four related entities (collectively referred to as Hong Kong Firm-1).  RODERIC SAGE, BERNHARD LAMPERT, and DANIEL WÄLCHLI, the defendants, were all directors of Hong Kong Firm-1.

e.   "Singapore Asset Manager-1" was a Singapore-based asset management firm that was wholly owned by a subsidiary of IHAG Holding.

f.   IVO BECHTIGER, the defendant, was a Swiss attorney and the former head of Legal and Compliance at IHAG.

BECHTIGER was also the owner and operator of a family office and corporate and trust services company located in Switzerland.

g.    BERNHARD LAMPERT, the defendant, was the Chief Executive Officer ("CEO") of Allied Finance Group, ALLIED FINANCE's parent company in Liechtenstein, and a director of ALLIED FINANCE and Hong Kong Firm-1.

h.    PETER RÜEGG, the defendant, was a member of IHAG's management and a relationship manager for IHAG.

i.    RODERIC SAGE, the defendant, was the founder and CEO of Hong Kong Firm-1.

j.    From at least in or about 2008 through at least in or about January 2010, ROLF SCHNELLMANN, the defendant, was the CEO of ALLIED FINANCE in Zurich.

k.    DANIEL WÄLCHLI, the defendant, was a member of IHAG Holding's executive board.    WÄLCHLI helped establish Singapore Asset Manager-1 and became a member of Singapore Asset Manager-1's board of directors.    WÄLCHLI was also a director of Hong Kong Firm-1.

### Obligations of United States Taxpayers
### With Respect to Foreign Financial Accounts

3.    At all times relevant to this Indictment:

a.    U.S. citizens and residents who had income in any one calendar year in excess of a threshold amount ("U.S. taxpayers") were required to file a U.S. Individual Income Tax

Return, Form 1040 ("tax return"), for that calendar year with the Internal Revenue Service ("IRS") by April 15 of the following year. On that tax return, U.S. taxpayers were obligated to report their worldwide income, including all income earned from foreign financial accounts (such as bank, brokerage, and securities accounts), and to pay the taxes due on that income.

b.   U.S. taxpayers also had an obligation to report to the IRS on the Schedule B of a tax return whether they had a financial interest in, or signature authority over, a financial account in a foreign country in a particular year by checking "Yes" or "No" in the appropriate box and identifying the country where the account was maintained.

c.   In addition, U.S. taxpayers who had a financial interest in, or signature authority over, one or more financial accounts in a foreign country with an aggregate value of more than $10,000 at any time during a particular year were required to file with the Department of the Treasury a Report of Foreign Bank and Financial Accounts, FinCEN Form 114 (the "FBAR," formerly known as Form TD F 90-22.1). The FBAR had to be filed on or before June 30 of the following year.

4.   As used in this Indictment, "undeclared account" refers to a financial account held or beneficially owned by an individual subject to U.S. tax and maintained in a foreign country that has not been reported by the individual account holder or

4

beneficial owner to the U.S. government on a tax return or FBAR as required.

## Swiss Bank Secrecy and the Impact of the UBS Prosecution on IHAG

5.    At times relevant to this Indictment, Switzerland maintained criminal laws that ensured the secrecy of client relationships at Swiss banks. The Swiss guarantee of secrecy historically has enabled U.S. clients to conceal their Swiss financial accounts from U.S. authorities.

6.    In or about mid-2008, the U.S. criminal tax investigation of UBS Group AG ("UBS"), a Swiss bank, became public. In February 2009, in the Southern District of Florida, UBS entered into a deferred prosecution agreement in which UBS admitted that it had used Swiss privacy law to aid and assist U.S. clients in opening and maintaining undeclared accounts to evade tax. These events prompted IHAG to scrutinize its banking business with its U.S. clients.

7.    In or about late 2008 and early 2009, approximately concurrent with the public announcements of the UBS criminal investigation and deferred prosecution agreement, IHAG began approaching its U.S. clients who had undeclared accounts and asking them to sign IRS Forms W-9, disclosing themselves as U.S. persons with foreign bank accounts, or potentially leave the bank. In the case of three long-standing, high-value U.S. clients with undeclared accounts (the "Clients"), however, IVO BECHTIGER,

5

BERNHARD LAMPERT, PETER RÜEGG, RODERIC SAGE, ROLF SCHNELLMANN, DANIEL WÄLCHLI, and ALLIED FINANCE TRUST AG, the defendants, and others known and unknown, conspired to allow the Clients to continue banking at IHAG, and later, at banks in Singapore, using undeclared accounts.

### The Conspiracy

8.    From at least in or about 2008 through in or about November 2014, IVO BECHTIGER, BERNHARD LAMPERT, PETER RÜEGG, RODERIC SAGE, ROLF SCHNELLMANN, DANIEL WÄLCHLI, and ALLIED FINANCE, the defendants, and others known and unknown, conspired to defraud the United States and to conceal from the IRS through fraudulent, deceitful, and dishonest means the existence of bank accounts maintained by and for the Clients at IHAG in Switzerland, and later, at other banks in Singapore, the assets held therein, and the income earned thereon in order to help the Clients evade U.S. taxes.

9.    To assist the Clients in defrauding the IRS and evading U.S. taxes, IVO BECHTIGER, BERNHARD LAMPERT, PETER RÜEGG, RODERIC SAGE, ROLF SCHNELLMANN, DANIEL WÄLCHLI, and ALLIED FINANCE, the defendants, and others known and unknown, devised and implemented a fraudulent scheme, referred to by the conspirators as the "Singapore Solution." The conspirators devised and implemented the Singapore Solution to fraudulently conceal the accounts of the Clients, the assets held therein, and the income

earned thereon from U.S. authorities.

