N15BWALH

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                          20 Cr. 497 (GHW)

 5   DANIEL WALCHLI,

 6

 7              Defendant.

 8                                          Oral Argument
     ------------------------------x
 9
                                            New York, N.Y.
10                                          January 5, 2023
                                            2:30 p.m.
11

12   Before:

13
                        HON. GREGORY H. WOODS,
14
                                            District Judge
15
                              APPEARANCES
16
     DAMIAN WILLIAMS
17        United States Attorney for the
          Southern District of New York
18   BY:  NANETTE L. DAVIS
          OLGA I. ZVEROVICH
19        CHRISTOPHER MAGNANI
          Assistant United States Attorneys
20
     MORVILLO, ABRAMOWITZ, GRAND, IASON & ANELLO, P.C.
21        Attorneys for Defendant Daniel Walchli
     BY:  JEREMY H. TEMKIN
22        RICHARD F. ALBERT
          JOSHUA P. BUSSEN
23        DANIEL P. GORDON

24   Also Present:  Special Agent Zachary Katz,  IRS

25
```

1    (Case called)

2    MS. DAVIS:  Good afternoon, your Honor.

3    Nanette Davis of the Department of Justice Tax

4    Division for the government, along with AUSA Olga Zverovich,

5    Tax Division trial attorney Chris Magnani, and IRS Special

6    Agent Zachary Katz.

7    THE COURT:  Good. Thank you very much.  Good

8    afternoon.

9    MR. TEMKIN:  Good afternoon, your Honor.

10    Jeremy Temkin, Morvillo, Abramowitz, Grand, Iason &

11    Anello, for Mr. Walchli.  Mr. Walchli is with us today, as are

12    my partner Rich Albert, and our colleagues Joshua Bussen and

13    Daniel Gordon.

14    THE COURT:  Very good.  Thank you very much.  Good

15    afternoon.

16    Counsel, I scheduled this conference in large part to

17    take up the motion to dismiss that was filed by the defendant

18    in this case, so I hope to do that.  Counsel, I've reviewed the

19    parties' submission in connection with that motion.  I'm happy

20    to give the parties the opportunity to add anything to your

21    written submissions if you'd like to do so.  But I have, as I

22    said, reviewed the written submissions that have been provided

23    to me in detail.  Before I move to that, let me ask if there's

24    anything else that either party would like to raise to the

25    Court's attention at this conference starting with counsel for

 1    the government.  Counsel.

 2              MS. DAVIS:  Other than the scheduling matters that are

 3    incorporated into the motion to dismiss, we have nothing

 4    further.

 5              THE COURT:  Thank you.  Counsel for defendant.

 6              MR. TEMKIN:  Your Honor, we've been going back and

 7    forth with the government over some discovery issues that we

 8    think we are resolving without the court's intervention.  So at

 9    this time, we don't have anything to raise with your Honor.

10              THE COURT:  Good. Thank you very much.  Thank you for

11    working together to resolve any such issues.  Please let me

12    know if there's anything that I can help you with.

13              So, counsel, as I said, I've read the written

14    submissions by the parties in connection with the motion.  Is

15    there anything that either side would like to add or add to or

16    amplify from your written submissions, beginning first with

17    counsel for defendant.  Counsel.

18              MR. TEMKIN:  Your Honor, we have three motions

19    essentially.  First motion to dismiss is based on the statute

20    of limitations, which I was planning to address with your

21    Honor.

22              The second issue is the extraterritoriality of *Klein*,

23    which Mr. Albert was going to address, and then the third deals

24    with the pretrial disclosures issues.  So if your Honor doesn't

25    mind taking them in that order, I would address the first and

1    the third, and Mr. Albert the second.

2              THE COURT:  Thank you.  I'm happy to hear from you.

3    Please go ahead.

4              MR. TEMKIN:  Thank you, your Honor.

5              So, your Honor -- and I know that you've reviewed the

6    papers, so you know that for purposes of this motion, we

7    acknowledge that the statute -- that the indictment was timely

8    on its face.  The optimal date for the statute of limitations

9    was April 16, 2021, and the government met that by filing the

10   indictment in September of 2020.  However, the government filed

11   the indictment under seal.  And when the government does that,

12   it is not entitled to the benefit of tolling, unless it can

13   establish first that the initial decision to seal the

14   indictment was informed by sound prosecutorial discretion.  And

15   second, that the indictment -- that any delay in unsealing the

16   indictment serve some legitimate prosecutorial need.

17             We do not dispute that the initial decision to file

18   under seal was reasonable, but we do argue and believe that the

19   government did not have a legitimate basis to continue to keep

20   the indictment under seal, either after October 15 when we

21   contacted the government and offered to bring Mr. Walchli to

22   the United States to face any charges that may have been

23   brought; or certainly after Mr. Lampert was arrested in a

24   country from which he could and ultimately was not extradited.

25             I don't think the government disputes that once we

1    contacted them and offered for Mr. Walchli to come to the

2    United States that it could not keep the indictment sealed as

3    to him.  I do think that they suggest that our offer was

4    somehow unreliable. And quite frankly, I don't understand that

5    argument.

6          Mr. Walchli is a businessman.  He is a respected

7    businessman.  He has no prior record.  He's charged with a

8    single conspiracy count.  He offered to come to the United

9    States from Switzerland, a country from which he never could

10   have been extradited if he had chosen to take that course as

11   some of his co-defendants have.  So our request that he be

12   afforded a reasonable bail package upon surrendering was not a

13   big ask.  It wasn't a heavy lift for the government to come to

14   an agreement on bail.  In fact, at no time prior to the

15   unsealing of the indictment did the government even ask what we

16   thought a reasonable bail package would entail. And there's no

17   suggestion that our discussions regarding the reasonable bail

18   package at any time implied that Mr. Walchli would not come or

19   that there was any sort of line in the sand drawn.

20          THE COURT:  Let me just ask about that, counsel.

21   There was a negotiation.  Is that right?

22          MR. TEMKIN:  Your Honor, there was -- a negotiation is

23   no different than negotiations that happen every single case

24   with a white collar defendant.  The government asked for

25   financials.  We provided them with financials.  The government

```
 1    asked for certain conditions relating to what would happen in

 2    the event that there was another lockdown, whether Mr. Walchli

 3    would have to come here in the event of a lockdown and sort of

 4    sit out any lockdown in the United States, or whether he could

 5    remain in Switzerland pending the resolution of a lockdown.

 6            THE COURT:  Let me just put it more bluntly.  Would

 7    the defense have necessarily accepted any set of conditions

 8    proposed by the United States?

 9            MR. TEMKIN:  Any reasonable set of conditions, yes.

10    In a white collar case in which the defendant has no prior

11    record, is voluntarily coming to face the charges, I think that

12    the package that we ultimately agreed upon was a reasonable

13    package. And there were no -- the only condition that was at

14    any time in question was whether Mr. Walchli would have to sit

15    here -- excuse the vernacular, cool his jets in the event of

16    another lockdown.  That was the only issue that caused any sort

17    of -- was a negotiated point.

18            And your Honor can see that we reached an agreement.

19    We reached an agreement relatively promptly, and Mr. Walchli is

20    of course here.  And in no point your Honor did we suggest

21    that, well, if you don't agree to this, he's not going to come.