10. As part of the Singapore Solution, between in or about June 2009 and in or about May 2010, the funds for the three Clients were transferred in "round trips": the funds traveled from the Clients' undeclared accounts at IHAG through nominee corporate bank accounts in other jurisdictions, including Hong Kong, and then returned back to IHAG in newly opened accounts nominally held by Singapore Asset Manager-1 (the "SAM-1 Accounts"). Following the round trips, the Clients' account information was stripped of all indicia of U.S. ownership in order to disguise the true ownership of the accounts and facilitate the Clients' tax evasion. Following the round trip, the Clients continued to beneficially own and control the funds in the SAM-1 Accounts, just as they had when the funds had been in the Clients' original, undeclared IHAG accounts, and continued to conceal the funds from U.S. authorities.

11. Beginning in or about December 2011, when the conspirators perceived a risk that the SAM-1 Accounts could no longer remain undeclared at IHAG without detection, IVO BECHTIGER, BERNHARD LAMPERT, PETER RÜEGG, DANIEL WÄLCHLI, and ALLIED FINANCE, the defendants, and others known and unknown, continued the fraudulent scheme by facilitating the transfer of the Clients' funds from the SAM-1 Accounts at IHAG to undeclared bank accounts in Singapore. After the funds arrived in Singapore, the Clients continued to beneficially own and control the funds and continued

7

to conceal them from U.S. authorities until at least in or about 2014. One of the Clients maintained an undeclared bank account in Singapore until at least in or about November 2014.

12. In return for designing and implementing the fraudulent scheme, IVO BECHTIGER and ALLIED FINANCE, the defendants, as well as IHAG, Singapore Asset Manager-1, and Hong Kong Firm-1, earned substantial fees from the Clients who used the Singapore Solution to evade their U.S. taxes.

### Means and Methods of the Conspiracy

13. Among the means and methods by which IVO BECHTIGER, BERNHARD LAMPERT, PETER RÜEGG, RODERIC SAGE, ROLF SCHNELLMANN, DANIEL WÄLCHLI, and ALLIED FINANCE, the defendants, and their co-conspirators would and did carry out the conspiracy were the following:

a. At various times in or about 2008 and 2009, LAMPERT, RÜEGG, SAGE, SCHNELLMANN, WÄLCHLI, and ALLIED FINANCE, and others known and unknown, participated in the process of crafting the Singapore Solution for IHAG clients with undeclared accounts.

b. At various times in or about 2009, RÜEGG, SAGE, and another IHAG employee met with one or more of the Clients to discuss solutions that would allow the Clients to continue banking with IHAG using undeclared accounts.

c. At various times in or about 2009, SAGE and

8

LAMPERT, and others known and unknown, created and caused to be created nominee entities in Hong Kong and the British Virgin Islands through Hong Kong Firm-1, among others, for the purpose of opening nominee bank accounts in Hong Kong to be used as part of the scheme. The nominee entities and bank accounts were structured in a manner designed to prevent the Hong Kong bank from having to identify the ultimate beneficial owner of the income and assets in the accounts. Specifically, each nominee entity opening an account was ostensibly owned by more than ten shell companies or shareholders. Because none of the nominal shareholders owned more than ten percent of the entity opening the account, the bank was not required under Hong Kong law to identify the ultimate beneficial owner of the account in the bank's "Know-Your-Client" and due diligence paperwork or otherwise.

d. At various times in or about 2009, SAGE and LAMPERT, and others known and unknown, opened and caused to be opened nominee bank accounts in Hong Kong to be used as part of the scheme.

e. At various times in or about 2009 and 2010, BECHTIGER, LAMPERT, RÜEGG, SAGE, SCHNELLMANN, WÄLCHLI, and ALLIED FINANCE, and others known and unknown, transferred and caused to be transferred funds from the Clients' undeclared accounts at IHAG to and through nominee bank accounts in Hong Kong.

f. At various times in or about 2009 and 2010,

9

BECHTIGER, LAMPERT, RÜEGG, SAGE, SCHNELLMANN, WÄLCHLI, and ALLIED FINANCE, and others known and unknown, transferred and caused to be transferred the Clients' funds from Hong Kong back to IHAG in undeclared nominee accounts held in Singapore Asset Manager-1's name.

g.    At various times in or about 2011 and 2012, BECHTIGER, LAMPERT, RÜEGG, WÄLCHLI, and ALLIED FINANCE, and others known and unknown, transferred and caused to be transferred the Clients' funds from undeclared nominee accounts at IHAG to undeclared nominee bank accounts in Singapore, where they remained undeclared until at least in or about 2014.

## Implementation of the Scheme
## for the Three U.S. Clients

### The Client-1 Family

14.    At all times relevant to this Indictment, Client-1 was a U.S. citizen and a hedge fund manager living in the Southern District of New York.

15.    Client-1's father began banking with IHAG in or about the 1960s and maintained an undeclared account at IHAG until his death in or about 1999, when the account passed to his wife and three adult children, including Client-1 (collectively, the "Client-1 Family"). From in or about 1995 to in or about 2009, the account was held in the name of a Liechtenstein foundation (the "S Foundation") created for the purpose of concealing the

10

true account holder's U.S. identity to facilitate tax evasion (the "S Foundation Account"). IVO BECHTIGER, the defendant, served as a member of the S Foundation's board until in or about March 2002.