22    That was never an issue.  So if the government had demanded a

23    $50 million bond or had made unreasonable requests, we may not

24    have been able to reach an agreement.  But if we hadn't reached

25    an agreement, we would have come to your Honor to pursue an
```

1    agreement.

2          And as I noted, your Honor, from October 15 of 2020,

3    when we made the initial offer, to October 5 of 2021, so 355

4    days, the government never asked us what conditions we were

5    thinking of.  And they could have done that without, in any

6    respect, disclosing that there was in fact an indictment if

7    that was their concern.  So if they thought that this was

8    somehow not a genuine offer, they could have explored that, but

9    they never did.

10          So, your Honor, the government argues that it was

11    entitled to keep the indictment sealed for a year after

12    Mr. Walchli's offer to come based on its purported desire to

13    arrest other defendants.  In this regard, it relies on the *Muse*

14    case and the *Davis* case.  The *Muse* case was the Second Circuit

15    case, and *Davis* I believe was Judge Haight.

16          And unlike *Muse* and *Davis*, here all of the

17    defendants -- and I think this is fairly undisputed.  This was

18    not a covert investigation.  This was not some sort of secret

19    concealed investigation.  Everyone knew that the government was

20    looking at the conduct that ultimately led to the indictment.

21    The conduct was first disclosed by Private Bank IHAG in

22    connection with its participation in the Swiss bank program.

23    It was publicly disclosed in the non-prosecution agreement that

24    the bank entered into with the department of justice.  It is

25    posted on the DOJ's website, and it was posted on the website

1   from 2015 forward.  Between June of 2014 and September of 2020,

2   the government had numerous contacts with lawyers for the bank,

3   lawyers for witnesses, actually met with a number of witnesses,

4   including one of the defendants. And perhaps most important in

5   terms of disclosure of the investigation, in the summer of

6   2017, the government filed requests for legal assistance with

7   the Swiss authorities.

8          And the significance of that, your Honor, is that

9   under the procedures and law governing such requests, the

10  defendants or the targets of the requests all receive notice.

11  So six of the seven individuals who were named in the

12  indictment were notified that the U.S. government was in fact

13  conducting an investigation, and was seeking evidence from the

14  Swiss authorities relating to that investigation.  So there was

15  no secret.  This was not a secret investigation.  And so we

16  because of that, this case falls more on the side of the

17  *Gigante* case, which was Judge Chin's case, and then the *Rogers*

18  case from Mississippi where the defendants were aware of the

19  pendency of an investigation, and the courts found that the

20  undermined the government's need to seal.

21         Now, we acknowledge that *Gigante* and Rogers were one

22  defendant cases.  But here, everyone of the defendants was

23  aware.  So this is not a situation where some defendants were

24  aware and others were not.  This is a case where everyone was

25  knowledgeable that there was an investigation pending.

1          THE COURT:  Is there evidence that the government was

2     aware that the defendants were aware?

3          MR. TEMKIN:  Well, your Honor, I know that at least as

4     early as June of 2014, the department of justice tax division

5     was aware that a number of the defendants were represented by

6     counsel, including that I was representing Mr. Walchli.  I

7     believe that certainly the government was aware and would have

8     been aware that by providing a request in legal assistance from

9     the Swiss authorities, that that would trigger notice to the

10    defendants of the pendency of the request for legal assistance.

11    So based on the sort of pendency of the investigation --

12         THE COURT:  Can I just ask a question.  My

13    understanding is from your submissions that you were not aware

14    that the defendant had been indicted at the time that you

15    reached out to the government.  Are you telling me that's not

16    the case?

17         MR. TEMKIN:  Was not aware that there was an

18    indictment pending.  I was aware that there was an

19    investigation.  I was aware that there was an investigation

20    starting in 2014, in connection with the Swiss bank program.

21    But when we contacted the department of justice, we were not

22    aware that an indictment had in fact been returned.  We were

23    aware that there had been certain steps taken in connection

24    with the investigation that led us to be sort of focused on the

25    possibility that there had been an indictment; hence the call

and hence the outreach.  But we were not aware that an

indictment had in fact been returned, let alone that it was

under seal.

            THE COURT:  Can I just probe that just out of

interest.  Mr. Walchli's role was what it was at the

institution.  You were aware of the fact that there was an

investigation or a *non pros* entered into with the institution.

How many levels down from the top of a company are supposed to

be aware that they are personally the target of a criminal

investigation as a result of the fact that the corporation has

entered into a *non pros*?

            So how far down does this, I'll call it, constructive

knowledge doctrine that you are promoting extend?

            MR. TEMKIN:  Certainly, your Honor.  To the extent

that the bank's counsel felt the need to identify -- to provide

counsel to an individual, that would certainly trigger one

level of knowledge.  So by virtue of the fact that we were

brought in and retained to represent Mr. Walchli, and the

government knew that.  So this is not a situation where you

have some third, fourth tier employee who is represented by

counsel, and the government is unaware of it.

            The government's aware that we are representing

Mr. Walchli.  And moreover, in connection with the request for

legal assistance, the government would be aware that

Mr. Walchli was notified of that; and so therefore should have

1    been aware that he knew that there was an investigation

2    pending.  So it's not -- it's not constructive knowledge just

3    in a vacuum, your Honor.  It's constructive knowledge in the

4    context of the government being told that this is an individual

5    who is represented, and the government subsequently making a

6    request of the Swiss authorities that causes the Swiss

7    authorities to notify Mr. Walchli that there is a pending

8    investigation.

9            THE COURT:  Thank you.  How does that argument extend

10   to the other defendants named in the indictment?

11           MR. TEMKIN:  Well, with respect to I believe all of

12   the individuals in the indictment other than one, I believe it

13   was Mr. Bechtiger, all of the remaining defendants were named

14   in the Swiss treaty request, the request for legal assistance.

15   I believe that the government was aware that Mr. Lampert,

16   Mr. Ruegg, and Mr. Schnellman were all aware of the

17   investigation.  And Mr. Sage was also identified in the treaty

18   request, so I believe that all but one of the defendants --

19   that would apply to all but one of the defendants.

20           THE COURT:  Thank you.  You can proceed.

21           MR. TEMKIN:  So based on sort of their awareness of

22   the investigation, defendants had an incentive not to travel

23   outside of Switzerland if they were so inclined to do.

24   Obviously everyone has a different risk tolerance.  Everyone

25   has a different willingness to come and face the charges.

1          Mr. Walchli obviously has made clear that he was

2   willing to face the charges and is here doing so.  But in our

3   reply papers, we noted that there were press reports as early

4   as 2012 in the Swiss press that people were -- bankers,

5   executives were being cautioned not to travel outside of

6   Switzerland.  So the notion that this goes to whether the

7   government reasonably could believe that people who were aware

8   that they specifically were under investigation would travel

9   outside of Switzerland and put themselves in a position where

10  they could be arrested and extradited.

11         And so given the public nature of the investigation,

12  given the notice that was provided to the defendants, and given

13  just the general cautions against travel, we submit that it was

14  not reasonable for the government to keep an indictment under

15  seal in the face of a specific offer by one of the defendants

16  to come to the United States to face the charges.

17         And when Mr. Lampert is arrested in February of 2021,

18  that sort of, that calculus becomes even more remote.  Now,

19  we've gone back and forth with the government over who knew of

20  Mr. Lampert's arrest, and when they knew it.  But quite

21  frankly, the government's position that there was no press

22  surrounding the arrest of Mr. Lampert; and so, therefore, it

23  had successfully kept that confidential.  They had no way of

24  knowing whether individuals in Switzerland were aware of it.

25  They had no way of knowing whether Mr. Lampert contacted some

1    of his co-defendants and said, by the way, I was arrested.

2    They could not have any assurances that that did not happen.

3    And so, as a matter of fact, as your Honor knows, as a

4    matter of fact, we did know that. But whether we knew or we

5    didn't know is almost irrelevant. The point is, is that the

6    government in assessing whether it is reasonable to keep the

7    indictment under seal at that point, whether they are making a

8    prosecutorial -- exercising their prosecutorial discretion in

9    saying, Wait, we can still capture other people. The question

10    is, is whether they were justified in keeping the indictment

11    under seal at that point.

12    And so we would ask that in assessing sort of the

13    reasonableness of the government's delay in unsealing the

14    indictment, and whether that served a legitimate prosecutorial

15    purpose, we think that the Court should consider three things:

16    First, the options that were available to the government.

17    Second, what the government did in fact to effectuate the

18    arrest of one of Mr. Walchli's co-defendants. And third,

19    whether disclosing the information to Mr. Walchli or disclosing

20    the fact that Mr. Walchli had been charged would have

21    materially affected the government's ability to get other

22    defendants.

23    With respect to the options that were available to the

24    government -- there are really four that they had. One is,

25    they could have unsealed the indictment in its entirety. I

1  note that they did that in other significant Swiss bank related

2  cases.  They did that in the *Paltzer* and *Buck* case that was

3  tried in this district.  They did that in the *Adami* case that

4  was prosecuted in the Eastern District of Virginia, and they

5  did that in the *Raoul Weil* case that was prosecuted in the

6  Southern District of Florida.  In each of those cases, the

7  indictment was either never filed under seal or was unsealed

8  within days of having been filed.  And in none of those cases

9  were the defendants present in the United States at the time.

10  They were all, as far as I understand it, based in Switzerland

11  and remained in Switzerland for some time until they

12  subsequently came to the United States to face charges.

13       But there is no mandate that the government file such

14  an indictment under seal.  And, in fact, in high profile cases,

15  they have done the opposite.  They filed the indictment

16  publicly, and they filed press releases related to that.

17       The second alternative that was available to the

18  government would have been to at the time the indictments were

19  returned to essentially obtain one overarching indictment, and

20  then a separate indictment in which it charged each of the six

21  defendants.  That is actually a course that the government took

22  in the Panama Papers case, *United States v. Ramses Owens*.  And

23  they also took that course in the *OneCoin* cryptocurrency

24  prosecution in this district.

25       A third option that was available to the government

1     upon Mr. Walchli's offer to surrender and come to the United

2     States would have been to do what it did with Mr. Lampert,

3     quite frankly, with far less justification or reason with

4     respect to Mr. Lampert.  But they could have obtained a limited

5     unsealing order, provided Mr. Albert and myself with a copy of

6     the indictment subject to restrictions, and allowed us to start

7     preparing a defense.  But they could have notified us that

8     there was in fact an indictment pending. That's that what they

9     did with Mr. Lampert.

10            And as your Honor knows from our papers, Mr. Lampert's

11    situation in February of 2021, is virtually identical to

12    Mr. Walchli's situation in October of 2020, except for the fact

13    that Mr. Walchli actually offered to come here.  If the

14    government really wanted to have a defendant to put on trial,

15    Mr. Walchli was ready, willing, and able to do that, and they

16    decided not to take him up on that offer.  That was their

17    decision, but they can't then say, but we're justified in

18    keeping the indictment under seal.

19            Finally, the government could have, as it did with

20    Mr. Chin, proceeded under seal in this case.  Obviously at some

21    point that becomes untenable, but we're now over two years

22    after we initially reached out to the government to make the

23    offer to come.  And so at what point in that two-year period

24    unsealing would have been necessary is unclear, but certainly

25    there was no reason why it could not have at least in the

1    initial stages sealed the indictment, and again allowed us to

2    begin litigating this case so that we're not two years down the

3    road and just now arguing motions.

4              The government chose not to do any of those things.

5    It chose basically to keep our offer that Mr. Walchli come to

6    the United States to face the charges in its back pocket in the

7    hopes that it might obtain some other defendant in the interim.

8    That's a choice the government made.  But having made that

9    choice, it cannot now say they're justified in keeping the

10   indictment under seal as Mr. Walchli.  As to the others,

11   they're not my problem.  But Mr. Walchli, they have a different

12   issue.

13             The next sort of point that I wanted to make was that

14   when you look at what the government did with respect to

15   obtaining the arrest of the different co-defendants.  The only

16   concrete step that the government identifies that it did, was

17   it lodged the arrest warrants with Interpol.   And

18   interestingly, at the time that we called the government and

19   made the offer, Interpol had not even published the warrants,

20   and it did not do so for another three or so months after that.

21   So I don't pretend to know all the steps the government took

22   covertly to try to obtain the presence of other defendants, but

23   certainly the only step they kept pointing to in this court is

24   the filing of the Interpol notice.

25             And that, quite frankly, when you're dealing with

1    defendants who are in countries from which they cannot be

2    extradited, and are aware that they are under investigation,

3    it's not really doing a lot to try to actually get defendants

4    into the country.

5         And that sort of goes to my next point which is, the

6    government's decision to keep the indictment under seal was not

7    based on some assessment of the likelihood that they would in

8    fact be able to get someone, one of the other defendants,

9    arrest them and extradite them.  And, of course, your Honor's

10   aware that extradition can frequently can be a years-long

11   process.  But it's not that there was some likelihood that that

12   would happen, it was really hope and speculation that it might

13   happen.

14        And again, in light of the public nature of the

15   investigation, in light of the sort of press reports in

16   Switzerland, there was just no basis to have that hope and

17   speculation that, in fact, one of these defendants would come.

18   Now, the government obviously points to the fact that they were

19   able to arrest Mr. Lampert and Mr. Ruegg, and they argue that

20   that justifies keeping the indictment under seal.

21        The first thing is, is that you have to assess the

22   decision to keep the indictment under seal at the time that it

23   was made, not with hindsight.  So the government looks and

24   says, looks with hindsight and says, Aha, we were able to

25   arrest Lampert, and we were able to arrest Ruegg, and so

1    therefore that justifies our decision.

2            The question is, is whether at the time that they

3    passed on our offer to bring Mr. Walchli to the United States,

4    whether that was a reasonable judgment, and at that time

5    obviously they had no way to know that they would be able to

6    arrest Mr. Lampert and Mr. Ruegg.

7            Second, Mr. Lampert was, of course, arrested in a

8    country from which he could not be extradited.  And so the fact

9    that he traveled outside of Switzerland to a country from which

10   he could not be extradited does not support the government's

11   conclusion that, in fact, that they were justified in keeping

12   the indictment sealed.

13           Similarly, the fact that Mr. Ruegg left Switzerland in

14   the summer of 2021, all that means is that he was prepared at

15   that point to take the risk associated with traveling,

16   notwithstanding an awareness that he was under investigation.

17   Of course the government did not obtain his extradition to this

18   day, two years after Mr. Walchli made the offer to come to the

19   United States, over two years after that.  He remains the only

20   defendant who the government has actually in hand, is able to

21   bring to this Court.  And so the fact that Mr. Ruegg ventured

22   outside of Switzerland would only help the government if in

23   fact number one, they had reason to think he would in fact do

24   that, not speculation or hope that he would get cabin fever

25   from Covid; but rather a reason to believe that they would in

1    fact be able to get someone.  And two, to be able to arrest

2    someone doesn't mean anything if you can't extradite them.

3          So, your Honor, for all those reasons we think that

4    the government was tardy in unsealing the indictment, that it's

5    not entitled to the tolling after October 15 of 2020, or

6    certainly February 1 of 2021.  And without that tolling, the

7    statute of limitations has expired, and the case should be

8    dismissed, and in fact must be dismissed.

9          THE COURT:  Good.  Thank you.  You can proceed,

10   counsel.

11         MR. TEMKIN:  Thank you, your Honor.

12         MR. ALBERT:  Good afternoon, your Honor.

13         I'm going to address our arguments regarding

14   extraterritoriality and the *Klein* doctrine.  Your Honor, it's

15   undisputed that all of the defendants actions alleged in the

16   indictment took place outside the United States, every single

17   meeting, communication, act by the defendants took place in

18   Europe or Asia; yet the government is trying to convict

19   Mr. Walchli and these other foreign defendants for their

20   foreign actions under the broad defraud prong of 18 U.S.C.

21   Section 371.

22         The indictment in this case cannot be squared with the

23   Supreme Court's and the Second Circuit's modern

24   extraterritoriality case law.  Now, first the government argues

25   incorrectly that this Court doesn't have to apply the two-step

1    framework of *RJR Nabisco* to resolve extraterritoriality in this

2    case because it relies on *Bowman*.

3        But over the last 13 years, your Honor, the Supreme

4    Court has reiterated on multiple occasions that the presumption

5    against extraterritoriality applies to all federal statutes.

6    And has, as one court has characterized it, has said that with

7    increased clarity and emphasis in recent years.  So in line

8    with those holdings, the Second Circuit has applied the

9    presumption against extraterritoriality and the two-step

10   framework of *RJR* in both criminal and civil cases, criminal and

11   civil statutes.  The argument that *Bowman* creates a carve out

12   for statutes that protect the U.S. government is incorrect for

13   a couple of reasons.

14       First of all, as we say in our briefs, your Honor, the

15   *Bowman* opinion doesn't stand for that far reaching proposal.

16   And the government's broad reading of *Bowman* just hasn't

17   survived the day.  *RJR*, the Supreme Court's decisions in RJR

18   and *Kiobel* and *Morrison* make very clear that the presumption

19   has to be applied in every case.  And one thing, one case that

20   sort of I think addresses this pretty cleanly is

21   *United States v. Garcia Sot*a, which is a 2020 D.C. Circuit

22   case, and that addressed a statute that is unquestionably aimed

23   at protecting the right of the government to defend itself.

24   It's one of those statutes.  It's 18 U.S.C. 1114, which is a

25   statute dealing with the killing of an officer, an employee of

1    the United States.

2    And the court explained that the court did not apply

3    the *Bowman* rule that the government is arguing for here,

4    explained that that broad rule that is being argued for here

5    would render almost all of the discussion in the *Bowman* case

6    itself as surplusage, and would purport to rebut the

7    presumption against extraterritoriality in broad swaths of the

8    U.S. Code.  And in that case, the D.C. Circuit ruled that

9    *Bowman* -- the court rejected the argument that it shouldn't

10    apply the presumption, and ruled that there was no permissible

11    domestic application of the statute and overturned the

12    conviction under 114.  So I think analytically that's kind of

13    the squarest one that shows that the government's *Bowman*

14    argument is not right.

15    And in the Second Circuit, since *RJR* in particular, I

16    think that there was -- there's been a gradual recognition of

17    the dominance of this framework.  But really since *RJR* in March

18    of '16 the Second Circuit has applied the two-step framework

19    both in civil and criminal cases, and the government cannot

20    cite a single Appellate decision that's issued after *RJR* that

21    supports its position that *Bowman* overrides the modern

22    framework.

23    THE COURT:  Let me just ask you the question.  Is

24    there a substantive difference between *RJR* and *Morrison* in

25    terms of what the Supreme Court has said the test is?

1          MR. ALBERT:  Your Honor, I don't know that there is,

2     but I think having lived through it, people thought, well,

3     *Morrison* is very -- it's a securities laws, that's always been

4     a weird animal.  In *Morrison* the Supreme Court was really

5     dealing with a big doctrine in the Second Circuit that it found

6     to be very amorphous.  And it was just not so clear, even

7     though the language of it, your Honor, I think the language of

8     it said, it applies in all cases.  It was a strongly written

9     decision by Justice Scalera in his customary way, but not

10    everybody fully accepted that it meant all statutes.  And it

11    was the subsequent decisions, like *RJR* that really underscored

12    it.  So for a couple of years, you see some cases, including in

13    this circuit, where the court was less sure.

14         And there are some district court decisions that say,

15    well, it's not so clear if this applies to criminal cases.  But

16    over the years, that doubt has been erased by the Supreme Court

17    and by the Second Circuit.  I mean, I could talk about some of

18    those cases, but I think the reality is that the language was

19    clear and blunt in *Morrison*, but it wasn't so clear to the

20    observing world, lawyers and judges, that it cut as broadly as

21    it does.

22         So, your Honor, just turning to the application of the

23    rule.  The conduct alleged in this indictment is impermissibly

24    extraterritoriality.  At step one, I don't think there's a lot

25    of dispute at step one under the analysis.  You look to see

1    whether the statute gives a clear affirmative indication that

2    applies extraterritorially.  Section 371 doesn't.  The

3    government doesn't argue otherwise.  We move to step two.

4         Step two, the first step of step two is, look at

5    what's the focus.  We're determining whether this is a domestic

6    application.  What's the focus, and then did the conduct that

7    relates to the focus take place in the United States.  Now, if

8    you look at page 23 of the government's brief, and the

9    government can speak to this, but I look at page 23 of

10   government's brief.  And they say they accept there that the

11   focus of 371 is to prevent acts of deceit, craft and trickery

12   that impede the IRS, but the focus is deceit, craft and

13   trickery.

14        All of those, all of the acts of deceit, craft and

15   trickery, all the deceptive conduct in this case, as well as

16   the conspiratorial agreement itself took place outside of the

17   United States.  None of the defendants lived in the U.S. or was

18   a U.S. citizen.  None of the defendants are alleged to have

19   traveled to the U.S. as part of the conspiracy, not one meeting

20   is alleged to have occurred in the United States, not a single