16. After the S Foundation Account passed to the Client-1 Family, Client-1 managed the account and the assets therein for the benefit of the Client-1 Family, even though the account remained in the name of the S Foundation. Client-1, and occasionally other members of the Client-1 Family, visited IHAG's Zurich office approximately semi-annually and, during the period relevant to this Indictment, met with PETER RÜEGG, the defendant, who was the relationship manager for the Client-1 Family. During these visits, Client-1 Family members typically withdrew hundreds of thousands of dollars in cash at a time and either mailed or carried the cash back to the United States, including to the Southern District of New York.

17. At various times in or about 2009, PETER RÜEGG, the defendant, and another IHAG employee met with Client-1 and informed Client-1, in sum and substance, that the Client-1 Family could no longer rely on a Liechtenstein foundation to conceal its undeclared account without detection. RÜEGG and the other IHAG employee explained to Client-1, in sum and substance, that they were working on a solution whereby the S Foundation Account would be closed and the funds from the account could be transferred through a series of offshore accounts back to IHAG in an account in the name of a

11

Singapore asset management company affiliated with IHAG, later established as Singapore Asset Manager-1.

18. In order to get more details about the scheme, in or about June 2009, Client-1 and his brother flew to Hong Kong to meet with RODERIC SAGE and PETER RÜEGG, the defendants. At the meeting, SAGE, RÜEGG, Client-1, and Client-1's brother discussed the Singapore Solution. Following the meeting, Client-1 agreed to participate in the scheme on behalf of himself and his family members.

19. At the time that Client-1 agreed to participate in the scheme, the S Foundation Account held shares in a relatively illiquid hedge fund operated by Client-1. The shares needed to be sold so that the resulting cash could be transferred out of the account as part of the scheme. To liquidate some of these shares, on or about September 16, 2009, a U.S.-based investment company solely owned by IHAG Holding purchased over $9.5 million USD worth of shares from the S Foundation.

20. After the hedge fund shares in the S Foundation Account were liquidated, BERNHARD LAMPERT, PETER RÜEGG, RODERIC SAGE, ROLF SCHNELLMANN, DANIEL WÄLCHLI, and ALLIED FINANCE, the defendants, and others known and unknown, transferred and caused to be transferred the Client-1 Family's funds as follows:

a. On or about September 18, 2009, approximately 50,495,380 Swiss francs ("CHF") were transferred from the S

12

Foundation Account to an account opened at a Hong Kong bank ("Hong Kong Bank-1") in the name of a nominee entity created by Hong Kong Firm-1 ("Hong Kong Account-1").

b.    On or about October 7 and 8, 2009, approximately $48,977,000 USD was transferred from Hong Kong Account-1 to a second account at Hong Kong Bank-1 in the name of a second nominee entity created by Hong Kong Firm-1 ("Hong Kong Account-2").

c.    On or about October 7 and 8, 2009, approximately $48,000,000 USD was transferred from Hong Kong Account-2 to a third account at Hong Kong Bank-1 in the name of a third nominee entity created by Hong Kong Firm-1 ("Hong Kong Account-3").

d.    On or about December 8, 2009, approximately $47,949,974 USD was returned to IHAG in Switzerland in a bank account in Singapore Asset Manager-1's name and using the pseudonym bank account name 63'000 (the "SAM-1 Account 63'000").

21.    The nominee entities created by Hong Kong Firm-1 were structured to prevent the Client-1 Family from being identified as the beneficial owner of the assets in Hong Kong Bank Accounts-1 through -3. Each nominee entity was falsely identified in account opening records as an investment vehicle purportedly for twelve unnamed European investors who wanted to invest in Asia.

22.    On or about December 4, 2009, Singapore Asset

Manager-1 entered into an Investment Management Agreement with ALLIED FINANCE, the defendant, to manage the Client-1 Family's undeclared funds.    The agreement identified Singapore Asset Manager-1's client only as ALLIED FINANCE "[r]epresenting a Client on whom Customer Due Diligence has been made according to Swiss CDD Standards."    BERNHARD LAMPERT and ROLF SCHNELLMANN, the defendants, signed the Investment Management Agreement on behalf of ALLIED FINANCE.  The Client-1 Family was not identified as the beneficial owner of the assets in the SAM-1 Account 63'000.

23.  On or about December 29, 2009, Singapore Asset Manager-1 sent a letter to IHAG stating, "We assure you that we have conducted customer due diligence on all of our clients and of their beneficial owners."

24.  As a result of the foregoing, once the Client-1 Family's funds returned to IHAG in the SAM-1 Account 63'000, the account information and funds were stripped of all indicia of U.S. ownership.    The account was held in Singapore Asset Manager-1's name, and Singapore Asset Manager-1's purported due diligence disclosed only that it was managing investments for ALLIED FINANCE, the defendant, representing an unnamed client.

25.  After the Client-1 Family's funds returned to IHAG in the SAM-1 Account 63'000, the Client-1 Family continued to control the account and its assets in the same manner as it had done before participating in the Singapore Solution.    In

14

particular, Client-1 continued to communicate with PETER RÜEGG, the defendant, regarding managing the account.

26.    In or about 2011, PETER RÜEGG, the defendant, and another IHAG employee informed Client-1, in sum and substance, that IHAG could no longer guarantee that they could keep the Client-1 Family's identities from being disclosed under the current structure.  RÜEGG and the other IHAG employee proposed a new solution whereby IVO BECHTIGER, the defendant, would serve as a nominee client for a new structure of accounts in Singapore.