21   email relating to the scheme or otherwise is claimed to have

22   been sent to the United States.  The nimiety entities and bank

23   accounts that were allegedly created to further the conspiracy,

24   none of them were based in the United States.  The round trips

25   of funds were from Switzerland, between Switzerland, Hong Kong

1    and Singapore, and every single overt act in the indictment.

2         So the government argues based on domestic events, the

3    government's argument on this is based on domestic events that

4    are not within the focus of the statute.  Particularly the

5    government's relying on the acts of the taxpayers, tax filings.

6    They also talk about carrying cash and limited financial

7    contacts with the United States.

8         With regard to the clients.  The government chose to

9    charge this case in a particular way, which is *Klein*, and it's

10   not -- they chose not to file it, as they have in many other

11   cases, as a conspiracy to file false tax returns or to evade

12   taxes.  If it had done that, then the actions of filing a false

13   tax return or evading taxes would very likely have fallen

14   within the focus of the statute, and they would have that

15   domestic application, but they did not.  They chose to

16   indictment this case as a *Klein* conspiracy.  And it wasn't an

17   accident.  I mean, I can't believe that it was an accident,

18   because they get a benefit from that.  And the benefit is that

19   it draws the focus onto the defendants, who are in Switzerland

20   and traveling in Asia, and away from the taxpayers.

21        But it cabins -- and, your Honor, the government has

22   lost these kinds of cases by charging conspiracy to evade taxes

23   or conspiracy to file false tax returns.  The perception has

24   been because the argument is, these Swiss bankers are worrying

25   about their obligation in Switzerland under Swiss law, the

1    obligation to file taxes is the American taxpayers. That's not

2    the Swiss people's obligation.

3            The focus of those cases when you charge it in the way

4    that pulls it to America, sufficiently to make it a domestic

5    application, you suffer the detriment of putting focus on the

6    American taxpayers, which the government I believe charged the

7    way it did to avoid that.  And that puts it in this position of

8    other cases where like *Prime International* and *Laydon* where the

9    deceptive conduct happens all overseas, but there's perhaps an

10   impact in the United States.  Those cases, *Laydon* and *Prime*

11   *International* are good examples where the court focuses on the

12   conduct that's relevant to the focus of the statute and says,

13   There is some incidental effects in the U.S.  There's

14   incidental conduct in the U.S., but the focus conduct is

15   overseas, and so it's not a domestic application.

16           As your Honor probably -- your Honor focused on the

17   language of *Morrison*.  There's that memorable phrase that the

18   presumption would be a Craven Watchdog indeed if it retreated

19   into its kennel anytime there's any contact with the U.S.

20   There's always going to be some contact with the U.S.  The

21   question is, Is it conduct related to the focus of the statute,

22   and it is not here.  The contacts at issue, the financial

23   contacts and the bank account transfers are really outside the

24   focus.  They're not the deceptive conduct.

25           And on that, it's important to, I think, distinguish

1    between a wire fraud case, which would be *Napout*, or a

2    sanctions case, which is the district court case *Zarrab* where

3    the wires -- the Second Circuit has ruled that the use of the

4    wires is the focus of the wire fraud statute.  And in *Zarrab*,

5    it's a sanctions case, moving monies into or through the United

6    States is the heart of the violation.  Here, the heart of the

7    violation is the deceptive conduct and it's all overseas.

8         I just want to point out, your Honor, to bring this

9    toward the conclusion that the problems of the *Klein* doctrine

10   itself sort of exacerbate -- they're exacerbated in this case

11   where there's extraterritoriality problems because *Klein* is

12   really a common law crime.  And there's no -- you can't do the

13   kind of analysis of Congress's intent as to extraterritoriality

14   that you'd like to do, because the whole doctrine is really

15   pretty well-unmoored from the statute.  I think *Klein* is an

16   example of a doctrine that like your Honor maybe followed the

17   *Ciminelli* case that was just argued in the Supreme Court,

18   Second Circuit's longstanding right to control theory, which is

19   an expansion of the concept of defraud.  It's going to lose

20   nine nothing in the Supreme Court.

21        *Klein* has maybe a longer pedigree than right to

22   control, but it is an old fashion broad expansion of the

23   concept of defraud.  The Second Circuit in the *Coplan* case

24   really sort of presaged that it's a very problematic doctrine.

25   It should not be expanded, and we should not be talking

1    about -- it should not be expanded in this case, and we should

2    not be talking about doing what Congress would have wanted with

3    this doctrine that it really did not create.

4            THE COURT:  Good.  Thank you very much, counsel.

5            Let me hear from counsel for defendant regarding what

6    I'll describe as bucket three.  Please, proceed.

7            MR. TEMKIN:  Thank you, your Honor.

8            Very, very briefly.  We have asked -- the pretrial

9    disclosure aspect of the motion deals with two points.  One is

10   a bill of particulars regarding co-conspirators, identifying

11   unindicted co-conspirators.  And the second is the timing and

12   sequence of pretrial exchanges of witness list and 3500

13   material and impeachment material, etc.

14           With respect to the bill of particulars.  Many, many

15   cases, defense lawyers send the government 15-page letters

16   requesting all sorts of particulars.  Tell me when my client

17   did this, and identify each and every instance in which my

18   client -- in which the conspiracy engaged in any overt act or

19   anything.  I will admit to being guilty of submitting such

20   requests for particulars.  We did not do that in this case.

21           In this case we asked for one thing, a list of

22   unindicted co-conspirators.  And the Second Circuit -- I'm

23   sorry, the Southern District, Judge Scheindlin's decision in

24   *Akami* sets forth the six factors that generally apply and

25   agreed upon as to when such particulars are appropriate.

1          Number one -- we go through the factors.  The first is

2     the number of co-conspirators that could possibly exist.  Now,

3     there are dozens in this case.  We go through the discovery,

4     there are dozens and dozens of names.

5          Second is the duration and breadth of the alleged

6     conspiracy.  The indictment charges a conspiracy that extended

7     for six years and included, I believe it's about five

8     companies.  The third factor is whether the government has

9     provided, otherwise provided adequate notice of the

10    particulars.  The indictment, unlike virtually any other

11    indictment I've seen in this district, this indictment does not

12    identify a single unindicted co-conspirator.  In fact, we're

13    somewhat surprised when the government responded to our

14    extraterritoriality motion by saying, Well, the taxpayers are

15    unindicted co-conspirators.

16         Well, that's not in the indictment.  They're referred

17    to as client-1, client-2, not a co-conspirator not named as a

18    defendant herein.  And Mr. Albert addressed why that is, and

19    quite frankly it's because each of those clients, two of the

20    three clients participated in the voluntary disclosure program.

21    And the government and the IRS in its wisdom decided that they

22    would not be prosecuted, that they would be given immunity from

23    prosecution by virtue of their participation in the voluntary

24    disclosure program.  So the government did not provide

25    adequate -- otherwise provide adequate notice of the identity

1   of the co-conspirators.

2           The volume of the pretrial discovery. We have 24,000

3   documents, 171,000 pages. Quite frankly, the discovery doesn't

4   say which of the individuals identified on page 522 of document

5   20,000. It doesn't say, Oh, that individual is a non-indicted

6   co-conspirator. The discovery doesn't reveal whether the

7   government is going to claim at trial that an individual is an

8   unindicted co-conspirator. Potential danger to

9   co-conspirators. If the government were to make such

10  disclosure, no allegation of that, no suggestion of that. This

11  is a white collar case. There's no indication that there's any

12  fear that someone would be in danger.

13          And finally, the potential harm to the government's

14  investigation. The investigation here started in 2014. The

15  conduct. The government's last overt act occurred in October

16  of 2014. It is impossible to envision any prejudice that the

17  government could suffer if eight years, coming on nine years

18  after the investigation started it were required to land and

19  tell us who it believes are unindicted co-conspirators.

20          Now in response to our motion, the government sort of

21  does the general boiler point in terms of you don't get the

22  whens, wheres and with whoms. But interestingly, two of the

23  cases the government cites, both *Feola* and *Cohen*, while denying

24  certain particulars, in fact grants the particulars that we're

25  seeking, which is the list of unindicted co-conspirators. So,

1    your Honor, we would ask that your Honor direct the government

2    to provide such particulars.

3         With respect to disclosure of trial materials.  In

4    relatively complicated white collar cases, government

5    frequently agrees and the court frequently orders the

6    government to provide witness list, 3500 material, exhibit

7    list, exhibits, and impeachment material in advance of trial,

8    significantly in advance of trial.  And the government is

9    right, there is no legal mandate that it provide 3500 material

10   in advance.  There is a legal mandate that it provide

11   impeachment material with sufficient advance notice so that we

12   will be able to make use of it.

13        And part of the problem here is, is that we suspect

14   that many of the government witnesses will be from outside the

15   United States.  Which means that if we get some information on

16   the eve of trial, we now need to hire investigators in

17   Switzerland or in Singapore or in Hong Kong to try to explore

18   and make use of the information that we get from the

19   government.  And so sort of waiting until the eleventh hour to

20   provide that information, while it might be all well and good

21   in a simple one week narcotics case where there's reason to be

22   concerned that there might be some risk or danger to witnesses,

23   this is a different animal.  And if we're going to be able to

24   make use of the materials, we're going to need some advance

25   notice.

1          With respect to exhibits.  Like I just said, we have

2     24,000 documents.  I don't know which one of those 24,000 the

3     government intends to offer at trial, and we shouldn't be in a

4     position where we're sitting here just before trial and trying

5     to guess.  Now we ask for 60 days in advance of the motion *in*

6     *limine* date.  And the reason why we did that is, is if we're

7     going to make meaningful motions *in limine* addressed to the

8     government exhibits, we need to know what those exhibits are.

9          Now, if your Honor is not going to hold us to the

10    motion *in limine* date, then 60 days before trial, we would ask

11    for that.  But we do think that we need the materials in

12    advance of -- sufficiently in advance of our deadlines for

13    making motions addressed to documents and witnesses so that we

14    can actually make meaningful motions to your Honor.  What I

15    really don't want to do is draft motions sort of guessing,

16    Well, the government might offer this and it might offer that,

17    and devote hundreds of hours of our time to preparing motions

18    and then have the government say, Well, we're not planning to

19    offer that document.  That would be quite frankly gamesmanship

20    to an inappropriate level.

21          Finally, your Honor, when we initially spoke with the

22    government about this issue, the government had suggested

23    simultaneous exchange.  And as we've written to your Honor,

24    both because of the burden of proof and the sequence in which

25    evidence is presented at trial, we think simultaneous

1    disclosure is inappropriate, and that it should be staggered

2    with the government going first, and then our providing our

3    disclosures after the government provides its.

4           THE COURT:  Thank you very much.

5           Counsel for the United States, I've heard from the

6    defense.  I'm happy to hear from you with respect to any of the

7    issues raised.  I have some questions for you, but I'm happy to

8    hear any argument that you wish to present to the Court, either

9    to respond to the arguments presented by counsel for defendant

10   or to add to or amplify points that were made in your briefing.

11   Counsel.

12          MS. DAVIS:  Your Honor, with the Court's permission,

13   I'll address the statute of limitations argument.  Mr. Magnani

14   is planning to address the extraterritoriality argument, and

15   Mr. Zverovich the discovery part.

16          THE COURT:  That's fine.  Please proceed.

17          MS. DAVIS:  Your Honor, as the defendant has said,

18   they don't contest the legitimacy of the government's initial

19   sealing of the indictment.  And I should have mentioned, I

20   prefer to keep my mask on.  But if it's too difficult for the

21   Court to hear me, I'm happy to take it off.

22          THE COURT:  Thank you. I don't mind if you leave it on

23   if you feel more comfortable, please just bring the microphone

24   as close to your face as possible so that the court reporter

25   and I can hear you clearly.

1        MS. DAVIS:  Yes, your Honor.

2        THE COURT:  Thank you.

3        MS. DAVIS:  The defense, however, is challenging the

4   government's continued sealing of the indictment while it tried

5   to effectuate the arrest of the offshore defendants.  There is

6   no dispute that the government cannot extradite defendants from

7   Switzerland on criminal tax charges.  And as the government

8   pointed out in its briefing, while there is on paper an

9   extradition treaty between the United States and Hong Kong

10  where Defendant Sage lives, the extradition treaty has in fact

11  been suspended; and therefore the government is unable to take

12  advantage of that with respect to Defendant Sage.  So the

13  government after it sealed the indictment initially was in a

14  position where the only reasonable chance to arrest the

15  defendants was if they chose to travel.

16       Now, the defense argument that the conversation in

17  which Mr. Temkin and Mr. Albert offered to have Mr. Walchli

18  come to the United States to face charges if there's a

19  reasonable bail package simply cannot be a trigger for

20  requiring the unsealing of an indictment.  Essentially what

21  that means is that any defense counsel, all they would have to

22  do is have that conversation, and the whole sealing and arrest

23  regime that has existed for many, many years would essentially

24  fall to the wayside.

25       Here, the Second Circuit forecloses in fact the

1    defendant's argument because the Second Circuit has held in

2    *Watson* and in *Muse* that it is permissible, even if one

3    defendant is available to be arrested, that the government may

4    seal the indictment to attempt to effectuate the arrest of

5    other defendants.  And that's exactly what we tried to do here,

6    your Honor, through the use of Interpol Red Notices, which is

7    the typical way that the government can seek the arrest of

8    offshore defendants.

9         And, in fact, the government -- the calculus of the

10   government that perhaps there might be travel by defendants,

11   especially in light of easing of Covid restrictions, the

12   reopening of borders, the rise of vaccine usage, the government

13   in fact was correct in its assessment.  Now, the defense has

14   suggested that the governments was unreasonable in continuing

15   to seal the indictment in light of the purported awareness of

16   the investigation, but we saw with the arrest of Defendant

17   Lampert, and the arrest of Defendant Ruegg that there are in

18   fact different risk tolerances; that it was worth the effort to

19   unseal in order to try to arrest.  The fact that we were

20   ultimately unsuccessful in getting the extradition of those

21   defendants is of no moment, your Honor.

22        The question is whether at the time we sealed and

23   continued the sealing of the indictment, that was a reasonable

24   choice of the government.  Courts have recognized that the

25   government has an interest, a legitimate prosecutorial interest

1   in arresting defendants who are indicted.  And I would say,

2   your Honor, in this particular case, I suppose we could have

3   indicted and then unsealed as the defense counsel has

4   suggested.  But that's essentially throwing up our hands and

5   saying, Hey, we're okay with these guys staying in Switzerland

6   for the rest of their lives and not coming to the U.S. to face

7   charges.  Other prosecution teams have made that choice.  We

8   chose to try to see if we could arrest them. That's a

9   completely legitimate and reasonable choice by the government,

10  and proper exercise of prosecutorial discretion.

11          The defense, in fact, cites no case that the mere

12  offer by a defense counsel for a client to come to face charges

13  should, as a matter of law, trigger the unsealing of an

14  indictment, and it really doesn't make any sense when you think

15  about it, your Honor, for that to be the governing law would

16  essentially render the whole unsealing and arrest process a

17  nullity.

18          The fact of Mr. Lampert's arrest in February of 2021,

19  doesn't change that calculus.  First of all, the only defendant

20  besides Mr. Lampert of whom we have evidence that they knew of

21  that arrest was Defendant Walchli based on Mr. Temkin's

22  declaration.  As we sit here today, I don't know and the

23  defendant hasn't offered any evidence that any of the other

24  defendants knew of that arrest.  And, in fact, there is a

25  suggestion to the contrary.  And how do we know that, because

1    Defendant Ruegg who was, in fact, still an employee of IHAG at

2    the time that he traveled in the summer of 2021, left

3    Switzerland, went to Spain, got arrested.

4              The fact that he jumped bail and absconded back to

5    Switzerland doesn't negate the fact that in fact the

6    government's calculus was reasonable.  We were able to arrest

7    him.  And, frankly, I believe he would have been extradited had

8    he not jump bail and returned to Switzerland.  And in fact

9    hereto, the defense points to no case law that says that the

10   arrest of one defendant mandates that the indictment be

11   unsealed.  Here, at the time of Lampert's arrest, it was a

12   situation of uncertainty.  The fact that we do not have an

13   extradition treaty with a country does not necessarily mean

14   that a defendant will not be returned to the U.S. to face

15   charges.  There are ways other than formal extradition that

16   countries sometimes agree to provide assistance to the United

17   States.

18             But I think that the question, your Honor, is whether

19   the government had a legitimate interest in trying to

20   effectuate the arrest.  The Second Circuit has recognized the

21   legitimacy of that interest.  And as soon as it became clear

22   that there had been publicity about the case, and it became

23   clear that a continued sealing would not be effectual, we moved

24   to unseal the indictment.  It was five and a half months after

25   the expiration of the statute of limitations period.

1

2          I don't think the Court need to address what the outer

3     limit or what the line drawing would be.  I think it's

4     sufficient to find that, as the Second Circuit has recognized,

5     it is a legitimate purpose for the government to try to seek

6     the arrest of co-defendants, even if you have one defendant

7     willing and able to be arrested.  I don't think that the

8     government should be in a position, especially with these

9     offshore defendants, where essentially you can indict, but you

10    can't try reasonably to arrest them.

11         The *Gigante* case and the *Rogers* case that the

12    defendant cite actually don't help the defendant.  They're

13    single defendant cases, not multi-defendant cases.  And in both

14    of those cases, the proffered reason for the sealing was

15    obviously not to effectuate the arrest of co-defendants, but to

16    continue on with the respective investigations, which the

17    respective courts found was not a sufficient reason to seal the

18    indictment.  And in fact, the *Gigante* case itself acknowledges

19    and recognizes that the *Watson* case stands for the proposition

20    that the government may seal an indictment to avoid tipping off

21    other defendants about the existence of an indictment in order

22    to try to effectuate arrest.

23         And importantly, your Honor, at no time, either in the

24    briefing or in their argument has the defendant articulated one

25    iota of prejudice that was suffered by the defendant during the

1    period of sealing.  And that's important because the *Watson*

2    case acknowledge and stated that if there is a situation of

3    actual prejudice suffered by the defendant, then that can

4    obviate the government's legitimate need for sealing, but

5    that's not what we have here.  There's been no assertion of any

6    sort of prejudice.  And I understand you may have questions,

7    happy to entertain whatever question you might have, your

8    Honor.

9            THE COURT:  Thank you.  That's fine.  I'll hear next

10   regarding the issue of the applicability of *Klein* and the

11   extraterritoriality application of it.

12           MR. MAGNANI:  Your Honor, I prefer to take my mask off

13   if that's okay.

14           THE COURT:  That's fine.

15           MR. MAGNANI:  Christopher Magnani for the United

16   States.  Good afternoon, your Honor.  It's nice to meet you.

17   This is the defendant's motion.  And in the defendant's motion,

18   he's asking for what the Court has described as an

19   extraordinary remedy that's limited to extremely unusual

20   circumstances.  And he's asked for that without any case law

21   that binds the Court to give the relief that he seeks.

22           So while not styled this way, the government's

23   construing this as a 12(b)(3)(B) motion, a motion to dismiss

24   for failure to state a claim, which both of the two arguments

25   relating to *Klein* apply to.  In other words, that an offense is

1   not pleaded in the indictment.  And there's three things that

2   the defense is asking this Court to do, none of which are

3   precedented, or none of which appear precedented, or which the

4   defendant's paper cannot cite a precedent.

5       The first thing is the defendant is asking this Court

6   to hold that a conspiracy to defraud the United States, a *Klein*

7   conspiracy, or what we sometimes call a defraud prong

8   conspiracy, that that offense does not apply

9   extraterritorially.  No court has held that.  The defendant is

10  then asking this Court to move onto what it says is step two of

11  *Nabisco*, and to make rulings that, one, the focus of the *Klein*

12  status -- which again no court has said what the focus is.

13  Mr. Albert said that we agreed with what they described it as,

14  which is something about deceit, craft or trickery.  I don't

15  think it's fair to say we agree, but we sort of assumed

16  arguendo because no court has grappled with determining what

17  the focus of the statute is, which inquires the Court to look

18  into what the Supreme Court calls, The object of its

19  solicitude, and it's pretty in the weeds, and the Court need

20  not decide that.

21      The third thing which is unprecedented which the

22  defendant is asking this Court to do is to dismiss an

23  indictment based on the fact that the indictments allegations

24  are not detailed enough and do not allege a sufficient enough

25  domestic nexus.  There's no case that the defense has cited

1    that show the court doing exactly that.  Civil cases are a

2    little different than criminal cases.  So in civil cases, a lot

3    of times things are decided on the pleadings, but most of the

4    cases that are cited here -- and there are some motion to

5    dismiss cases cited here, but most of theme are related to

6    appeals after there's been a trail, and the court can determine

7    whether or not there's sufficient evidence of a domestic nexus.

8         Now your Honor invited us to talk about things --

9    because the Court's of course aware of our arguments in the

10   filings.  And so I do want to just focus on the things that

11   either were not really emphasized in our opposition for the

12   Court.  And the first -- and this is going to be good news for

13   everybody is, I actually don't think this argument over whether

14   *RJR* applies is of any moment.

15        Now, the United States has argued that *Bowman*

16   basically creates an exception; in other words, an exception to