27.    In or about May 2012, Client-1 met with IVO BECHTIGER, the defendant, and an IHAG employee in Singapore to discuss how to continue to conceal the Client-1 Family's undeclared funds offshore.  BECHTIGER and the IHAG employee proposed having the Client-1 Family's funds transferred from the SAM-1 Account 63'000 at IHAG to two different bank accounts held by new nominee entities at banks in Singapore.

28.    In furtherance of this plan, IVO BECHTIGER, the defendant, an IHAG employee, and Client-1 met with representatives of a Singapore-based trust company (the "Singapore Trust Company") and a Singapore-based asset management company ("Singapore Asset Manager-2") about opening undeclared bank accounts in Singapore. As part of the scheme, BECHTIGER agreed to serve as the nominal client for the new accounts in Singapore, although, in actuality, the Client-1 Family would continue to own and control the accounts.

15

29. On or about May 29, 2012, IVO BECHTIGER, the defendant, settled a trust through the Singapore Trust Company (the "A Trust"), to be used to hold assets of the Client-1 Family originating from the SAM-1 Account 63'000 at IHAG. The Singapore Trust Company was appointed to be the trustee of the A Trust. BECHTIGER caused one of his family members, rather than any of the Client-1 Family members, to be the nominal beneficiary of the A Trust. The A Trust then established a BVI company ("the BVI Company") to hold the assets of the trust, with the Singapore Trust Company identified as the sole shareholder of the BVI Company.

30. On or about May 29, 2012, IVO BECHTIGER, the defendant, sent a "letter of wishes" to the Singapore Trust Company as trustee of the A Trust, in which BECHTIGER stated, in part, "During my lifetime, I would like you [sic] consult me at regular intervals and make such distributions of income and capital as I may request you and on any other matter concerning the Trust." BECHTIGER also directed that "[t]he contents of this letter are confidential and should not be disclosed to anyone other than any new Trustee."

31. On or about September 13, 2012, ALLIED FINANCE, the defendant, in a letter signed by BERNHARD LAMPERT, the defendant, instructed Singapore Asset Manager-1 to transfer securities from the SAM-1 Account 63'000 at IHAG to an account at a Singapore bank ("Singapore Bank-1") that was opened in the name of the BVI Company

16

("Singapore Account-1").

32. On or about September 13, 2012, ALLIED FINANCE, the defendant, in a letter signed by BERNHARD LAMPERT, the defendant, instructed Singapore Asset Manager-1 to transfer approximately CHF 7,056,000 from the SAM-1 Account 63'000 at IHAG to an account at another Singapore bank ("Singapore Bank-2") held by Singapore Asset Manager-2 ("Singapore Account-2").

33. On or about September 17, 2012, pursuant to the instructions of ALLIED FINANCE and BERNHARD LAMPERT, the defendants, approximately CHF 7,087,700 was transferred from the SAM-1 Account 63'000 to Singapore Account-1, and approximately CHF 7,056,000 was transferred from the SAM-1 Account 63'000 to Singapore Account-2. On or about September 20, 2012, approximately CHF 7,055,777 was transferred from Singapore Account-2 to an account at the Singapore branch of a Swiss bank ("Singapore Bank-3") held in the name of a fund managed by Singapore Asset Manager-2 ("Singapore Account-3"). Following these transfers, the Client-1 Family beneficially owned and controlled Singapore Account-1 and Singapore Account-3, but neither Client-1 nor Client-1's family members disclosed any offshore accounts to the IRS until at least in or about May 2014.

### Client-2

34. At times relevant to this Indictment, Client-2 was a U.S. citizen who resided in North Carolina.

17

35. From in or about 2003 through in or about 2009, Client-2 held an undeclared account at IHAG in the name of a Panamanian foundation (the "GF Foundation") established by IHAG to help conceal Client-2's U.S. identity (the "GF Foundation Account").

36. In or about 2009, rather than declare the GF Foundation Account to U.S. authorities and pay U.S. taxes, Client-2 participated in the Singapore Solution. As part of the scheme, BERNHARD LAMPERT, RODERIC SAGE, ROLF SCHNELLMANN, DANIEL WÄLCHLI, and ALLIED FINANCE, the defendants, and others known and unknown, transferred and caused to be transferred Client-2's funds as follows:

a. Between on or about June 4, 2009 and on or about September 23, 2009, approximately $3,400,000 USD and approximately CHF 10,437,372 were transferred from the GF Foundation Account to an account opened at Hong Kong Bank-1 in the name of a nominee entity created by Hong Kong Firm-1 ("Hong Kong Account-4").

b. On or about October 7 and 8, 2009, approximately $3,402,500 USD and approximately CHF 10,437,000 were transferred from Hong Kong Account-4 to another account at Hong Kong Bank-1 in the name of another nominee entity created by Hong Kong Firm-1 ("Hong Kong Account-5"). The funds were then transferred to another account at Hong Kong Bank-1 in the name of

18

another nominee entity created by Hong Kong Firm-1 ("Hong Kong Account-6").

c. On or about December 22, 2009, approximately $2,695,756 USD and approximately CHF 10,437,000 were returned to IHAG in Switzerland in a bank account in Singapore Asset Manager-1's name and using the pseudonym bank account name 63'002 (the "SAM-1 Account 63'002").