17   the normal application of the presumption against

18   extraterritoriality application of the law.  And the reason why

19   the United States framed it that way is because that's the way

20   *Bowman* itself phrased it, and that's the way the Second Circuit

21   phrased it in *Vilar*.  But now that, as defense points out, the

22   Second Circuit has done the Nabisco -- or the *RJR Nabisco* two

23   step in criminal cases, we don't have an issue with that.

24        But what we would say is that, to the extent that

25   that's the way the Court wants to analyze it, we would say that

1    when it comes to *Bowman* type offenses -- in other words, *Bowman*

2    distinguishes between two types of crimes, crimes against

3    persons and property, and crimes that, among other things,

4    include the right of the government to defend itself.  And I'm

5    going to refer those as *Bowman* type crimes.  With *Bowman* type

6    crimes, we would say the first step has past.  In other words,

7    there's a clear indication --

8            THE COURT:  Let me just pause you.  I'm not sure that

9    your argument is on all fours with what you wrote in your

10   briefing.  My understanding of the government's argument is

11   that, what you're describing now as *Bowman* type crimes.  And as

12   the Second Circuit has described in *Vilar* are just offenses to

13   which the presumption established in *Morrison* and *RJR* do not

14   apply.  You seem to now be saying that it does apply, and it

15   impacts how I thread it through the two step process.

16           Is the government either changing its position, or am

17   I misunderstanding what you wrote in your briefing?

18           MR. MAGNANI:  No, your Honor.  I'm just not being

19   clear. You're correct.  That is the way we framed it in our

20   papers.  I'm just explaining that the reason we framed it that

21   way is because *Bowman* itself and *Vilar* use the language of the

22   presumption of statutory interpretation that we're talking

23   about here, about the presumption not applying.

24           But what I'm also saying is that -- and the reason I'm

25   bringing this up is because, although *Bowman* was not mentioned

in any of the merits briefs in *Morrison*, *Kiobel* and *RJR*
*Nabisco*, the United States did in a footnote in its *RJR* brief
mention it.  And it basically said that the United States
believes *Bowman* type crimes satisfy the clear indicia of
extraterritoriality.  I guess what I'm saying, your Honor, is
it doesn't matter how the Court looks at it, whether it goes
with the way we put in our papers that the presumption doesn't
apply, or whether it goes with what the defense is saying, the
presumption always applies.  But then we would just say, but
it's always satisfied.  The presumption is always rebutted when
it comes to a *Bowman* type crime.

        Because any other interpretation would not make any
sense because it would create these immunities, exactly what
*Bowman* talks about, it would create an immunity for foreigners
who are trying to injure the United States. That's one of the
things just that basically whether you do the *Nabisco* two step
or not, it doesn't change the outcome at all.  We would just
say that if you do engage in that two-step framework, the first
step is satisfied.  Whereas Mr. Albert said that he believe
that we would concede that the first step was not satisfied.
That's not correct.

        The second thing I wanted to touch on -- and actually
was some of the cases that the defendant cited only in his
reply brief.  And actually one of them is the case that
Mr. Albert cited to your Honor here from this podium, which is

1    the case called -- it's the D.C. Circuit case *Garcia* Sota.  And

2    in *Garcia Sota*, reading it in the defendant's brief, it does

3    seem like a big problem for our argument, but it's not for

4    three reasons that the defendant didn't mention in his reply

5    brief, and didn't mention from the podium.

6         The first reason is that the statute in question 1114

7    which criminalizes killing U.S. officials, that statute was

8    deemed to apply extraterritorially in the Second Circuit twice.

9    In two of the cases we cited, both in *Siddiqui* and in

10   *Al Kassar*, the Second Circuit found different from the D.C.

11   Circuit, that that statute did have extraterritorial

12   application.

13        Secondly, the analysis that the D.C. Circuit did in

14   that case, it was a little more nuanced, and it involved the

15   interplay between 1114 and 116.  So you see 1114 did not have

16   any express extraterritorial application language, but 1116

17   did.  And so when the D.C. Circuit looked at those two

18   together, it determined that 1116 would have applied, but 1114

19   just didn't.  It was just the wrong statute, so it was a little

20   more of a nuanced analysis.  And the third thing is that the

21   D.C. Circuit at that time was bound by an earlier -- and it

22   cites to this case, an earlier 2004 D.C. Circuit case, which it

23   cites in the opinion, and it is called *Delgado Garcia*.

24        And in *Delgado Garcia*, the D.C. Circuit basically came

25   up with a way to read *Bowman* that was a little different than

1    other circuits and different from the Second Circuit.

2              THE COURT:  Can I just ask, why doesn't that end the

3    analysis from the government's perspective?  Why aren't you

4    just telling me that my circuit says X?

5              MR. MAGNANI:  The reason, your Honor, is because

6    *Siddiqui* and *Al Kassar* also have some problematic language

7    which we don't agree.  And so although *I think* -- *Vilar* is

8    actually -- I'll answer it this way.

9              Your Honor asked a question at one point, Is there a

10    substantive difference between *Morrison* and *RJR*.  And my answer

11    to that question would be no.  And the reason is because when

12    the Supreme Court decided *RJR*, it explained that that two step

13    was nothing new, it was just what came out of *Morrison* and

14    *Kiobel*.  And so *Vilar* is a great example of that.  So in *Vilar*,

15    which the defense complains is a pre-*RJR* case, it's of no

16    moment.  And the reason is because in *Vilar* they applied the

17    presumption against extraterritorial application to a criminal

18    securities fraud case.

19              In other words, what was a civil 10(b)(5) securities

20    fraud case in *Morrison*, the Second Circuit in *Vilar* said, this

21    applies to criminal as well and it kicked the conviction or it

22    remanded.  So I don't think that -- anyway, so the point is I

23    don't want to -- we back away from some of the language in

24    *Siddiqui* and *Al Kassar*, because I think those cases may have

25    the mistaken language about the cannon of statutory

1    interpretation not applying to criminal cases. We acknowledge

2    that it of course applies to criminal cases. But also there

3    are some important differences between the trio of civil cases

4    that the Supreme Court ruled on and criminal cases. The three

5    Supreme Court cases, *Morrison*, *Kiobel* and *RJR*, all of them

6    involved foreign individuals or foreign governments using U.S.

7    courts and U.S. laws to sue foreign companies for rights of

8    actions that presumably they could have -- they could have

9    prosecuted in other jurisdictions.

10            It's very different in this case. In a criminal case,

11   the United States can only vindicate its rights here. In other

12   words, if you extended the defendant's argument or the

13   defendant's argument that defraud prong conspiracies to defraud

14   the United States did not apply extraterritorially, the United

15   States would have no other venue to prosecute these kind of

16   offenses, whether it's contractors in Afghanistan or bankers in

17   Switzerland. If we can't prosecute those cases here, we have

18   no other remedy, unlike all the civil litigants in those other

19   cases. Which again, all involve foreign plaintiffs and foreign

20   defendants.

21            Finally, the third thing I wanted to mention -- and by

22   the way, the point about the cases that were cited only in the

23   reply brief, I don't have to get into it, but the defense also

24   cited some Second Circuit cases; namely, *Hoskins* and *Epskamp* --

25            THE COURT: Sorry, before you move on. You spent

1    sometime on this issue to walk away from *Siddiqui*, doesn't the

2    Circuit already do that in *Vilar*?

3        MR. MAGNANI:  Yes, your Honor.  In other words, in our

4    brief we gave a long string cite to many Second Circuit cases

5    from 2000 -- from pre-*Morrison* times to post-*Morrison* times.

6    And in some of those earlier cases -- and I think *Siddiqui* and

7    *Al Kassar* are two of them.  They do use that problematic

8    language.  But, yes, it's clear, all the parties agree, this

9    cannon of statutory interpretation applies in criminal and

10    civil cases.

11        THE COURT:  Thank you.  You can proceed.

12        MR. MAGNANI:  And I don't think it's worth necessarily

13    getting into, but to the extent that the Court is concerned

14    about or thinks the cites to *Hoskins* or *Epskamp* are persuasive.

15    Again, those cases are also very distinguishable in ways that

16    are not mentioned in the defendant's reply brief.  And so to

17    the extent the Court's interested in that, I'm happy to go into

18    it.

19        THE COURT:  Thank you.  I don't want to spend a lot of

20    time with that, nor do I think I need to spend a lot of time

21    with this other issue, but you raised it so I will.

22        Under this alternative framing of how to approach

23    *Bowman* and *Vilar* in light of the language in *Morrison*, you tell

24    me that I should see *Vilar* and *Bowman* as satisfying the first

25    prong of the Supreme Court's test stated in *Morrison*, and even

1    more clearly stated in *RJR*.  That step is whether the statute

2    gives a clear affirmative indication that it applies

3    extraterritoriality.  How does your argument work?  In other

4    words, if this is not language that's in the statute, how would

5    you have me take it that the language from these cases then

6    satisfies that first step which is tethered to the text of the

7    statute?

8        MR. MAGNANI:  Your Honor, I think we're all actually

9    in the agreement that the text of the statute is the thing that

10   controls.  And the only thing I would just add to your Honor's

11   recitation of *RJR*, is it goes on to say, An express statement

12   of extraterritoriality is not essential.  Assuredly, context

13   can be consulted as well.  And in *RJR* the court went on to say

14   that in that case, Context was dispositive.  To give some

15   examples of what I mean --

16       THE COURT:  Sorry, just to be clear, and I don't want

17   to spend a lot of time on this.  But, regardless of the later

18   text to which you point me, the first step looks at the

19   statute, not some Supreme Court decision from decades ago,

20   almost a hundred years ago.  So how is it that in this

21   construction I read the decisions of these court cases to check

22   the box for statutory text that the Supreme Court tells me

23   should be based on the text of the statute?

24       MR. MAGNANI:  The answer is, in *Bowman*, the court did

25   exactly this.  So the lower court in *Bowman* made a mistake and

1    thought that this was a jurisdictional question.  The *Bowman*

2    court, the Supreme Court, did the textual analysis.  But what

3    it explained was that, there are other things to look at other

4    than where statute is.  *Bowman* actually gives a lot of examples

5    of other statutes that would overcome the presumption.  Or

6    again to use *Bowman*'s framework, to which the presumption would

7    not apply.

8           And the examples it gives include forging a ship's

9    papers.  In other words, it doesn't say it applies

10   extraterritorially, but obviously Congress would have wanted it

11   to in case people did that on the high seas.  It also gives

12   examples about enticing desertion from the naval service.

13   Again, no language specifically about extraterritoriality, but

14   it's obvious from the context and the language in the text that

15   it was meant to apply overseas, same for bribing a U.S.

16   military officer.

17          THE COURT:  Thank you.  Good.  Understood.

18          MR. MAGNANI:  At the end of day what *Bowman* does with

19   the predecessor statute is it says, Congress wrote a statute

20   that's design to protect the United States government from

21   conspiracies to defraud it.  It would not have intended to

22   create immunities for overseas people who do that.  And that's

23   why I give the example of whether it's the Swiss banker or the

24   contractors in Afghanistan.

25          So the last thing, the third thing that I just had

1    was -- and this is something that we actually don't -- we

2    didn't really focus on in our briefs.  And I touched on it a

3    little bit in the beginning, was just procedurally, to the

4    extent that the Court, step one, agrees with the defense that

5    this statute does not apply extraterritorially; and step two,

6    agrees that the focus of the statute is what the defendant says

7    it is.  If the Court gets to that second step of *Nabisco* to

8    decide whether this is a permissible domestic application, we

9    would submit that this is not the time to do it.  And the

10   reason is -- well, there are a few reasons.

11           The first is that at this stage, in the motion to

12   dismiss stage, the Court has to assume all the factual

13   allegations in the indictment are true.  One of those

14   allegations in the indictment is that the defendant and others,

15   known and unknown, conspired to defraud the United States in

16   the Southern District of New York and elsewhere.  Having to

17   assume that that's true at this point, the Court would have to

18   deny this.

19           And that's why I was pointing out before how most of

20   the cases we're hooking at here are Appellate cases after

21   there's been evidence at trial.  Because as the Court knows,

22   the United States is obviously not limited in its presentation

23   of evidence by what it's alleged in the indictment.  In fact,

24   there's not really much required of the United States to allege

25   in an indictment.  It really need only allege the statutory

1    language, and give enough detail to prevent the defendant from

2    being tried twice for the same crime and to give sufficient

3    notice. So if a boilerplate indictment would have been enough,

4    something with just the statutory language, then the Court

5    should not look at the other allegations in the indictment to

6    determine whether that's sufficient to meet step two of whether

7    this is a domestic application.

8           That's the defense just wanting the Court to engage in

9    just basically sort of a summary judgment, because there be

10   other evidence at trial, including, for example -- and this one

11   we did mention in our briefs.  We expect that the evidence at

12   trial will include American taxpayers talking about filing

13   false tax returns in the United States.  There's a number of

14   things, and we do go over them in our brief, so I won't repeat

15   them all now.  But pages 22 to 26 of our filing go into

16   domestic allegations that are alleged in the indictment, but

17   the Court -- it would be inappropriate for the Court to limit

18   itself only to that at this stage, because the indictment is

19   sufficient, in that it tracks the statutory allegations and it

20   does allege that the conspiracy was in the Southern District

21   and elsewhere.

22           THE COURT:  Thank you.

23           MR. MAGNANI:  One other thing.  Sorry, your Honor.  I

24   was just sort of looking at my notes from Mr. Albert's

25   argument.  Mr. Albert was talking about how *Zarrab* was a

1    sanctions case, and he's not wrong.  I think it was an IEPA

2    case, but there's also a *Klein* conspiracy charged there.  And

3    so that's another one of these cases where -- and actually, I

4    think that's one of the cases where the Court did find there

5    was sufficient domestic nexus, but I just wanted to point out

6    that there was a *Klein* conspiracy charged there as well.

7    Because *Klein* conspiracies are not only conspiracies to defraud

8    the IRS, but can also be to defraud other agencies of the

9    United States, so a sanctions violation could be charged under

10   *Klein* or *Hammerschmidt* doctrine.  Unless there any questions,

11   your Honor, that's all I have.

12           THE COURT:  Just a brief one.  Counsel for defendant

13   pointed us to *Ciminelli*, and I'm not going to make any

14   predictions about how that case is going to come down, but my

15   recollection is that the government changed its position in the

16   arguments about whether or not the argument presented by the

17   prosecution to the trial court was actually a legitimate

18   theory.  So I just want to inquire to ensure that the

19   government has made sure that the Solicitor General is going to

20   stand behind the feasibility of a *Klein* conspiracy on the basis

21   that the government is pursuing here.

22           Any comment, counsel?

23           MR. MAGNANI:  No comment, your Honor.  Only that at

24   this time the Court is still bound by *Coplan*.  So regardless to

25   anything that we advance, Coplan is the law of the Circuit, and

1    it's pretty clear on the *Klein* conspiracy doctrine.

2              THE COURT:  Thank you.  Good.

3              Any brief rebuttal?  I'm sorry, let me hear from

4    counsel for the United States on the discovery related issues.

5              MS. ZVEROVICH:  Thank you, your Honor.  Olga

6    Zverovich, and I will be brief with respect to the discovery

7    issues unless the Court has questions.

8              With respect to the defendant's request for a bill of

9    particulars.  The law is clear that a bill of particulars is

10   not a general investigatory tool.  The sole purpose of a bill

11   of particulars is to furnish facts that are necessary to

12   apprise the defendant of the charges against him in order to

13   allow him to prepare his defense, avoid unfair surprise, and

14   plead double jeopardy.  In this case, a bill of particulars is

15   not necessary because the government's disclosures in this case

16   are more than sufficient to apprise the defendant of the

17   charges against him.

18             First, the government has filed a very detailed

19   indictment.  It spans several dozen pages, and it sets forth

20   the scheme in a lot of details.

21             THE COURT:  Let me just focus you on this, counsel.

22   They're only asking for the identity of the asserted

23   co-conspirators.  Do any of the materials identify who the

24   alleged co-conspirators are?

25             MS. ZVEROVICH:  Yes, your Honor.  The government in

1    this case provided discovery which was organized and provided

2    to counsel in searchable format.  That discovery includes,

3    among other things, emails among various co-conspirators.  It

4    includes bank records relevant to the transactions at issue in

5    the scheme.  And again, that discovery was provided in an

6    easily digestible searchable format.

7         THE COURT:  Thank you.  But in saying that, is it

8    searchable by conspirator, yes, no?  In other words, how is the

9    defense to ascertain from the materials that you provided who

10   the government asserts is a co-conspirator of the defendant

11   here?

12        MS. ZVEROVICH:  No, your Honor.  It is not searchable

13   in that way.  It is word searchable.  But, your Honor, the law

14   in this Circuit is clear that an indictment need not identify

15   every single person who is involved in a conspiracy or, every

16   single overt act that's committed in furtherance of the

17   conspiracy.

18         In this case, the indictment is particularly detailed.

19   It does not identify each and every person involved, but the

20   discovery does provide additional information about that.  So

21   there could be emails in which other folks are copied, etc. And

22   so in the government's view under the clear law in this

23   Circuit, a bill of particulars is not required under the law.

24        THE COURT:  Thank you.  Let me just ask.  Your

25   colleague just referred to tax filings having been made in the

1    United States and that there will be evidence of that at trial.

2    I've also heard during the course of today's argument that the

3    government may have provided immunity to certain U.S. taxpayers

4    who may have taken advantage of the -- I'll call it, the

5    benefits of the asserted scheme.

6         Is the government taking the position that those

7    taxpayers are co-conspirators?

8         MS. ZVEROVICH:  We are, your Honor.

9         THE COURT:  Thank you.  Did the defendant know that

10   before today?

11        MS. ZVEROVICH:  I believe we made that point in our

12   briefing, your Honor.

13        THE COURT:  Thank you.  You can proceed.

14        MS. ZVEROVICH:  Thank you, your Honor.

15        And then with respect to the scheduling question.  I

16   will not spend very much time on it.  We pointed out in our

17   briefing that the schedule that the defendant proposed in their

18   opening papers would essentially mean that all of the

19   government's trial materials would be due five months before

20   the trial date, which really is an unprecedented and

21   extraordinarily early schedule.

22        We haven't found any case in which such a schedule was

23   ordered by the court.  We counter-proposed with what I think is

24   a reasonable schedule, which is to produce those materials

25   three weeks before the trial date.  I think the suggestion that

1    this will prevent the defendant from filing motions *in limine*

2    should not be accepted by the Court.  I think it's typical for

3    parties to file motions *in limine* before exhibits and *Jencks*

4    Act materials are produced.  To the extent there are

5    supplemental issues to take up with the Court, we can do that

6    at the final pretrial conference.

7         THE COURT:  Let me just ask, I saw from your

8    submissions that you proposed to provide the materials to the

9    defense on the 15th of May, that is three weeks prior to trial.

10   What's the magic of three weeks?  Could you do it four weeks

11   before trial?

12        MS. ZVETOVICH:  Your Honor, there's no magic to that

13   date. We picked it as a reasonable date consistent with our

14   schedules set in similar cases.  Four weeks is fine.

15        THE COURT:  Thank you.

16        MS. ZVETOVICH:  Your Honor, I'll just finally note

17   that --

18        THE COURT:  Let me just pause.  I apologize.  No, go

19   ahead, counsel. I apologize.

20        MS. ZVETOVICH:  Thank you, your Honor.

21        Just one other note which is that in producing the

22   Rule 16 materials in this case, we actually already produced to

23   the defense most of the witness statements at issue in this

24   case.  We did that without having an obligation to do that, and

25   so they already have most of the witness statements.  To the

extent they need to investigate or hire investigators to speak
with people abroad, they already have the information they need
to do that.

THE COURT:  Good.  Thank you.  Just briefly, counsel.
Counsel for defendant asserted that there's no risk to the
potential co-conspirators here were I to order bill of
particulars consistent with their request.  Does the government
have any comment on that proffer?

MS. ZVETOVICH:  Your Honor, we're not alleging that
that factor in itself supports a denial of the bill of
particulars, but we are saying that the balance of the factors
does.

THE COURT:  Thank you.  Good.  Anything else, counsel?

MS. ZVETOVICH:  No, your Honor.  Thank you.

THE COURT:  Good.  Thank very much.  Counsel for
defendant, any brief rebuttal?

MR. TEMKIN:  Very briefly, your Honor.

On the statute of limitations, and I think Mr. Albert
may have some brief comments on the extraterritoriality.
First, with respect to the argument that we have not
established prejudice.  Your Honor, the law is crystal clear.
The government has the burden to justify the sealing of the
indictment.  And if the statute of limitations ran, because it
did not, could not justify the running of the sealing of the
indictment and the tolling of the statute, if the statute of

limitations ran, the case is dismissed.  No prejudice is

required, if the statute of limitations ran.

Second, government still hasn't said what it did other

than Red Notices to effectuate the arrest of defendants in

jurisdictions from which they could not be extradited, and so

therefore we are dealing in the realm of speculation, not sort

of good exercise of prosecutorial discretion.

Third, our offer to -- Mr. Walchli's offer to appear

in this court did not in and of itself trigger the requirement

that it unseal as to all defendants.  What it did do was it

precludes them from saying that it was justified in keeping the

indictment sealed and running the statute of limitations as to

Mr. Walchli.

Finally, and at a minimum, your Honor, it had the

obligation to test that.  It can't come to court and say, well,

it wasn't made in good faith.  It did nothing to test that

offer.  And, your Honor, having done this for a long time, and

I'm sure your Honor having been on the bench for a long time

knows, that it is an extraordinary thing for a defendant who

resides in a country from which he or she cannot be extradited

to in fact voluntarily come to the United States.  And so at a

minimum if the government was serious about pursuing this case,

it had been an obligation to test that offer.

Finally, your Honor, with respect to the government's

assertion that as soon as it became clear that there had been