37. The nominee entities created by Hong Kong Firm-1 were structured to prevent Client-2 from being identified as the beneficial owner of the assets in Hong Kong Bank Accounts-4 through -6. Each nominee entity was falsely identified in account opening records as an investment vehicle purportedly for twelve unnamed European investors who wanted to invest in Asia.

38. On or about December 18, 2009, Singapore Asset Manager-1 entered into an Investment Management Agreement with ALLIED FINANCE, the defendant, to manage Client-2's undeclared funds. The agreement identified Singapore Asset Manager-1's client only as ALLIED FINANCE "[r]epresenting a Client on whom Customer Due Diligence has been made according to Swiss CDD Standards." BERNHARD LAMPERT and ROLF SCHNELLMANN, the defendants, signed the Investment Management Agreement on behalf of ALLIED FINANCE. Client-2 was not identified as the beneficial owner of the assets in the SAM-1 Account 63'002.

39. On or about December 29, 2009, Singapore Asset

19

Manager-1 sent a letter to IHAG stating, "We assure you that we have conducted customer due diligence on all of our clients and of their beneficial owners."

40. As a result of the foregoing, once Client-2's funds returned to IHAG in the SAM-1 Account 63'002, the account information and funds were stripped of all indicia of U.S. ownership. The account was held in Singapore Asset Manager-1's name, and Singapore Asset Manager-1's purported due diligence disclosed only that Singapore Asset Manager-1 was managing investments for ALLIED FINANCE, the defendant, representing an unnamed client.

41. After Client-2's funds returned to IHAG in the SAM-1 Account 63'002, Client-2 continued to control the account and its assets in the same manner as Client-2 had done before participating in the Singapore Solution.

42. Following the round trip, Client-2's funds remained at IHAG for approximately two years and then, as with Client-1's funds, were moved to Singapore in order to continue to conceal them from U.S. authorities.

43. On or about December 12, 2011, ALLIED FINANCE, the defendant, in a letter signed by BERNHARD LAMPERT, the defendant, instructed Singapore Asset Manager-1 to transfer approximately CHF 11.5 million from the SAM-1 Account 63'002 at IHAG to an intermediary account at Hong Kong Bank-1 (the "Hong Kong

Intermediary Account"), and close the SAM-1 Account 63'002 after transferring the remaining balance, totaling approximately CHF 80,000, to an account at a Liechtenstein bank in the name of "Allied Middle East FZC."

44. Between on or about December 14, 2011 and on or about December 21, 2011, Singapore Asset Manager-1 caused the transfer of approximately CHF 11.5 million to the Hong Kong Intermediary Account, approximately CHF 14,500 to Allied Finance (HK) Ltd., approximately CHF 9,300 to Singapore Asset Manager-1, approximately CHF 9,700 and CHF 35,400 to Allied Middle East FZC, approximately CHF 145,800 to a Panamanian foundation of which IVO BECHTIGER, the defendant, was the beneficiary, and approximately CHF 10,800 to IHAG in "administrative fees."

45. On or about February 15, 2012, Client-2's assets were transferred out of the Hong Kong Intermediary Account to a bank account at the Singapore branch of a Swiss bank ("Singapore Account-4") held in the name of a fund managed by Singapore Asset Manager-2 with IVO BECHTIGER, the defendant, serving as the purported client. Following these transfers, Client-2 (and, following Client-2's death in or about December 2012, a member of Client-2's family) continued to beneficially own and control Singapore Account-4 and did not disclose the account to the IRS until in or about June 2014.

**Client-3**

46. At all times relevant to this Indictment, Client-3 was a U.S. citizen residing in San Francisco, California, and Ho Chi Minh City, Vietnam.

47. At various times from at least in or about 2001 through in or about May 2010, Client-3 maintained at least five undeclared accounts at IHAG. Client-3 did not identify himself as the beneficial owner of the assets in these accounts. Instead, Client-3 held these accounts in nominee names, including in the name of the "W Foundation" (a Liechtenstein foundation) and the "P Foundation" (a Panamanian foundation). Client-3 also identified non-U.S. citizens, including a Filipino relative and a Malaysian individual close to Client-3 ("Individual-1"), as nominal owners of the accounts.

48. By in or about April 2010, Client-3 consolidated his funds into one undeclared account at IHAG in the name of the P Foundation (the "P Foundation Account").

49. In or about May 2010, IVO BECHTIGER, the defendant, and others known and unknown, transferred and caused to be transferred approximately CHF 4,193,312 from the P Foundation Account through a bank account in Liechtenstein in the name of a corporate entity controlled by ROLF SCHNELLMANN, the defendant, to a bank account at Hong Kong Bank-1 held in the name of Singapore Asset Manager-1. These transfers were made in order to strip the

22

funds of any indicia of U.S. ownership.

50.    Between in or about May 2010 and in or about July
2011, Client-3's funds were transferred via a series of wire
transfers from Hong Kong Bank-1 back to IHAG into accounts with
pseudonym bank account names 63'003 and 63'004 (the "SAM-1 Account
63'003" and "SAM-1 Account 63'004"), which were nominally held by
Singapore Asset Manager-1 on behalf of two nominee foundations,
the "R Foundation" and the "L Foundation," both managed by IVO
BECHTIGER, the defendant.    BECHTIGER, as a "representative" of
each foundation, entered into an Investment Management Agreement
between each foundation and Singapore Asset Manager-1.