```
1   publicity, they move to unseal.  I think that that was verbatim
2   what the prosecutor said earlier.  That is simply not the case,
3   your Honor.  Your Honor, Mr. Ruegg was arrested on August 16 of
4   2021.  That arrest was publicized the very next day, August 17.
5   It appeared in the press.  We cite to the link to where the
6   article appears.  The government did not move to unseal the
7   indictment for 41 days.  So it cannot come here and say, well,
8   as soon as there was publicity, we unsealed it.  They did not
9   do that.
10          MR. ALBERT:  Your Honor, I'll be very brief.
11          THE COURT:  Thank you.
12          MR. ALBERT:  With regard to -- counsel alleged that
13   there's domestic activity, the American taxpayers filing false
14   tax returns. That's outside the focus of the *Klein* conspiracy.
15   And the notion that because they could file an indictment that
16   just tracks the statutory language if they file, as they did
17   here, a 35-pager, that defines in much more detail what this
18   conspiracy, that we have to ignore that and give them the
19   benefit of, as if it were a completely blank slate.  It's just
20   not the law of this Circuit.  It is unusual to dismiss an
21   indictment.  But if the indictment by its language and what it
22   says pleads them into a box that they hadn't thought of, the
23   Court doesn't have to close its eyes to that, and that is what
24   has happened here with the extraterritoriality.
25          With regard to the Zarrab case.  In that case, the
```

1    language in the opinion in that case does not even speak about

2    *RJR* at all, and it doesn't cite *Bowman*.  I don't think that's

3    one that this Court should rely upon.  The last point I want to

4    make is just picking up on something your Honor said.  I do

5    think it's appropriate and fair not to put our client through a

6    case on a highly problematic doctrine, the *Klein* doctrine if

7    the government, as it did in Ciminelli -- your Honor is 100

8    right -- in Ciminelli the Solicitor General backed away from

9    the right to control theory.  And did so in its papers for the

10   first time ever after dozens and dozens of defendants in this

11   courthouse and in this Circuit in particular were put through

12   that.

13           I think it's appropriate when your Honor said --

14   because counsel didn't answer it.  Has the Solicitor General

15   said that they're going to stand behind *Klein*, and I think it's

16   appropriate for your Honor to require the government to get

17   that representation from the Solicitor General.  And if not, we

18   can all go home.  Thank you.

19           THE COURT:  Very good.  So, counsel, I'm going to step

20   down to consider the parties' arguments.  Thank you very much

21   for your thoughtful comments.

22           Yes, counsel.

23           MS. DAVIS:  Your Honor, could I just interject and

24   just point the Court to paragraph 19 of the indictment.

25   Mr. Albert got up and said that all the conduct was outside of