51.    Although the SAM-1 Accounts 63'003 and 63'004 were
nominally held by Singapore Asset Manager-1 on behalf of the
foundations managed by IVO BECHTIGER, the defendant, in actuality,
the funds in the accounts belonged to Client-3.    Client-3
maintained control and ownership of the funds in the accounts
without disclosing them to U.S. authorities.

52.    In or about April 2011, Client-3 sent a letter to
IVO BECHTIGER, the defendant, asking BECHTIGER to "transfer all
assets from [the L Foundation] to [the R Foundation] as they are
in Privatbank IHAG Zurich and close the account."    Per that
request, in or about April 2011, all funds in the SAM-1 Account
63'004 were transferred to the SAM-1 Account 63'003.

53.    In or about January 2012, Client-3 used the

23

Singapore Trust Company to create a new trust structure consisting of a Singapore trust with the Singapore Trust Company as trustee and owner of a new BVI company called W Investment Ltd. In or about March 2012, IHAG opened an account in the name of Singapore Asset Manager-1 on behalf of W Investment Ltd. (the "W Investment Account").

54. In or about late March 2012, IVO BECHTIGER, the defendant, and others known and unknown, transferred and caused to be transferred Client-3's assets from the SAM-1 Account 63'003 at IHAG into the W Investment Account at IHAG.

55. Between in or about April 2011 and in or about July 2012, IVO BECHTIGER, the defendant, and others known and unknown, transferred, and caused to be transferred, funds from the SAM-1 Account 63'003 and the W Investment Account to undeclared bank accounts in Singapore nominally held in the name of Singapore Asset Manager-1. One of the accounts (the "SAM-1 Singapore Account-1") was held for the R Foundation. The other account (the "SAM-1 Singapore Account-2") was held for W Investment Ltd. The funds transferred to these accounts belonged to Client-3, who maintained control and ownership of the funds in the accounts without disclosing them to U.S. authorities.

56. Client-3 regularly visited Singapore Asset Manager-1's office in Singapore to pick up cash withdrawn from the SAM-1 Singapore Account-1 and, later, the SAM-1 Singapore Account-

2.   When Client-3 and/or Individual-1 picked up cash withdrawn from the SAM-1 Singapore Account-1, IVO BECHTIGER, the defendant, would send Singapore Asset Manager-1 written instructions to deliver payments to Client-3 and Individual-1.

57.   Client-3's funds remained in the undeclared SAM-1 Singapore Account-1 until in or about March 2012 and in the undeclared SAM-1 Singapore Account-2 until at least in or about November 2014.

### Statutory Allegations

58.   From at least in or about 2008 through at least in or about November 2014, in the Southern District of New York and elsewhere, IVO BECHTIGER, BERNHARD LAMPERT, PETER RÜEGG, RODERIC SAGE, ROLF SCHNELLMANN, DANIEL WÄLCHLI, and ALLIED FINANCE TRUST AG, the defendants, together with others known and unknown, willfully and knowingly did conspire, combine, confederate, and agree together and with each other to defraud the United States of America and an agency thereof, to wit, the IRS.

59.   It was a part and an object of the conspiracy that IVO BECHTIGER, BERNHARD LAMPERT, PETER RÜEGG, RODERIC SAGE, ROLF SCHNELLMANN, DANIEL WÄLCHLI, and ALLIED FINANCE TRUST AG, the defendants, together with others known and unknown, willfully and knowingly would and did defraud the United States of America and the IRS for the purpose of impeding, impairing, obstructing, and defeating the lawful governmental functions of the IRS in the

ascertainment, computation, assessment, and collection of revenue, to wit, federal income taxes.

## Overt Acts

60.  In furtherance of the conspiracy and to effect the illegal objects thereof, IVO BECHTIGER, BERNHARD LAMPERT, PETER RÜEGG, RODERIC SAGE, ROLF SCHNELLMANN, DANIEL WÄLCHLI, and ALLIED FINANCE TRUST AG, the defendants, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.  On or about December 10, 2008, SCHNELLMANN e-mailed an IHAG employee diagrams of structures that could be implemented by and for IHAG clients who wanted to maintain undeclared accounts.

b.  On or about January 19, 2009, at a joint meeting of the executive boards of IHAG Holding and IHAG, WÄLCHLI presented the "concept, synergies, and implementation" of "Asia Financial Services."  WÄLCHLI's presentation included diagrams of substantially the same structures that SCHNELLMANN had e-mailed to an IHAG employee on or about December 10, 2008.

c.  On or about March 17, 2009, an IHAG employee e-mailed an ALLIED FINANCE employee, copying SCHNELLMANN, in anticipation of a meeting with Client-1.  The IHAG employee asked ALLIED FINANCE to prepare a presentation regarding "your solution" involving the "Asia Asset Manager."

d.    On or about March 20, 2009, an ALLIED FINANCE employee (the "AF Employee") sent an e-mail copying SCHNELLMANN. The AF Employee wrote that "Liechtenstein could not stand up against the international pressure any longer and announced to give out information on request of a foreign authority. This leads to the implementation of new structures that you see attached." The AF Employee attached diagrams of structures that would allow clients to continue maintaining undeclared accounts with IHAG.

e.    In or about late May or early June 2009, at an IHAG executive board meeting, the executive board discussed its handling of U.S. clients and noted that the "Singapore solution is in sight."

f.    On or about May 29, 2009, SCHNELLMANN e-mailed LAMPERT and SAGE, among others, regarding fee splits among IHAG, ALLIED FINANCE, and Hong Kong Firm-1 for joint clients. SCHNELLMANN wrote that "this arrangement is valid for US clients."