```
1    the U.S., and that is simply not true as alleged in the
2    indictment.  A paragraph that they've ignored repeatedly in
3    their papers and at the podium that they used a U.S. based
4    investment company to liquidate illiquid shares of client-1's
5    holdings at IHAG which was a conditional precedent to them
6    being able to effectuate the Singapore Solution.  So if the
7    Court is looking for domestic touch, if you will, of this
8    scheme, it need look no further than paragraph 19, a paragraph
9    that the defendants apparently have not read.
10           MR. ALBERT:  Your Honor, respectfully, we do address
11   that in our papers.  I didn't address it today.  There's a lot
12   I didn't address today.  That is the Craven Watchdog right
13   there.  There's something that touched the United States.
14   There's always something that touches the United States.  That
15   is incidental.  It's not the focus.  It is not the focus of the
16   indictment.
17           THE COURT:  Thank you.  Understood.
18           So I'm going to step down now.  I'm going to consider
19   the parties arguments.  I'll be back out after I've had the
20   opportunity to do that.  You should feel free to step out of
21   the courtroom.  I don't think that I'll be back in less than
22   ten minutes, so feel free to step out and stretch your legs.
23   I'll be back shortly.  Thank you.
24           (Recess)
25           THE COURT:  You can be seated.
```

1          First, thank you very much, counsel, for your

2     arguments.  I've considered them.  I think I have a view

3     regarding these issues, and I'm going to take sometime now,

4     with apologies, to try to resolve the issues presented by the

5     motion.  So please bear with me as I let you know both the

6     outcome of the motion and the reasoning that underpins my

7     decision.

8          As the parties know, this motion was filed on

9     October 7, 2022. The motion was to dismiss the indictment

10    against him under 18 U.S.C. § 371 for a conspiracy to defraud

11    the United States.  Mr. Walchli argues that the indictment is

12    barred by the relevant statute of limitations, or that in the

13    alternative, the indictment must be dismissed because it has

14    improperly been given extraterritorial application.  If the

15    Court declines to dismiss the indictment, Mr. Walchli

16    alternatively requests that the Court order the Government to

17    produce-on a timely basis, as early as five months before

18    trial-a Bill of Particulars, a witness list, an exhibit list,

19    and *Jencks* Act and impeachment material.

20         I have reviewed the parties' submissions.

21    Mr. Wälchli's memorandum in support of his motion was filed on

22    October 7, 2022, and is located at Docket Number 45.  I will

23    refer to that document as the "Defendant's Motion."  The

24    government's opposition to Mr. Wälchli's motion was filed on

25    October 28, 2022, and is located at Docket Number 47.  I will

refer to that document as the "Government's Opposition."
Finally, Mr. Wälchli's reply brief was filed on November 11,
2022, and is located at Docket Number 52.  I will refer to that
document as the "Reply."  Finally, I have also listened to and
considered oral argument presented by the parties today.

I will rule on this motion orally.  For the reasons
that follow, defendant's motion to dismiss the indictment is
denied.  The parties are familiar with the underlying facts and
procedural history.  Therefore, I will not recite those in
detail.  To the extent that any of the facts alleged in the
indictment are pertinent to my decision, those facts are
embedded in my analysis, the same is true with respect to facts
presented in the various affidavits submitted by the parties.

I'll begin with I., Legal Standards.

A. Motion to Dismiss an Indictment.

On a pretrial motion to dismiss an indictment, "the
allegations of the indictment must be taken as true." *Boyce
Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n.16
(1952).  Taking those allegations as true, "at this stage of
the proceedings, the indictment must be tested by its
sufficiency to charge an offense." *United States v. Sampson*,
371 U.S. 75, 78-79 (1962).  In other words, unless the
indictment is not "valid on its face," there "is enough to call
for trial of the charge on the merits." *Costello v. United
States,* 350 U.S. 359, 363 (1956).

1    Given these rules, "the standard for the sufficiency

2    of an indictment is not demanding." *United States v. Balde*,

3    943 F.3d 73, 89 (2d Cir. 2019).  And indictments are rarely

4    dismissed:  "The dismissal of an indictment is an extraordinary

5    remedy reserved only for extremely limited circumstances

6    implicating fundamental rights." *United States v. De La Pava*,

7    268 F.3d 157, 165 (2d Cir. 2001) (internal citation omitted).

8    B. Statute of Limitations

9    The applicable statute of limitations for a conspiracy

10   to defraud the United States in violation of Title 18 U.S.C. §

11   371 is six years.  See 26 U.S.C. § 6531.  "The statute of

12   limitations . . . runs from the last overt act during the

13   existence of the conspiracy." *Fiswick v. United States*, 329

14   U.S. 211, 216 (1946).  Further, "the law [is] clear that the

15   filing of a sealed indictment within the statutory period

16   serves to toll the statute of limitations even if the

17   indictment is not unsealed until after the period has expired."

18   *United States v. Watson*, 599 F.2d 1149, 1154 (2d Cir. 1979),

19   opinion amended on reh'g, 690 F.2d 15 (2d Cir. 1979), and

20   modified on reh'g sub nom. *United States v. Muse*, 633 F.2d 1041

21   (2d Cir. 1980).

22   Under Federal Rule of Criminal Procedure 6(e)(4),

23   there are no "specific procedures to be followed by the

24   magistrate prior to the sealing of an indictment"-indeed, there

25   is "no need for the United States Attorney to do more in the

first instance than to make a request that the indictment be

sealed." *United States v. Srulowitz*, 819 F.2d 37, 41 (2d Cir.

1987).  But a criminal defendant has the "right to challenge

the propriety of the sealing . . . after the indictment is

opened to public inspection."  Id. at 41 (emphasis omitted).

Specifically, a criminal defendant may allege, after

the indictment is unsealed, that the government did not meet

its responsibility to "unseal the indictment as soon as its

legitimate need for delay has been satisfied."  Watson, 599

F.2d at 1154.  "[T]he government, if challenged, must

demonstrate legitimate prosecutorial purposes for the secrecy

of the indictment."  *Srulowitz*, 819 F.2d at 41.  The Second

Circuit has "held that there are various legitimate

prosecutorial objections, including, but not limited to, the

facilitation of arrest, that will justify the sealing of an

indictment."  Id. at 40.  An additional legitimate objective,

where a given defendant's "confederates [are] indicted

defendants as well," is the "need to capture [those

defendants]."  *Muse*, 633 F.2d at 1041.

Finally, "[i]t is an open question in this Circuit

whether a defendant is required to prove actual prejudice to

prevail on a statute of limitations motion when the Government

has unreasonably delayed the unsealing, or whether prejudice is

simply presumed and the indictment should be dismissed."

*United States v. Gigante*, 436 F. Supp. 2d 647, 655 (S.D.N.Y.

2006).  But if a defendant "can show substantial actual
prejudice" from the delay in unsealing an indictment, the
Government must show that its decision to delay unsealing was
"justified by a strong prosecutorial interest, not simply by a
legitimate interest."  *Watson*, 599 F.3d at 1149.

C. Extraterritoriality

As a general rule, "legislation of Congress, unless a
contrary intent appears, is meant to apply only within the
territorial jurisdiction of the United States."  *Morrison v.*
*Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010) (quoting
*EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991)).  And
the Supreme Court has articulated a two-step test that is
typically employed to determine when a statute applies
extraterritorially.  First, a court must determine "whether the
statute gives a clear, affirmative indication that it applies
extraterritorially."  *RJR Nabisco, Inc. v. European Cmty.*, 579
U.S. 325, 337 (2016).  If not, the Court must then "determine
whether the case involves a domestic application of the
statute."  Id.

But in *United States v. Bowman*, the Supreme Court
distinguished between "crimes against private individuals or
their property," for which Congress must expressly provide in
the statute for extraterritorial application, and "criminal
statutes which are, as a class . . . enacted because of the
right of the government to defend itself," for which

extraterritorial application can "be inferred from the nature
of the offense."  260 U.S. 94, 98 (1922).  The Second Circuit
has thus explained that there is an exception to the
presumption against extraterritoriality for "statutes
prohibiting crimes against the United States government," which
"may be applied extraterritorially even in the absence of clear
evidence that Congress so intended."  *United States v. Vilar*,
729 F.3d 62, 73 (2d Cir. 2013) (quoting *United States v.*
*Gatlin*, 216 F.3d 207, 211 n.5.  (2d Cir. 2000)).

Let me read another quote from *United States v. Vilar*
where the Circuit wrote the following "In other words, the
presumption against extraterritoriality does apply to criminal
statutes, except in situations where the law at issue is aimed
at protecting "the right of the government to protect itself."
That is citing to *Bowman*, and it is in *United States v. Vilar*
729 F.3d 73.

II. Analysis.

A. The Indictment is not barred by the statute of
limitations

Mr. Walchli argues that the government's indictment
must be dismissed pursuant to the statute of limitations.  But
because the Government had a legitimate prosecutorial purpose
to maintain the indictment under seal until it was unsealed on
September 28, 2021, the statute of limitations was tolled until
that time, and therefore was not exceeded.

1          The parties agree on several predicate facts

2     concerning this issue.  To start, they agree that the statute

3     of limitations for the crime charged against Mr. Wälchli-a

4     so-called "*Klein* conspiracy" under 18 U.S.C. § 371-is six

5     years.  See defendant's motion at 8, government's opposition at

6     3; see also 26 U.S.C. § 6531(1) (setting a six-year statute of

7     limitations for "offenses involving the defrauding or

8     attempting to defraud the United States or any agency thereof,

9     whether by conspiracy or not, and in any matter").  The parties

10    further agree that, based on certain aspects of how the statute

11    runs and on acts taken by the Government to toll the statute

12    independent of sealing the indictment, the statute of

13    limitations to bring the indictment ran through April 16, 2021.

14    See Defendant's Motion at 8-9, Government's Opposition at 3-4.

15          Finally, Mr. Walchli does not contest that the sealed

16    indictment was returned within that timeframe, that it was

17    properly sealed when it was filed, or that the filing of a

18    sealed indictment further tolls the applicable statute of

19    limitations.  See Defendant's Motion at 5 (noting that the

20    indictment was returned by the grand jury on September 15,

21    2020); id. at 11 ("[W]e do not challenge the initial sealing of

22    the Indictment."); id. at 9 ("The law [is] clear that the

23    filing of a sealed indictment within the statutory period

24    serves to toll the statute of limitations even if the

25    indictment is not unsealed until after the period has expired."

1    (quoting *Watson*, 599 F.2d at 1154)).

2           Instead, Defendant argues that the Government's

3    failure to unseal the indictment "as soon as its legitimate

4    need for delay [was] satisfied," *Watson*, 599 F.2d at 1154,

5    means that it cannot rely on the sealed indictment to toll the

6    limitations period through September 28, 2021, when the

7    indictment was unsealed after the publication of the arrest of

8    Mr. Wälchli's co-defendant Mr. Ruegg.  Defendant points to two

9    events that, in his view, independently required the

10   indictment's unsealing before September 2021.

11          First, in a telephone call and subsequent letter in

12   October 2020, Mr. Walchli shared that he was willing to come to

13   the United States to contest charges against him; according to

14   Mr. Walchli, after that time, the government could no longer

15   "rely on its desire to facilitate his arrest to support

16   sealing."  Defendant's Motion at 12.  Second, according to

17   Mr. Walchli, the February 2021 arrest of Mr. Wälchli's

18   co-conspirator Mr. Lampert meant that the other defendants in

19   the case would have learned about it, and that "any claim by

20   the government that the arrest of one defendant 'would cause

21   his co-defendants to flee' could no longer hold water."  Id. at

22   15 (quoting *Muse*, 633 F.2d at 1044).

23          The Government's decision not to unseal the indictment

24   before September 2021, however, was justified at all times by,

25   at the least, the need to capture Mr. Wälchli's co-defendants.

1    If the continued sealing of an indictment is challenged by a

2    Defendant, the Government's burden is to "demonstrate

3    legitimate prosecutorial purposes for the secrecy of the

4    indictment." *Srulowitz*, 819 F.2d at 41.  The Government has

5    met that burden here.

6            To start, the Government has a strong argument that

7    Mr. Wälchli's willingness to face charges as soon as October

8    2020 was not a firm offer but rather a conditional one.  See

9    Government's Opposition at 8-9.  As the Government notes, while

10   Mr. Walchli offered to appear in the United States at that

11   time, he did so "subject to . . . reaching an agreement on a

12   reasonable bail package."  Docket Number 46 Exhibit B.  The

13   defense today acknowledged, consistent with its filing, that it

14   would accept only a reasonable deal-not any deal presented by

15   the Government.  Because the defendant conditioned his

16   willingness to appear on the agreement on terms that he found

17   to be reasonable, I think that the Government fairly describes

18   this as a conditional offer.  It is hard to understand how that

19   conditional offer represented such a firm commitment that it

20   could require immediate unsealing of the indictment by the

21   Government.

22           But even had Mr. Walchli made a definite offer to

23   appear at that time, it would have done nothing to obviate the

24   Government's legitimate interest in pursuing arrests of

25   Mr. Wälchli's co-conspirators, which unsealing the indictment

could have threatened.  Muse is instructive.  There, the
Government delayed both in unsealing an indictment against and
in arresting Defendant Muse, one of four individuals indicted
in a narcotics conspiracy, for fear that "the [unsealed]
indictment and arrest of Muse would cause his co-defendants to
flee."  *Muse*, 633 F.2d at 1041.  If *Muse* "had been the sole
defendant," the Second Circuit explained, "the Government might
be hard put to justify its delay" in unsealing the indictment
and arresting Muse.  Id.  "But his confederates were indicted
defendants as well, and the need to capture them [was] as
justifiable a basis for delay as the need to capture *Muse*
himself."  Id.

        So too here.  At the time of Mr. Wälchli's conditional
offer to come to the United States to defend charges against
him in October 2020, the Government was in the midst of
substantial efforts to arrest not only Mr. Walchli but also the
other five individual defendants named in the indictment.  It
had obtained Interpol Red Notices to place arrest warrants into
international law enforcement databases; because of a backlog
at Interpol, however, those arrest warrants had not yet been
published.  Government's Opposition at 2.  And it knew that all
six defendants lived in countries that would not extradite them
to the United States.  Id. at 7-8.

        Accordingly, to arrest any defendant, the Government
had to wait for that individual to travel outside of his home

country.  Id.  Had the Government unsealed the indictment in

October 2020, however, it would have risked tipping off all of

the defendants before the summer 2021 travel season, which

could have, in turn, led them to decline to travel out of their

home countries (and prevented the arrest of any of them).

Instead, with the indictment sealed, two of those

individuals-Mr. Lampert and Mr. Rüegg-indeed left their home

countries and were arrested in other jurisdictions, which

provides evidence of the effectiveness of the Government's

decision to maintain the seal on the indictment.

Nor did the event undergirding Defendant's second

unsealing argument-the arrest of Mr. Lampert in February

2021-eliminate the Government's need to maintain the

indictment's seal to avoid informing the other co-defendants

about it.  Defendant argues that, even though Mr. Lampert's

arrest was not reported in the press, given the "close-knit

Zurich financial community," the "notion that the other

defendants . . . would not learn of his arrest was fanciful."

Defendant's Motion at 16.  And Defendant's counsel has attested

that he did in fact learn of Mr. Lampert's arrest in early

February 2021.  See Reply at 6 n.4.  But Defendant does not

assert that the other co-defendants were aware of Mr. Lampert's

arrest.  Nor does he claim that those defendants (or, for that

matter, Mr. Walchli) knew of the content of Mr. Lampert's

indictment, as opposed to his arrest; thus, he does not assert

that any of those defendants would have known that they were

co-conspirators in the charged Klein conspiracy.

In fact, as defendant admits, there was a limited

unsealing order entered in Mr. Lampert's case precluding

Mr. Lampert or his defense team from "providing, disseminating,

or otherwise revealing the Indictment of the existence or any

contents thereof to any person, entity, or third party, by any

means."  Defendant's Motion at 16 (alterations in original).

And as Defendant concedes, "a defendant who knows that he is

named in an indictment may be marginally less willing to travel

to a jurisdiction where he would be subject to extradition than

a defendant who is merely generally aware of a government

investigation."  Reply at 8 (emphasis omitted).

Defendant notes that the order preventing discussion

of the indictment in Mr. Lampert's case was not entered until

nineteen days after his arrest, and that discussions between

Mr. Lampert and the other defendants about the indictment could

have occurred in that window.  Id.  But crediting that

argument—that the arrest of one co-defendant requires the

unsealing of a criminal indictment as to all, even if there is

no evidence that the Government knew of conversations about the

indictment between the co-conspirators—would be very

problematic as a rule.

In cases involving a sealed indictment against

multiple co-conspirators, after all, the defendants will often

1    be in tight-knit communities like the defendants here; if that

2    fact precluded the Government from arresting one individual and

3    maintaining a sealed indictment as to the others, it would be

4    extremely difficult for the Government to pursue conspiracy

5    cases.  Ad lib about drug cases Here, given that Defendant has

6    not shown that discussions between charged co-conspirators

7    about the indictment's content actually occurred, much less