g.    On or about June 6, 2009, WÄLCHLI e-mailed SAGE and LAMPERT, copying others. WÄLCHLI wrote, "In spite of the discussions we had in London, there still seem to be a lot of discussions about which structures shall be sold to which client in which situation." WÄLCHLI wrote that he asked SAGE to "arrange a meeting in order to solve those issues as quickly as possible."

h.    On or about June 23, 2009, SAGE's personal assistant sent an e-mail to WÄLCHLI, copying SAGE, attaching a diagram of a scheme that would become the Singapore Solution.

i.    On or about June 24, 2009, SAGE, through his personal assistant, e-mailed WÄLCHLI and another IHAG employee regarding SAGE's discussions with RÜEGG about the flow of funds in the scheme.  SAGE wrote, "Peter mentioned that the funds will not flow directly from Ihag to [Hong Kong Bank-1] but via an Allied Finance vehicle ... Clearly, if it were possible to interpose an 'acceptable' step between Ihag and HK Co I would see that as a positive amendment."

j.    On or about July 15, 2009, SCHNELLMANN e-mailed SAGE, LAMPERT, and WÄLCHLI.  SCHNELLMANN wrote, "[W]e have to get the US clients off Form A [the form used to identify the beneficial owner of the assets in an account in Switzerland], and have them invest through a structure, where IHAG has control and use of the funds, without having a reporting problem."

k.    On or about July 31, 2009, LAMPERT e-mailed SCHNELLMANN, SAGE, and WÄLCHLI, among others, regarding ways to open bank accounts in Hong Kong without disclosing the beneficial owners of the assets in the accounts and having Singapore Asset Manager-1 open bank accounts at IHAG without having to identify the beneficial owners.

l.    On or about December 4, 2009, Singapore Asset Manager-1 and ALLIED FINANCE entered into an Investment Management Agreement, signed by LAMPERT and SCHNELLMANN on behalf of ALLIED FINANCE, to manage the Client-1 Family's funds.

m.    On or about December 18, 2009, Singapore Asset Manager-1 and ALLIED FINANCE entered into an Investment Management Agreement, signed by LAMPERT and SCHNELLMANN on behalf of ALLIED FINANCE, to manage Client-2's funds.

n.    On or about the following dates, LAMPERT, RÜEGG, SAGE, SCHNELLMANN, WÄLCHLI, and ALLIED FINANCE, and others known and unknown, transferred and caused to be transferred the Client-1 Family's funds as follows:

| Overt Act | Approximate Date | Approximate Amount | Originating Account | Recipient Account |
|---|---|---|---|---|
| i. | September 18, 2009 | 50,495,380 CHF | S Foundation Account | Hong Kong Account-1 |
| ii. | October 7, 2009 | 28,977,000 USD | Hong Kong Account-1 | Hong Kong Account-2 |
| iii. | October 7, 2009 | 20,000,000 USD | Hong Kong Account-2 | Hong Kong Account-3 |
| iv. | October 8, 2009 | 20,000,000 USD | Hong Kong Account-1 | Hong Kong Account-2 |
| v. | October 8, 2009 | 28,000,000 USD | Hong Kong Account-2 | Hong Kong Account-3 |
| vi. | December 8, 2009 | 47,949,974 USD | Hong Kong Account-3 | SAM-1 Account 63'000 |

o. On or about the following dates, LAMPERT, SAGE, SCHNELLMANN, WÄLCHLI, and ALLIED FINANCE, and others known and

unknown, transferred and caused to be transferred Client-2's funds
as follows:

| Overt Act | Approximate Date | Approximate Amount | Originating Account | Recipient Account |
|---|---|---|---|---|
| i. | June 4, 2009 | 3,400,000 USD | GF Foundation Account | Hong Kong Account-4 |
| ii. | September 9, 2009 | 5,062,770 CHF | GF Foundation Account | Hong Kong Account-4 |
| iii. | September 15, 2009 | 4,732,000 CHF | GF Foundation Account | Hong Kong Account-4 |
| iv. | September 21, 2009 | 642,602 CHF | GF Foundation Account | Hong Kong Account-4 |
| v. | October 7, 2009 | 10,437,000 CHF | Hong Kong Account-4 | Hong Kong Account-5 |
| vi. | October 8, 2009 | 3,402,500 USD | Hong Kong Account-4 | Hong Kong Account-5 |
| vii. | October 8, 2009 | 10,437,000 CHF | Hong Kong Account-5 | Hong Kong Account-6 |
| viii. | October 8, 2009 | 3,402,500 USD | Hong Kong Account-5 | Hong Kong Account-6 |
| ix. | December 22, 2009 | 2,695,756 USD | Hong Kong Account-6 | SAM-1 Account 63'002 |
| x. | December 22, 2009 | 10,437,000 CHF | Hong Kong Account-6 | SAM-1 Account 63'002 |

p.   On or about May 5, 2010, BECHTIGER, and others
known and unknown, caused approximately CHF 4,193,312 of Client-
3's funds to be transferred from the P Foundation Account, through
an account in Liechtenstein in the name of a corporate entity
controlled by SCHNELLMANN, and ultimately to a bank account at
Hong Kong Bank-1 held in the name of Singapore Asset Manager-1.