8    that the Government knew of any such discussions, he has not

9    shown that the Government's belief that the indictment's

10   unsealing could reveal its existence to other defendants was

11   illogical or unreasonable.  To the contrary, the arrest of Mr.

12   Ruegg in August 2021, even after Mr. Lampert's February 2021

13   arrest, strongly supports the Government's view of the need to

14   maintain the indictment's seal after Mr. Lampert's arrest.  See

15   Government's Opposition at 13.

16         Had Mr. Ruegg known he was named in the indictment

17   despite its sealing, it is extremely unlikely, or at least

18   somewhat less likely, he would have traveled to a country where

19   he could be arrested; that he did so significantly undercuts

20   the defense's argument that Mr. Wälchli's co-conspirators knew

21   about the indictment's contents after Mr. Lampert's arrest.  In

22   short, the arrest of Mr. Lampert in February 2021 does not mean

23   that the other defendants in this case knew about the

24   indictment's content, and the Government accordingly had

25   legitimate reason to maintain it under seal after that arrest.

1    Defendant's cited cases are unavailing.  His lead

2    case, *United States v. Gigante*, 436 F. Supp. 2d 647 (S.D.N.Y.

3    2006), involved an indictment against a single defendant where

4    the Government obtained four superseding sealed indictments,

5    all to extend the statute of limitations and effectuate "the

6    Government's need for additional time to investigate a related

7    and still uncharged crime."  436 F. Supp. 2d at 650-51, 653.

8    The court rejected that rationale for sealing.  Id. at 658.

9    And while it noted that "the facilitation of arrest" is a

10    motive that can justify continued sealing of an indictment, id.

11    at 654 (quoting *Srulowitz*, 819 F. 2d at 40), it held that on

12    the case's facts, sealing the indictment was not necessary to

13    pursue Mr. *Gigante's* arrest, see id. at 657.

14    By contrast, the Government here had good reason to

15    think that continuing the seal of the indictment was necessary,

16    or at least helpful, to achieving the arrests of other

17    defendants in this case.  As discussed, that reasoning was

18    borne out when, even after the arrest of Mr. Lampert, the

19    indictment remained sealed and Mr. Ruegg traveled out of his

20    home country, enabling his arrest.  See Government's Opposition

21    at 13.  More broadly, Defendant does not cite to any case in

22    which a court rejected as illegitimate the Government's

23    decision to maintain a sealed indictment in order to effectuate

24    the arrest of co-defendants.  This Court declines to be, to its

25    knowledge, the first court to do so.

1      Defendant's final response is to suggest other paths

2  the government could have taken in pursuing the arrests of Mr.

3  Wälchli's co-defendants.  See Reply at 8 (noting that the

4  Government "could have (1) applied for a limited unsealing

5  order with respect to Mr. Walchli, as it did with Mr. Lampert

6  following his arrest in February 2021; (2) obtained a

7  bare-bones superseding indictment charging Mr. Walchli alone,

8  as it has done in several other cases in this District; or (3)

9  charged Mr. Walchli in a separate, sealed criminal case").  But

10  charging decisions are within "the "broad discretion of the

11  prosecutor, . . . and a prosecutor's pretrial charging decision

12  is presumed legitimate." *United States v. Sanders*, 211 F.3d

13  711, 716 (2d Cir. 2000).  Unless Mr. Walchli can show

14  significant prejudice from the continued sealing of the

15  indictment, the Government's burden is not to show that it had

16  no other paths to pursue its stated pretrial goals; rather, it

17  must merely show some "legitimate prosecutorial purpose[ ] for

18  the secrecy of the indictment." *Srulowitz*, 819 F.2d at 41; see

19  also *Watson*, 599 F.2d at 1154 (requiring only that the

20  Government show some "legitimate need for delay" in unsealing

21  the indictment to maintain the seal but noting that "when a

22  defendant can show substantial actual prejudice, the Government

23  must show that the delay is justified by a strong prosecutorial

24  interest, not simply by a legitimate interest").

25      Here, Mr. Walchli challenges, at most, less than a

year of continued sealing from October 2020 (when he made his conditional offer to appear in the U.S.) to September 2021, when the indictment was unsealed.  And he does not make any specific argument about prejudice that he suffered because of the continued sealing of the indictment.  So the Government's burden is merely to show a legitimate prosecutorial purpose for the continued sealing, *Srulowitz*, 891 F.2d at 41, and under Muse, there is no doubt that the need to avoid tipping off Mr. Wälchli's co-defendants was such a purpose.  Accordingly, the Government's sealing of the indictment until September 2021 was not unlawful, it was reasonable; the statute of limitations on Mr. Wälchli's indictment did not expire before then, and the indictment will not be dismissed on that basis.

B. Section 371 Applies Extraterritorially

Mr. Wälchli's second argument for dismissing the Government's indictment is that it relies on an invalid extraterritorial application of the *Klein* doctrine.  But because, in the Court's view, 18 U.S.C. § 371 does under Second Circuit law apply extraterritorially, the indictment will not be dismissed for this reason either.

This issue turns on what standard applies to determine extraterritoriality.  Defendant urges the Court to apply the two-step framework laid out in several Supreme Court cases, most recently *RJR Nabisco, Inc. v. European Community*, 579 U.S. 325 (2016).  Under that framework, the Court must first decide

1    "whether the statute gives a clear, affirmative indication that

2    it applies extraterritorially."  Id. at 337.  If not, then the

3    statute may only be applied if there was "a domestic

4    application of the statute."  Id.  This framework operates and

5    is sometimes referred to as a "presumption against

6    extraterritoriality."  See Reply at 12.

7         The Government in its briefing, however, disputes that

8    the RJR Nabisco framework and the presumption against

9    extraterritoriality apply here.  It points to longstanding

10   Second Circuit and Supreme Court precedent that "[s]tatutes

11   prohibiting crimes against the United States government may be

12   applied extraterritorially even in the absence of clear

13   evidence that Congress so intended."  *Vilar*, 729 F.3d at 73 (2d

14   Cir. 2013) (quoting *Gatlin*, 216 F.3d at 211 n.5); see Bowman,

15   260 U.S. at 98 (distinguishing "[c]rimes against private

16   individuals or their property," for which Congress must

17   expressly provide in the statute for extraterritorial

18   application, from "criminal statutes which are, as a class . .

19   . enacted because of the right of the government to defend

20   itself," for which extraterritorial application can "be

21   inferred from the nature of the offense").

22        It notes that this exception to the presumption

23   against extraterritoriality applies to prosecutions against

24   foreign nationals as well as to those against U.S. citizens.

25   Government's Opposition at 19 n.6; see, e.g., *United States v.*

1    *Siddiqui*, 699 F.3d 690, 698, 700-01 (2d Cir. 2011).  In

2    argument, the Government has stepped back from its reliance on

3    *Siddiqui*.  And it argues that no Supreme Court case, including

4    *RJR Nabisco*, can be read to have altered that exception.

5         In the Court's view, the Government has the stronger

6    argument.  Importantly, both the Second Circuit and Supreme

7    Court have indicated that unless binding precedent is directly

8    overruled, courts must apply it.  For instance, the Second

9    Circuit has noted that it reads its own cases "in harmony with

10   [the Circuit's] other precedents." *United States v. Punn*, 737

11   F.3d 1, 12 (2d Cir. 2013).

12        And the Supreme Court has instructed courts of appeal

13   that "if a precedent of this Court directly has direct

14   application in a case,  yet appears to rest on reasons rejected

15   in some other line of decisions, the Court of Appeals should

16   follow the case which directly controls, leaving to this Court

17   the prerogative of overruling its own decisions." *Rodriquez de*

18   *Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989).

19   While those cases addressed how appellate courts should read

20   arguably conflicting precedents, they stand for the broader

21   principle that courts should not discard binding precedent

22   unless it has been clearly overruled.

23        Applied here, that principle dictates that the

24   standard articulated by the Supreme Court in Bowman and

25   reaffirmed by the Second Circuit in *Vilar* and elsewhere-that

1    statutes that "relate to crimes against the United State

2    government" apply extraterritorially, 729 F.3d at 73-remains

3    binding on this Court.  Defendant's attack on the relevant

4    language in *Vilar* as dicta that has "plainly not survived the

5    day," Reply at 15, is inaccurate.  Contrary to Defendant's

6    contention, there is simply no "plain" indication that the

7    *Bowman, Vilar,* and similar cases have been reversed.  While the

8    Supreme Court has used broad language in recent years to

9    describe the presumption against extraterritorially, it has not

10   discussed, let alone overruled, *Bowman* or the exception to the

11   presumption that it created for crimes against the U.S.

12   government.

13        And the Second Circuit decisions that have, since *RJR*

14   *Nabisco*, applied the presumption against extraterritoriality in

15   criminal cases have done so with respect to statutes that

16   regulate crimes against individuals, rather than those against

17   the United States.  See *United States v. Napout*, 963 F.3d 163,

18   168 (2d Cir. 2020) (conspiracy to commit honest services wire

19   fraud); *United States v. Hoskins*, 902 F.3d 69, 72 (2d Cir.

20   2018) (bribery of foreign officials under the Foreign Corrupt

21   Practices Act); *United States v. Epskamp*, 832 F.3d 154, 160 (2d

22   Cir. 2016) (intent to distribute a controlled substance aboard

23   an aircraft).  In short, absent clear overruling of Bowman,  or

24   for my purposes, significantly, *Vilar*, or other decisions

25   discussing and applying the exception to the presumption

against extraterritoriality for crimes against the government, this Court cannot discard those decisions.

*Vilar's* timing, in particular, is strong evidence of the continued validity in this circuit of the exception to the presumption of extraterritoriality for crimes against the government, given that *Vilar* articulated that exception even after several Supreme Court cases used broad language to describe the presumption's scope.  In *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), for instance, the Supreme Court explicitly stated that courts "apply the presumption in all cases."  561 U.S. at 261.  And in *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013), the Court again described the presumption against extraterritoriality as applying to statutes generally.  See 569 U.S. at 115.

Yet even after these two decisions, *Vilar* reaffirmed that the presumption does not apply to "situations where the law at issue is aimed at protecting 'the right of the government to defend itself.'"  729 F.3d at 73 (quoting *Bowman*, 260 U.S. 94, 98 (1922)).  So Defendant's view that *RJR Nabisco* changed all of that by noting that the presumption applies to "federal laws," without further consideration of what exceptions might apply, is hard to square with the Second Circuit's re-articulation, in *Vilar*, of presumed extraterritorial application of laws that prevent crimes against the U.S. Government even post-Morrison and *Kiobel*.

1          I am not writing on a blank slate.  While as a

2    district court judge, I might have missed the import of the

3    language in Morrison, I expect that the Second Circuit would

4    not have fallen so short when reaching their conclusion in

5    *Vilar*:  I assume that the Circuit fully appreciated the ruling

6    in Morrison and considered it in reaching the conclusion that

7    they did in *Vilar*.  If *Vilar* was wrongly decided, it is for the

8    Second Circuit, not me, to decide.  Similarly, if they want to

9    walk back the sweep of the statements that they made in *Vilar*,

10   that is for them to do.

11         This conclusion also accords with the one reached by

12   the only court (to this Court's knowledge) in this circuit to

13   consider the extraterritorial application of 18 U.S.C. § 371

14   after *RJR Nabisco.*  See *United States v. Buck*, No. 13-cr-0282,

15   2017 WL 4174931 (S.D.N.Y. Aug. 28, 2017).  In *Buck*, Judge

16   Marrero concluded that "as warranted by *Vilar*, Section 371 may

17   be applied extraterritorially," and that he was "not convinced

18   that *Kiobel, Morrison*, or *RJR Nabisco* compel a different

19   result."  2017 WL 4174931, at *7.

20         Judge Marrero noted that those three civil Supreme

21   Court cases are "are silent with respect to the application of

22   extraterritoriality in the context of criminal prosecution."

23   Id.  And he ended his discussion of the issue by "find[ing]

24   that *Kiobel, Morrison*, and *RJR Nabisco* have no bearing on

25   criminal actions brought by the United States Government to

1    prosecute criminal offenses committed abroad that defraud the

2    United States."  Id.

3            This Court believes that based on the nature of

4    existing Second Circuit precedent, it must agree.  Because that

5    is so, the government's extraterritorial application of 18

6    U.S.C. § 371 to defendant's conduct was not improper.  There is

7    no question that this statute, and the Klein doctrine under

8    which Mr. Walchli is being prosecuted, represent crimes

9    committed against the United States rather than against

10   individuals.  See 18 U.S.C. § 371 (criminalizing conspiracies

11   "to defraud the United States, or any agency thereof in any

12   manner or for any purpose"); *United States v. Klein*, 247 F.2d

13   908, 916 (2d Cir. 1957) (interpreting 18 U.S.C. § 371 to

14   prohibit not only "the cheating of the Government out of

15   property or money," but also "interfering with or obstructing

16   one of its lawful governmental functions by deceit, craft or

17   trickery, or at least by means that are dishonest" (internal

18   citation omitted)).

19           Indeed, defendant makes no argument that, if *Bowman*

20   and *Vilar* govern this case, the extraterritorial application of

21   the statute to Mr. Walchli was unlawful.  Accordingly, the

22   Court declines to dismiss the indictment as an improper

23   extraterritorial application of 18 U.S.C. § 371.

24           Ad lib about Government's argument.

25           Finally, the Court recognizes that the Defendant has

raised a facial challenge to the *Klein* doctrine for

preservation for the Second Circuit, even while acknowledging

that, in light of binding precedent, "this Court cannot sustain

such a facial challenge to Klein."  Defendant's Motion at 18.

That is correct—this Court is bound by the Second Circuit to

recognize the continued validity of *Klein*.  Nonetheless, the

Court notes that Defendant has raised strong arguments that

Klein, in criminalizing dishonest conduct that does not

actually deprive the government of any property, appears

discordant both with the plain text of 18 U.S.C. § 371 and

recent guidance from the Supreme Court concerning the reading

of criminal statutes.  See 18 U.S.C. § 371 (prohibiting

conspiring to "defraud the United States"); *McNally v. United*

*States*, 483 U.S. 350, 358 (1987) (noting that "'to defraud'

commonly refer[s] 'to wronging one in his property rights by

dishonest methods or schemes'" (quoting *Hammerschmidt v. United*

*States*, 265 U.S. 182, 188 (1924)); *Kelly v. United States*, 140

S. Ct. 1565, 1571–72 (2020) (similarly limiting a statute

focused on wire fraud to the deprivation to "only when" the

fraudulent scheme is "for obtaining money or property"

(internal citation omitted)); see also *Wooden v. United States*,

142 S. Ct. 1063, 1082–87 (2022) (*Gorsuch, J.*, concurring)

(calling for a reinvigoration of the "rule of lenity").

    Defendant's argument on this point is thus

well-taken—but, given binding Second Circuit precedent, does

not permit dismissal here.  I asked the government whether they

had consulted with the Solicitor General's office to confirm

that it will support any conviction obtained in this case in

the Second Circuit and the Supreme Court. I'm not going to

order that they do so, but I will definitely reiterate a

logical comment made by defendants counsel which is that it

would be useful perhaps to do so given in particular that this

case rests exclusively on that statute.

So again, I'm not ordering that the government do

anything.  But given what we know the defendant's view

regarding this statute and we know what the next steps would be

in this case should there be a conviction, it might make sense

to consider soliciting feedback on the continued viability of

the doctrine and the Solicitor General's willingness to support

the viability of the doctrine here.

III. Defendant's Alternative Requests for Pretrial

Materials.

Because the indictment is not dismissed, I now turn to

considering Defendant's alternative requests.  I am going to

begin by discussing the legal standards for these requests, and

then expect to engage in a discussion with the parties to help

guide my resolution of these issues.

A. Legal Standards

i.Defendant's Demand for Production of a Bill of

Particulars

1        Federal Rule of Criminal Procedure 7(f) "permits a

2   defendant to seek a bill of particulars in order to identify

3   with sufficient particularity the nature of the charge pending

4   against him, thereby enabling defendant to prepare for trial,

5   to prevent surprise, and to interpose a plea of double jeopardy

6   should he be prosecuted a second time for the same offense."

7   *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987).

8   The decision to grant or deny a request for a bill of

9   particulars "rests within the sound discretion of the district

10  court."  Id.  Requests for "whens," "wheres," and "with whoms"

11  regarding conspiracy are routinely denied.  *United States v.*

12  *Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001).

13       "A bill of particulars is required 'only where the

14  charges of the indictment are so general that they do not

15  advise the defendant of the specific acts of which he is

16  accused.'"  *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir.

17  1999) (internal citations omitted).  It is not "a general

18  investigative tool, a discovery device or a means to compel the

19  government to disclose evidence or witnesses to be offered

20  prior to trial."  *United States v. Tuzman*, No. 15-cr-536, 2017

21  WL 4785459, at *13 (S.D.N.Y. Oct. 19, 2017) (quoting *United*

22  *States v. Gibson*, 175 F.Supp. 2d 532, 537 (S.D.N.Y. 2001)).

23  "Instead, its purpose is to supplement the facts contained in

24  the indictment when necessary to enable defendants to identify

25  with sufficient particularity the nature of the charges against

them."  Id. (quoting *United States v. Gotti*, No. 02-cr-743, 2004 WL 32858, at *8 (S.D.N.Y. Jan. 6, 2004)).  "The line between mere evidentiary detail and information needed to prepare a defense and prevent unfair surprise can be thin indeed."  *Rajaratnam*, 2010 WL 2788168, at *1.