q.    On or about the dates below, BECHTIGER, and others known and unknown, caused Client-3's funds to be returned from Hong Kong Bank-1 to IHAG as follows:

| Overt Act | Approximate Date | Approximate Amount | Recipient Account |
|-----------|------------------|--------------------|--------------------|
| i. | May 14, 2010 | 780,000 CHF | SAM-1 Account 63'003 |
| ii. | May 14, 2010 | 644,000 CHF | SAM-1 Account 63'004 |
| iii. | May 19, 2010 | 1,487,500 CHF | SAM-1 Account 63'003 |
| iv. | May 20, 2010 | 1,138,000 CHF | SAM-1 Account 63'004 |
| v. | June 21, 2010 | 216,348 USD | SAM-1 Account 63'003 |
| vi. | June 21, 2010 | 233,521 USD | SAM-1 Account 63'003 |
| vii. | July 21, 2011 | 785,894 CHF | SAM-1 Account 63'003 |

Transactions (v) and (vi) above were each routed through a correspondent bank account in New York, New York.

r.    On or about March 16, 2012, BECHTIGER and an IHAG employee met with representatives of the Singapore Trust Company in Singapore.  Following the meeting, the CEO of the Singapore Trust Company e-mailed BECHTIGER and the IHAG employee stating, in part, "You might also wished[sic] to be informed that under Singapore laws, the beneficiaries of the Trust are 'concealed.'"

s.    On or about July 16, 2012, Singapore Account-1 was opened at Singapore Bank-1 in the name of the BVI Company

with the sole share held by the Singapore Trust Company. On or about September 17, 2012, BECHTIGER, LAMPERT, and WÄLCHLI, and others known and unknown, transferred and caused to be transferred approximately CHF 7,087,000 from the SAM-1 Account 63'000 to Singapore Account-1 and approximately CHF 7,056,000 from the SAM-1 Account 63'000 to Singapore Account-2. On or about September 18, 2012, BECHTIGER, and others known and unknown, transferred and caused to be transferred approximately CHF 7,055,776 from Singapore Account-2 to Singapore Account-3.

      t.  On or about March 26, 2012, BECHTIGER, and others known and unknown, transferred and caused to be transferred, Client-3's assets valued at approximately $1,264,768 USD from the SAM-1 Account 63'003 to the W Investment Account.

      u.  On or about the dates listed below, BECHTIGER, and others known and unknown, transferred and caused to be transferred Client-3's funds from bank accounts at IHAG to undeclared bank accounts in Singapore as follows:

| Overt Act | Approximate Date | Approximate Amount | Originating Account | Recipient Account |
|---|---|---|---|---|
| i. | April 8, 2011 | 100,000 USD | SAM-1 Account 63'003 | SAM-1 Singapore Account-1 |
| ii. | August 11, 2011 | 500,000 USD | SAM-1 Account 63'003 | SAM-1 Singapore Account-1 |
| iii. | August 22, 2011 | 400,000 USD | SAM-1 Account 63'003 | SAM-1 Singapore Account-1 |

| | | | | |
|------|------------------|-----------------|--------------------------|-----------------------------|
| iv.  | December 14, 2011 | 990,000 USD     | SAM-1 Account 63'003     | SAM-1 Singapore Account-1   |
| v.   | January 13, 2012 | 8,000,000 HKD   | SAM-1 Account 63'003     | SAM-1 Singapore Account-1   |
| vi.  | July 26, 2012    | 1,200,000 USD   | W Investment Account     | SAM-1 Singapore Account-2   |

Transactions (i), (ii), (iii), and (vi) above were each routed through a correspondent bank account in New York, New York.

v.    On or about the dates listed below, Client-3, with the assistance of BECHTIGER, withdrew, and caused to be withdrawn, the following approximate amounts of cash from the SAM-1 Singapore Account-1:

| Overt Act | Approximate Date | Approximate Amount |
|-----------|------------------|--------------------|
| i.        | April 13, 2011   | 20,000 USD         |
| ii.       | April 26, 2011   | 10,000 USD         |
| iii.      | August 22, 2011  | 15,000 USD         |
| iv.       | December 7, 2011 | 15,000 USD         |
| v.        | March 15, 2012   | 20,000 USD         |

w.    On or about October 31, 2013, BECHTIGER received payment of fees in the amount of approximately CHF 190,022.49 in the name of BECHTIGER's nominee Panamanian foundation from Singapore Account-4.

x.    On or about the dates listed below, Client-3 withdrew, and caused to be withdrawn, the following approximate amounts of cash from SAM-1 Singapore Account-2:

| Overt Act | Approximate Date | Approximate Amount |
|-----------|------------------|--------------------|
| i. | July 25, 2012 | 50,000 USD |
| ii. | May 10, 2013 | 20,000 USD |
| iii. | February 7, 2014 | 25,000 USD |
| iv. | June 2, 2014 | 50,000 USD |
| v. | July 3, 2014 | 10,000 USD |
| vi. | October 16, 2014 | 25,000 USD |

(Title 18, United States Code, Section 371.)

_Leonie Boulon_
FOREPERSON

_Audrey Strauss_
AUDREY STRAUSS
Acting United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

---

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

### UNITED STATES OF AMERICA

v.

IVO BECHTIGER,
BERNHARD LAMPERT,
PETER RÜEGG,
RODERIC SAGE,
ROLF SCHNELLMANN,
DANIEL WÄLCHLI, and
ALLIED FINANCE TRUST AG,

Defendants.

---

### SEALED INDICTMENT

(18 U.S.C. § 371)

AUDREY STRAUSS
Acting United States Attorney

*Leonie Berland*
Foreperson

---