It is well-established that a defendant is entitled to a bill of particulars only where it is "'necessary to the preparation of his defense, and to avoid prejudicial surprise at the trial.'"  *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990), abrogated on other grounds by *United States v. Marcus*, 628 F.3d 36, 41 (2d Cir. 2010)) (quoting 1C. *Wright*, Federal Practice and Procedure § 129, at 434-35 (2d ed. 1982)).  "[A] bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means."  *Walsh*, 194 F.3d at 47.  However, the Government cannot "fulfill its obligation merely by providing mountains of documents to defense counsel who were left unguided as to which documents [the Government would rely on at trial]."  *Bortnovsky*, 820 F.2d at 575.

In "evaluating requests for disclosure of the identity of unindicted co-conspirators, courts should consider such factors as:  (i) the number of co-conspirators; (ii) the duration and breadth of the alleged conspiracy; (iii) whether the Government otherwise has provided adequate notice of the particulars; (iv) the volume of pretrial discovery; (v) the

potential danger to co-conspirators and the nature of the

alleged criminal conduct; and (vi) the potential harm to the

Government investigation."  United States v. Joseph, No.

02-cr-1589, 2003 WL 22019427, at *2 (quoting United States v.

Nachamie, 91 F. Supp. 2d 565, 572 (S.D.N.Y. 2000)).

ii. Defendant's Demand for Production of a Witness

List, 18 U.S.C. § 3500 Material, Impeachment Material, and

Exhibits.

There is no constitutional requirement "that the

prosecution must reveal before trial the names of all

witnesses."  Weatherford v. Bursey, 429 U.S. 545, 559 (1977).

Nor does Federal Rule of Criminal Procedure 16 "require the

Government to furnish the names and addresses of its

witnesses."  United States v. Bejasa, 804 F.2d 137 (2d Cir.

1990).  That said, in their discretion, "district courts have

the authority to compel pretrial disclosure of the identity of

government witnesses."  United States v. Cannone, 528 F.2d 296,

300 (2d Cir. 1975).

But if the defense makes "only an abstract, conclusory

claim that such disclosure was necessary to its proper

preparation for trial" and the "government advance[s] specific

grounds for denying the defense's requests for discovery of the

identity of the government's witnesses," it is an abuse of

discretion to require production of the identity of government

witnesses.  Id. at 301-02.

1          In contrast to the discretion courts retain to require

2     the Government to produce witness lists, the "*Jencks Act*

3     prohibits a District Court from ordering the pretrial

4     disclosure of witness statements." *United States v. Coppa*, 267

5     F.3d 132, 145 (2d Cir. 2001); see 18 U.S.C. § 3500(a) (the

6     *Jencks Act*, which provides that no witness statement shall be

7     discoverable "until said witness has testified on direct

8     examination on trial of the case").

9          Even so, the Second Circuit has noted that in the

10    "spirit of cooperation among court and counsel," it is

11    appropriate for courts to encourage pretrial disclosure of such

12    materials where possible. *United States v. Percevault*, 490

13    F.2d 126, 132 (2d Cir. 1974).

14         Additionally, although it is not required by Rule 16,

15    "it is within a district court's authority to direct the

16    Government to identify [prior to trial] the documents it

17    intends to rely on in its case in chief." *United States v.*

18    *Vilar*, 530 F. Supp. 2d 616, 639 (S.D.N.Y. 2008) (collecting

19    cases).  Disclosure of an exhibit list prior to trial has been

20    ordered in cases involving a large volume of documents and a

21    complex alleged scheme.  See, e.g., *Vilar*, 530 F. Supp. 2d at

22    639-40 (finding it reasonable, in part because of the large

23    number of documents at issue, to grant request for early

24    disclosure of exhibit list); *United States v. Chalmers*, 474 F.

25    Supp. 2d 555, 573 (S.D.N.Y. 2007) ("In this case, given the

1    large volume of documents produced by the Government thus far,

2    a significant portion of which are in Arabic and have yet to be

3    translated by the Government . . . defendants' requests for

4    pre-trial disclosure are reasonable."); *United States v.*

5    *Falkowitz*, 214 F. Supp. 2d 365, 392-93 (S.D.N.Y. 2002)

6    ("Although the requested discovery is not specifically

7    authorized, the Court finds that Defendants' request is

8    reasonable because of the numerous documents and alleged

9    participants in the relatively complex Scheme.").

10          Finally, "the Second Circuit requires only that

11    impeachment material be disclosed 'in time for its effective

12    use at trial.'"  *United States v. Canter*, 338 F. Supp. 2d 460,

13    462 (quoting *United States v. Coppa*, 267 F.3d 132, 142 (2d Cir.

14    2001)).  The baseline practice for courts in this district is

15    to require "that the Government produce these materials a few

16    days before the start of trial, usually on the Friday before a

17    trial scheduled to start on a Monday."  Id. (citing *United*

18    *States v. Santiago*, 174 F.Supp. 2d 16, 40-41 (S.D.N.Y. 2001);

19    *United States v. Perez*, 940 F. Supp. 540, 553 (S.D.N.Y. 1996)).

20          But adherence with common practice is not the legal

21    standard-the rule remains that the material must be disclosed

22    in time for its effective use at trial.  *United States v.*

23    *Siddiqi,* No. 06-cr-377, 2007 WL 549420, at *4 (S.D.N.Y. Feb.

24    21, 2007) ("[T]he Court notes that the existence of a

25    long-standing and judicially-endorsed practice in this District

allowing the prosecution to produce [impeachment] evidence the

Friday before trial does not absolve the Government of its

overriding obligation to provide [impeachment] material in time

for its effective use at trial.  This standard remains the

constitutional benchmark and it must be applied to the distinct

facts of each individual case.") (citations omitted).

        In short, "where the complexity of the case is

exceptional and the amount of evidentiary materials it produces

is extremely voluminous," the Court may "order the Government

to disclose such materials well in advance of trial." *Canter*,

338 F. Supp. 2d at 462.

        B. Analysis

        i. Bill of Particulars

        The Court concludes that Mr. Walchli is entitled to a

bill of particulars identifying unindicted co-conspirators.  It

is true that requests for "whens," "wheres," and "with whoms"

regarding conspiracy are routinely denied.  *Mitlof*, 165 F.

Supp. 2d at 569.  But here, Mr. Walchli seeks only the "with

whoms"-his request for a Bill of Particulars is limited to

"identifying known, unindicted co-conspirators."  Defendant's

Motion at 28.  Accordingly, the relevant factors for

consideration are "(i) the number of co-conspirators; (ii) the

duration and breadth of the alleged conspiracy; (iii) whether

the Government otherwise has provided adequate notice of the

particulars; (iv) the volume of pretrial discovery; (v) the

potential danger to co-conspirators and the nature of the
alleged criminal conduct; and (vi) the potential harm to the
Government investigation." *Joseph*, 2003 WL 22019427, at *2
(quoting *Nachamie*, 91 F. Supp. 2d 565, 572 (S.D.N.Y. 2000)).

Here, the Indictment alleges that the conspiracy
spanned six years and included at least five companies.  See
Docket Number 2  1-2.  Additionally, it repeatedly refers to
"others known and unknown" who participated in the alleged
conspiracy.  See, e.g., id.  8-9, 11.  Defendant, moreover, has
represented that the Government's admittedly voluminous
disclosure materials do not "answer the critical question of
which of the hundreds of people named in those documents the
government will claim was a co-conspirator."  Defendant's
Motion at 29.

The Government does not contest this.  Nor does it
claim that disclosing known, unidentified co-conspirators would
cause "potential danger to co-conspirators" or "potential harm
to the Government investigation." *Joseph*, 2003 WL 22019427, at
*2 (quoting *Nachamie*, 91 F. Supp. 2d at 572).  Instead, it
critiques Defendant's request as "appear[ing] to be an improper
effort to cabin the Government's proof at trial."  Government's
opposition at 29.  But it is hard to see why that is so, given
Defendant's representation that if the Government "learns of
additional co-conspirators between now and the start of the
trial, [it] can amend its bill of particulars to identify those

1    individuals."  Reply at 27 n.22.  ad lib about length.

2         The Government, of course, is correct that "[c]ourts

3    have routinely held that the Government is not required to

4    identify all unindicted co-conspirators."  Government's

5    Opposition at 29.  But courts have also often held the

6    opposite; that is a natural byproduct of district courts'

7    discretion in reviewing requests for Bills of Particulars and

8    the fact that each case presents distinct facts.  See, e.g.,

9    *United States v. Akhavan*, 20-cr-188, 2020 WL 2555333, at *2

10   (S.D.N.Y. May 20, 2020); United States v. Barrett, 153 F. Supp.

11   3d 552, 572-73 (E.D.N.Y. 2015); United States v. *Kahale*, 789 F.

12   Supp. 2d 359, 372-73 (E.D.N.Y. 2009); *Nachamie*, 915 F. Supp. 2d

13   at 573.

14        Considering the length of the conspiracy charged, the

15   number of potential co-conspirators, the large volume of

16   discovery, and the apparent lack of potential danger to

17   co-conspirators or to the Government's investigation, granting

18   Defendant's narrow bill of particulars request for a list of

19   known, unidentified co-conspirators is appropriate.  See, e.g.,

20   *Akhavan*, 2020 WL 2555333, at *2 (granting bill of particulars

21   where the charged conspiracy lasted three years and the volume

22   of discovery made it so that it was "practically impossible for

23   the defendants to ascertain whom the Government considers a

24   co-conspirator").  Knowing the identity of known and identified

25   purported co-conspirators will also likely help the parties and

the Court evaluate the admissibility of out-of-court statements
made by those individuals.

I accordingly order that the Government produce a bill
of particulars identifying all known co-conspirators no later
than fourteen days from the date of this order, and that the
Government update that list should any other known
co-conspirators arise.

ii. Production of a Witness List, 18 U.S.C. § 3500
Material, Impeachment Material, and Exhibits

I will now turn to the other materials requested by
Defendant-his request for early disclosure of witnesses that
the Government intends to call in its case-in-chief, witness
statements under the *Jencks Act*, 18 U.S.C. § 3500, impeachment
material for such witnesses, and an exhibit list and copies of
exhibits it intends to call during its case-in-chief.

I anticipate ordering that the government produce all
of defendants requested materials, aside from those under the
*Jencks* Act four weeks in advance of trial as the government has
stated it can do, and will request that the government consider
producing material under the *Jencks* Act on that same timeframe.

And I anticipate further ordering and requesting as
appropriate, the defense to produce those same materials three
weeks in advance of trial.

As previously noted, varying legal standards apply to
different aspects of Defendant's request.  First, "it is within

a district court's authority to direct the Government to identify [prior to trial] the documents it intends to rely on in its case in chief," *Vilar*, 530 F. Supp. 2d at 639, and disclosure of an exhibit list prior to trial has been ordered in cases involving a large volume of documents and a complex alleged scheme, see, e.g., id. at 639-40.

Second, "the Second Circuit requires . . . that impeachment material be disclosed 'in time for its effective use at trial.'" *Canter*, 338 F. Supp. 2d at 462 (quoting *Coppa*, 267 F.3d at 142). Finally, and contrastingly, the "*Jencks* Act prohibits a District Court from ordering the pretrial disclosure of witness statements." *Coppa*, 267 F.3d at 145.

Defendant requests that this material be disclosed sixty days in advance of Mr. Wälchli's deadline for motions in limine, a time that is approximately five months in advance of trial. Defendant's Motion at 31. But he does not cite any authority for such a remarkably early production of material, nor does he cite any authority for the proposition that the production of this material should be tied to the deadline for motions in limine. See id. at 31-32 (listing cases wherein material was ordered to be produced, at most, eight weeks before trial). Indeed, as far as this Court can tell, ordering the production of these materials five months in advance of trial would be wholly unprecedented.

On the other hand, several facts nonetheless compel

1  the Court to require the production of the non-Jencks Act

2  material four weeks in advance of trial.  First, the defense

3  should be provided adequate time before trial to investigate

4  key witnesses who may reside overseas.

5      I understand that the government has asserted that

6  they have identified many of those witnesses, which is part of

7  the reason why I conclude that four weeks is sufficient.

8  Second, there are substantial number of documents in this case

9  for defendant to review -- approximately 171,000 pages

10  according to defendant.  See defendant's motion at 32.

11      Given these facts, the Court believes requiring

12  production of this material four weeks before trial is

13  sufficient both to comply with the constitutional requirement

14  that impeachment material be disclosed in time for its

15  effective use at trial, and a reasonable exercise of its

16  discretion to compel early production of exhibits.  See Canter,

17  338 F. Supp. 2d at 462; *Vilar*, 530 F. Supp. 2d at 639 (S.D.N.Y.

18  2008).

19      By contrast, the Court cannot order the government to

20  provide early disclosure of materials under the *Jencks Act*,

21  I've told you that the plain command based on the Jencks Act's

22  text which provides that no witness statement shall be

23  discoverable "until said witness has testified on direct

24  examination on trial of the case," precludes the Court from

25  directing the Government to provide *Jencks Act* material at any

1    specific time in advance of trial.

2           Nonetheless, as I've said, the Second Circuit has

3    noted that in the "spirit of cooperation among court and

4    counsel," it is appropriate for courts to encourage pretrial

5    disclosure of such materials where possible, so let me do that.

6           Counsel for the United States, you're willing to

7    commit to producing the *Jencks* Act materials also four weeks in

8    advance of trial?

9           MS. DAVIS:  Yes, your Honor.  As a practical matter,

10   we've already produced most of them.

11          THE COURT:  Thank you very much.

12          To summarize, no later than four weeks before trial,

13   the government is directed to provide defendant with a

14   preliminary, or "working," list of witnesses and exhibits it

15   expects to use at trial, no later than four weeks before trial,

16   unless the government, as to any particular document or

17   witness, demonstrates by convincing evidence that the

18   disclosure may endanger any witness or other person or would

19   otherwise be significantly prejudicial to the orderly

20   presentation of the government's case.  See *United States v.*

21   *Falkowitz*, 214 F. Supp. 2d at 392-93.

22          The government is further directed to provide

23   Defendant with any impeachment material and with copies of its

24   electronic exhibits by that same time.  The Court understands

25   that the Government has committed to providing *Jencks* Act

1    material by that same date and I appreciate that.

2              Finally, it should be obvious that the government is

3    obligated to provide the defense with any *Brady* information

4    consistent with its obligations if such materials are included

5    in materials that otherwise *Jencks* Act material, they are not

6    protected from prompt disclosure to the defense.  So the

7    government must comply with its obligations under *Brady* and its

8    progeny, and that is just the rule and I remind you of it.

9              So counsel for the defendants, I'm directing that the

10   defense provide a reciprocal list of its exhibits and

11   witnesses, impeachment materials and copies of exhibits on or

12   about the dates that three weeks before trial, and understand

13   that the defense I hope will commit to providing the equivalent

14   to *Jencks* Act material with respect to your witness by that

15   date.

16             Are you willing to do that with respect to your

17   witness statements, counsel for defendant?

18             MR. TEMKIN:  Yes, your Honor.

19             THE COURT:  Good.  Thank you very much.

20             I'm not going to set a schedule now for the filing of

21   additional motions *in limine* after these materials are

22   produced.  Let me just set my baseline expectation.  my

23   baseline expectation is that consistent with normal practice,

24   the parties will file plenary motions *in limine* prior to these

25   disclosures.  My expectation is that you will do it with

1    respect to issues that you are aware of.

2            If the production of any of these materials prior to

3    trial raises additional issues that may justify the filing of

4    additional motions *in limine*, I'll consider an application for

5    leave to file such additional motions.  But you should expect

6    that the default rule will be that you should file motions *in*

7    *limine* with respect to issues that you anticipate arising at

8    trial; and that you, therefore, will have to do so before the

9    full scope of the government's case has been revealed to you

10   through these disclosures that I will be ordering and

11   gratefully accepting your offer of as appropriate.  So thank

12   you very much, counsel.

13           Thank you to our court reporter for your indulgence.

14   That's all that I wanted to take up.  Just a brief note for the

15   government.  Your walking away from *Vilar* sort of confounded me

16   here as you can tell, so just a brief note on that.  Good.

17           What else do we need to take up here, if anything?  I

18   understand that we've already excluded time through the trial

19   date, so I don't think that that's a piece of business that we

20   need to take up.  Is there anything else that we need to take

21   up before we adjourn?  First counsel for the government.

22           MS. DAVIS:  Your Honor, I don't believe that the

23   government walked away from *Vilar*.  I think what Mr. Magnani

24   was doing was offering a different way to look at *Vilar* given

25   *RJR Nabisco*.  We've obviously briefed this.  You've heard our

1    argument.  You've ruled. That's fine.  We want to make clear

2    that we certainly acknowledge that *Vilar* is binding precedent

3    on this Court.

4              THE COURT:  Thank you. That's fine.  Thank you.

5              We'll leave the needling over this to law professors.

6    If it was earlier in the day, I might take it up.

7              Counsel for defendants, anything else from you?

8              MR. ALBERT:  Nothing further.

9              THE COURT:  Thank you all very much.  This proceeding

10   is adjourned.  Thank you very much.

11              (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25