O42WwalS

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        20 Cr. 497 (GHW)

5    DANIEL WALCHLI,

6                   Defendant.
                                         Sentence
7    ------------------------------x

8                                        New York, N.Y.
                                         April 2, 2024
9                                        10:00 a.m.

10   Before:

11
                        HON. GREGORY H. WOODS,
12
                                         District Judge
13
                             APPEARANCES
14
     DAMIAN WILLIAMS
15        United States Attorney for the
          Southern District of New York
16   BY:  OLGA I. ZVEROVICH
          Assistant United States Attorney
17        -and-
          NANETTE L. DAVIS
18        Special Assistant United States Attorney

19   MORVILLO, ABRAMOWITZ, GRAND, IASON & ANELLO, P.C.
          Attorneys for Defendant
20   BY:  JEREMY H. TEMKIN
          RICHARD F. ALBERT
21        JOSHUA P. BUSSEN

22
     Also Present:  Dr. Andreas Lanzlinger
23

24

25
```

O42WwalS

```
1              (Case called; appearances noted)

2              THE COURT:  Good morning.

3              We're here to conduct a sentencing hearing for the

4    defendant, Mr. Walchli.  First, I note that in the past Mr.

5    Walchli has proceeded without the need for the use of an

6    interpreter.  I've reviewed the transcript of our prior

7    proceeding, and counsel assured me that one was not needed.

8              Counsel for defendant, can I hear from you; does the

9    defendant require the services of an interpreter --

10             MR. TEMKIN:  No, your Honor.

11             THE COURT:  -- for these proceedings?

12             MR. TEMKIN:  No, your Honor.

13             THE COURT:  Thank you.

14             So it's your understanding that he will understand

15   everything that's said here today.

16             MR. TEMKIN:  Yes, your Honor.

17             THE COURT:  Thank you.

18             Mr. Walchli, please let me know if at any point you

19   have any difficulty hearing or understanding anything that's

20   said here today.

21             THE DEFENDANT:  Thank you, your Honor.

22             THE COURT:  Thank you.

23             First, I've received and reviewed the following

24   materials in connection with the sentencing:

25             First, the presentence report, which is dated March 7,
```

O42WwalS

1    2024;

2              Second, the defendant's sentencing memorandum, which

3    is dated March 19, 2024, together with its exhibits;

4              Third, the government's sentencing memorandum, dated

5    March 26, 2024, together with its exhibits; and

6              Fourth, the defendant's supplemental sentencing

7    submission, which is dated March 28, 2024.

8              Counsel, have each of the parties received all of

9    those materials?

10             Counsel, first, for the United States.

11             MS. DAVIS:  Yes, your Honor.

12             THE COURT:  Thank you.

13             Counsel for the defendant.

14             MR. TEMKIN:  Yes, your Honor.

15             THE COURT:  Thank you.

16             I know that the defendant's sentencing memorandum had

17   been filed with the clerk of the court subject to some

18   redactions that I'd like to talk about now.  The government's

19   sentencing submissions were initially filed on the docket, but

20   due to a docketing error, those were provisionally sealed.  I'd

21   like to talk about that as well.

22             First, counsel for defendant, I've reviewed the

23   proposed redactions to your sentencing submissions.  All of the

24   defendant's redactions in colors other than blue are approved.

25   They relate to health and other privacy information as to which

1    the defendant's and other privacy interests outweigh the

2    presumption of public access in judicial documents.

3            Now, as to the redactions in blue, I just want to

4    discuss them briefly, because I'm not sure why they all need to

5    be redacted.  The principal question, I think, here is about

6    the nature of the ODVP program and whether and to what extent

7    it requires the redaction of the identity of people that

8    participated in that program.  That's my principal question

9    here.

10           MR. TEMKIN:  Your Honor, we proposed that redaction

11   out of courtesy to the government.  My understanding, having

12   done a number of voluntary disclosures, is that the identity of

13   taxpayers who do voluntary disclosures is subject to 26 U.S.C.

14   6103, which is confidentiality of tax matters.

15           As your Honor will hear later, we think that there are

16   some issues with the fact that taxpayers are able to avoid even

17   public shaming by virtue of their participation in voluntary

18   disclosure program.  But it is, I think, practice to redact

19   their names.  The government has done so throughout, so we did

20   so as a courtesy.  I certainly have no objection to having

21   their names unsealed.

22           THE COURT:  Thank you.

23           Apart from that information, which the government, I

24   expect, will argue should be protected as a result of the fact

25   that the information was disclosed as part of the program,

O42WwalS

1    there's other information that's also proposed to be redacted

2    there that does not disclose identities of taxpayers who

3    participated in the amnesty program.

4            Does the defense have any arguments in favor of those

5    proposed redactions, or were those redacted, again, as a

6    courtesy to the government?

7            MR. TEMKIN:  Those were redacted because the names

8    appear in the bill of particulars as unindicted coconspirators.

9    The bill of particulars was filed under seal, so because we

10   were disclosing materials that are otherwise sealed, we thought

11   that it was appropriate to submit those in redacted form.

12           THE COURT:  Thank you.

13           Does that relate just to the names?

14           MR. TEMKIN:  The names, yes.  It's the names, and

15   certainly the positions of the individuals would effectively

16   identify them by name.  So by giving the position that the

17   person holds, you're effectively identifying the person for the

18   public.

19           THE COURT:  Thank you.

20           Let me hear from the government about the names and

21   I'll call it the broader description of the roles of the people

22   involved.

23           Counsel for the government, let me hear your argument.

24           MS. DAVIS:  Your Honor, Mr. Temkin is correct that we

25   have limitations, based on Section 6103 of the Internal Revenue

O42WwalS

```
 1   Code, and we take that obligation quite seriously, so we try to
 2   err on the side of caution.
 3               THE COURT:  Thank you.
 4               That's fine.  Understood.
 5               MS. DAVIS:  Yes.
 6               THE COURT:  I appreciate that argument with respect to
 7   the people that participated in the program, and I think that
 8   that interest as well as the statutory authority cited by
 9   defendant are sufficient to outweigh the presumption of public
10   interest in judicial documents.  I should say with respect to
11   this issue that the weight of the presumption is very low.  The
12   identities of the particular people involved has very little --
13   really, no -- weight in my decision-making here.
14               What about the other information?
15               MS. DAVIS:  Your Honor, just as department policy does
16   militate in favor of not publicly identifying unindicted
17   coconspirators, I think the policy specifically refers to an
18   indictment, but we also try to be cautious about it for privacy
19   and reputational reasons, and that would be the reason to not
20   identify those people by name.  And I agree with Mr. Temkin
21   that there are some instances where identifying them by
22   position would lead one to easily identify them by name.
23               THE COURT:  Thank you.
24               On this, as to the names, I appreciate the issue, but
25   part of my concern about some of the proposed redactions --
```

O42WwalS

1   again, the ones in blue -- is that they go to what I understand

2   to be one of Mr. Walchli's arguments, which is that his conduct

3   was not undertaken by him alone but that he went to others with

4   respect to the conduct.  That information is significant for my

5   decision-making here, and it's not apparent from the face of

6   the documents what those facts are with the redactions in the

7   scope that had been proposed here.

8              Any other argument on this?

9              MS. DAVIS:  Not from the government, your Honor.

10             THE COURT:  Thank you.

11             Counsel for defendant, let me hear from you.

12             MR. TEMKIN:  Your Honor, in redacting those names and

13   the other identifying information, we were acting pursuant to,

14   again, the fact that the coconspirator list was sealed and also

15   aware of the Department of Justice's policy against essentially

16   publicly shaming people who don't have an opportunity to appear

17   and defend themselves.

18             THE COURT:  Sorry.  Let me just pause you.

19             Counsel for the government, let me point you, for

20   example, to the defendant's sentencing submission, just to

21   frame the conversation with more concrete information for us.

22             Look at the bottom paragraph on page 24 of their

23   sentencing submission and the carryover paragraph.  Let's start

24   with the last sentence of that carryover paragraph on page 25.

25             Why should that be redacted?

O42WwalS

1          MS. DAVIS:  Your Honor, we would have no objection to

2     that last sentence being unredacted.

3          THE COURT:  Thank you.

4          And similarly, the redaction to the first sentence in

5     that paragraph, what's the argument in favor of redacting that

6     information?

7          MS. DAVIS:  I think in that particular paragraph, your

8     Honor, I think that if just the name is redacted, that that

9     would be sufficient.

10          THE COURT:  Thank you.

11          Good.

12          I'm going to approve more limited redactions with

13     respect to the content that was redacted in the defendant's

14     submissions in blue.  I think that there has been a sufficient

15     showing, as I described earlier, for redaction of the

16     identities of the individual taxpayers who participated in the

17     amnesty program for the reasons that I articulated earlier.

18          I also believe that there's sufficient justification

19     for maintaining under seal the specific names that are

20     identified in the redactions otherwise, but there's a

21     substantial amount of information.  For example, the one that I

22     understand now to be undisputed, just for illustrative

23     purposes, a statement that Holding's board approved the

24     formation of Helvetic, including its role in the Singapore

25     solution.  Such statements regarding the board approval of Mr.

O42WwalS

```
 1   Walchli's accused conduct I don't think should be redacted.  It
 2   has substantial weight in my assessment of the defendant's
 3   arguments regarding his role in this criminal conduct, and
 4   because of that, the weight of the presumption is high.  And I
 5   don't think that there's a sufficient showing of a
 6   countervailing privacy interest that outweighs that
 7   presumption, so I'm going to approve the proposed redactions in
 8   blue by the defense insofar as they pertain to the specific
 9   identities -- that is, the names -- of the people involved.
10   But otherwise, without a further showing, I'm not going to
11   permit the remaining redactions that have been provided to the
12   Court in blue in the defendant's submissions.  And so I'm
13   directing that the defense file a new version of those
14   submissions with the more limited redactions that have been
15   approved by me.
16           With respect to the government's submissions, as I
17   understand it, the majority of the redactions are ones that are
18   permitted under the rules in any event.  Those are permitted
19   under the rules.  There are two redactions that are sought in
20   addition to those.  Those relate to the information provided on
21   footnote 4 -- I'm sorry.
22           MS. DAVIS:  Footnote 1, your Honor.
23           THE COURT:  Thank you.
24           -- footnote 1 on page 4 of the government's sentencing
25   submission.  There, the information has very little weight --
```

O42WwalS

really, no weight -- in the Court's decision-making.  As a

result, the presumption is very low.  There is substantial

privacy interest and perhaps other equities involving

international comity which outweigh the presumption of public

access to judicial documents, and so I approve that.

Counsel for the government, because the version that

was filed online was the unredacted version, I don't know what

the specific reference is to the other thing that you wanted to

redact.

Is it the first name in bullet 1?

MS. DAVIS:  Yes.  There are a few instances, I

believe, of the same name reference as in the defendant's

motion that we've just covered.  I think we did it in a more

narrow way.  Other than the redactions that are authorized by

the Court's local rules, the other redactions were primarily in

the exhibits, and they related to individuals who worked for

the companies who otherwise had no role in anything.

THE COURT:  Thank you.

Understood.

Those redactions are also approved.  As counsel's

argued, they have no role in the underlying offenses.  Their

identities have no bearing on the Court's assessment of this

issue, and therefore, the weight of the presumption is very

low.  On the other hand, there are substantial privacy

interests implicated by disclosure of their identities, given

O42WwalS

```
 1    that, as the government has described, they had no role in the
 2    incident itself.
 3           Counsel for the government, I direct that you file the
 4    properly redacted versions of those documents on the public
 5    docket as promptly as practicable after today's proceeding and,
 6    in any event, no later than this Thursday.
 7           Very good.
 8           Counsel, are there any other submissions in connection
 9    with this sentencing?
10           First, counsel for the government.
11           MS. DAVIS:  No, your Honor.
12           THE COURT:  Thank you.
13           Counsel for defendant.
14           MR. TEMKIN:  No, your Honor.
15           THE COURT:  Thank you.
16           Let me turn, first, to counsel for defendant.
17           Counsel, have you read the presentence report?
18           MR. TEMKIN:  Yes, your Honor.
19           THE COURT:  Have you discussed it with your client?
20           MR. TEMKIN:  Yes, your Honor.
21           THE COURT:  Thank you.
22           Mr. Walchli, have you read the presentence report?
23           You can remain seated until I ask you to stand.
24           THE DEFENDANT:  Yes, sir, your Honor.
25           THE COURT:  Thank you.
```

O42WwalS

1          Have you discussed it with your counsel?

2          THE DEFENDANT:  Yes, your Honor.

3          THE COURT:  Have you had the opportunity to review

4     with your counsel whether there are any errors in the report?

5          THE DEFENDANT:  Yes, your Honor.

6          THE COURT:  Have you had the opportunity to review

7     with your counsel whether there are any other issues with the

8     presentence report that should be addressed by the Court?

9          THE DEFENDANT:  Yes, your Honor.

10         THE COURT:  Thank you.

11         Counsel for the United States, have you read the

12    presentence report?

13         MS. DAVIS:  Yes, your Honor.

14         THE COURT:  Do you have any objections related to the

15    factual accuracy of the presentence report?

16         MS. DAVIS:  Not technically to the factual accuracy.

17    We believe that the fine reference may have omitted the

18    possibility, not on the first page but in the body of it, the

19    possibility of twice the pecuniary gain or loss as an

20    alternative fine measure.

21         THE COURT:  Thank you.

22         Understood.

23         But there are no objections related to the factual --

24         MS. DAVIS:  No.

25         THE COURT:  -- accuracy of the presentence report, is

O42WwalS

1       that right?

2                   MS. DAVIS:  That's correct, your Honor.

3                   THE COURT:  Thank you.

4                   Counsel for defendant, do you have any objections

5       related to the factual accuracy of the presentence report?

6                   MR. TEMKIN:  Your Honor, we do not.

7                   I do want to call your Honor's attention to -- it was

8       a footnote in the reply submission that we filed last week that

9       noted that there was an error in the presentence report.

10      Paragraph 85 referred to, attributed something to our statement

11      of the offense, which we think is in error.  I don't think it's

12      a factual error.  I don't think it's material, but I did want

13      to make sure that your Honor was aware of that.

14                  THE COURT:  Thank you.

15                  I am.

16                  Counsel for the defense, I understand there are no

17      objections related to the factual accuracy of the report.  Is

18      that correct?

19                  MR. TEMKIN:  That's correct, your Honor.

20                  THE COURT:  Thank you.

21                  Given that there are no objections to the factual

22      recitations in the presentence report, the Court adopts the

23      factual recitations in the presentence report.  The presentence

24      report will be made a part of the record in this matter and

25      will be placed under seal.  If an appeal is taken, counsel on

O42WwalS

1    appeal may have access to the sealed report without further

2    application to the Court.

3            Now, although district courts are no longer required

4    to follow the sentencing guidelines, we are still required to

5    consider the applicable guidelines in imposing sentence, and to

6    do so, it's necessary that we accurately calculate the advisory

7    sentencing guidelines range.

8            In this case, the defendant pleaded guilty to Count

9    One of the indictment in this case, which is numbered 20 Cr.

10   497.  Count One charged him with conspiracy to defraud the

11   United States.

12           Counsel for the United States, does the government

13   agree that a two-level adjustment is appropriate here under

14   Section 3E1.1(a)?

15           MS. DAVIS:  Yes, your Honor.

16           THE COURT:  And is the government moving for an

17   additional one-level adjustment under 3E1.1(b)?

18           MS. DAVIS:  Yes, your Honor.

19           THE COURT:  Thank you.

20           I calculate the sentencing guidelines in a manner

21   consistent with the presentence report.  The applicable

22   sentencing guidelines manual is the November 1, 2023,

23   sentencing guidelines manual.

24           Pursuant to Section 2T1.9, I look to Section 2T1.4 to

25   determine the base level for the offense.

O42WwalS

1          Pursuant to Section 2T1.4(a)(1) and 2T4.1(g), the

2     offense level is 18 because the agreed-upon loss tax is more

3     than $250,000 but less than $550,000.

4          Because the offense involved the use of sophisticated

5     means, a two-level increase is warranted pursuant to Section

6     2T1.4(b)(2).

7          Because the defendant has no criminal history points

8     and the other conditions set forth in Section 4C1.1 do not

9     apply, a two-level reduction is warranted pursuant to Section

10     4C1.1.

11          Because the defendant has demonstrated acceptance of

12     responsibility for his offense through his plea allocution, I

13     apply a two-level reduction pursuant to Section 3E1.1(a).

14          Upon motion by the United States, an additional

15     one-level reduction is warranted under Section 3E1.1(b).

16          As a result the applicable sentencing guidelines

17     offense level is 15.

18          The defendant has no criminal history points.  As a

19     result, the defendant is in criminal history category I.

20          I've considered whether there's an appropriate basis

21     for departure from the advisory range within the guidelines

22     system, and while I recognize that I have the authority to

23     depart, I do not find any grounds warranting a departure under

24     the guidelines.

25          In sum, I find that the offense level for this offense

O42WwalS

| | |
|---|---|
| 1 | is 15 and that the defendant's criminal history category is I. |
| 2 | Therefore, the guidelines range applicable to this matter is 18 |
| 3 | to 24 months' imprisonment. |
| 4 | Counsel, does either party have any objections to the |
| 5 | sentencing guidelines calculation? |
| 6 | First, counsel for the United States. |
| 7 | MS. DAVIS:  No, your Honor. |
| 8 | THE COURT:  Thank you. |
| 9 | Counsel for defendant. |
| 10 | MR. TEMKIN:  No, your Honor. |
| 11 | THE COURT:  Thank you. |
| 12 | Counsel for defendant, do you wish to be heard with |
| 13 | respect to sentencing? |
| 14 | MR. TEMKIN:  Yes, your Honor. |
| 15 | THE COURT:  Thank you. |
| 16 | Please proceed. |
| 17 | MR. TEMKIN:  May I use the lectern, your Honor? |
| 18 | THE COURT:  You may. |
| 19 | MR. TEMKIN:  Your Honor, thank you very much. |
| 20 | First, as we get started, I'd just like to introduce |
| 21 | Mr. Walchli's family and friends who are here today. |
| 22 | In the front row, starting with his friend Sean Kirby, |
| 23 | who traveled up from Virginia to be with Mr. Walchli today, |
| 24 | Mr. Kirby wrote a letter to your Honor, and his parents who |
| 25 | also wrote a letter had intended to be here but could not |

O42WwalS

1    because of medical issues.

2            Next are Mr. Walchli's wife Antoinette and his

3    daughters Virginia and Raffaela, followed by his brother Peter

4    and his mother and stepfather, Margrit and Jean-Pierre Huber.

5    All of the Walchlis have traveled, obviously, from Switzerland

6    to be here with Dani today.

7            I know your Honor has read all of the materials that

8    we've submitted, and I'll try to be brief this morning.  I'll

9    do my best.

10           Your Honor, the government has asked for a guidelines

11   sentence.  As your Honor knows, probation recommended a

12   six-month sentence based on several mitigating factors that it

13   has identified, and we have asked for a noncustodial sentence.

14   We did not make that request lightly, your Honor, but we do

15   believe that the factors set forth in Section 35553(a) and

16   mitigating factors not addressed by the probation department

17   warrant a noncustodial sentence.

18           I'm going to start by talking briefly about Dani's

19   personal history and characteristics.

20           Section 3553(a) recognizes that while the defendant is

21   obviously here because of the offense conduct, in determining

22   an appropriate sentence, your Honor is permitted -- in fact,

23   required -- to consider the entire person.  And I think our

24   sentencing memo and the supporting letters demonstrate that

25   Dani is a good, decent, honorable person; came from a modest

O42WwalS

background, in a small working-class community in Switzerland,
to achieve substantial success, through hard work, dedication,
and whose sole contact with law enforcement is a result of his
involvement in what we call the Singapore solution.

First and foremost, the letters describe Dani as a
loving husband, caring father, devoted son, loyal adviser to
his brother.  They describe him as a kind and decent man, who
cares for elderly neighbors, who's an exceptionally hardworking
executive but who, while he was demanding of himself, also was
a mentor to his subordinates.

I was struck by the letters that Sara Nogly and David
Keller wrote to your Honor, describing how Dani gave them
opportunities to flourish, ensured that they would receive
credit for success but also stood up for them if there were
complaints.  So he was the kind of supervisor who showed real
support for his colleagues and genuine interest in their
careers, as your Honor saw.

The letters also talked about Dani's commitment to
leaving the world a better place than he found it.  Your Honor,
I know, read Dani's account of his trip to the Philippines and
how he was struck by the poverty that he observed and how he
felt a calling to do something about it.  Fortunately, he was
connected with the Child's Dream charity, based in Thailand,
and that charity's mission of providing education and health
care to poor children throughout Asia.  As Mr. Jenni and

1   Mr. Siegfried wrote in their letter to your Honor, Dani's

2   commitment was not just about giving money.  He personally

3   traveled to Thailand, the Myanmar border, Cambodia, to observe

4   Child's Dream's work in person.  He even went so far as to

5   deliver laptops to the children.

6            Dani also introduced Child's Dream to his friends and

7   family, who have become supporters of the charity as well, and

8   it says something about Dani's commitment to leaving the world

9   a better place.  But of all the letters we submitted, the ones

10  that sort of struck me most and said the most about Dani's

11  character were the ones that described his commitment to the

12  victims of the horrific bus accident involving several

13  employees of Evaluserve in India.

14           As your Honor knows, Dani served on Evaluserve's board

15  by virtue of his employer's investment in that company.

16  Nothing in that position required Dani to take a personal

17  interest or get personally involved in the lives of the victims

18  of that accident.  But after he heard about the accident, Dani

19  was so concerned that he got on a plane and flew to Delhi to

20  visit the victims personally and assure them they would be

21  taken care of.

22           But this was not a perfunctory fly-by visit.  Dani

23  took a genuine interest in the lives of people he never met

24  before.  He personally made medical arrangements for victims of

25  the accident, including Himanshu Sharma.  And when Himanshu

O42WwalS

later traveled to Switzerland for medical care, Dani and

Antoinette visited him in the hospital, invited him and his

brother to their home and generally made sure that they were

comfortable in a strange country.

In his letter to your Honor, which is exhibit 15,

Himanshu describes Dani as a pillar of strength for him and his

family.  If your Honor permits, I'll read a brief portion of

the letter, where Himanshu says:

What makes Daniel's actions even more exceptional is

the fact that at the time of the accident, he was a complete

stranger to me.  Our paths had never crossed before, and yet

Daniel treated me as if I were a beloved family member.

Daniel's selflessness and genuine actions exemplify the essence

of humanity, proving that compassion knows no bounds.

Your Honor, I respectfully submit that the most

genuine reflection of a person's character is how they behave

towards others who they know will never be in a position to

reciprocate.  Dani's relationship with Himanshu and the other

victims of the bus accident speaks volumes about his character.

Before I turn to the offense conduct, your Honor, I

want to speak about one other aspect of Dani's character that I

think bears mentioning and bears consideration.

Other defendants, both in this case and in other,

similar cases, have opted to avoid facing the consequences of

their conduct by staying in their home countries.  One of

O42WwalS

Dani's codefendants went so far as to jump bail when he was arrested in Spain.  As your Honor knows, Dani could have stayed in Switzerland and waited out the Department of Justice.  In fact, the defendants in the Wegelin case did just that, and ultimately, after nearly a decade, those defendants were rewarded for their intransigence and they were allowed to plead to misdemeanors.  But Dani was not going to hide from the Court's jurisdiction.  Instead, he directed us to notify the government of his willingness to come to the United States to face the charges.

Now, to be clear, it was to face the charges; before Dani pleaded guilty, we raised what we thought at the time, and still think, were meritorious motions.  We challenged the crime conspiracy doctrine generally and especially its extraterritorial application in this case.  We also challenged the application of the statute of limitations in light of the delay in unsealing the indictment.  But after your Honor denied those motions, Dani agreed to plead guilty.

We understand that the government would have preferred Dani to waive extradition, plead guilty, cooperate before even returning the indictment, but in considering Dani's character, it cannot be that his decision to voluntarily come to the United States, when he could have remained in his home country for the rest of his life, deserves absolutely no consideration. So we ask your Honor to consider it as one of the mitigating

O42WwalS

factors that weighs in favor of a noncustodial sentence.

Your Honor, obviously, Section 3553(a) requires consideration of the nature and circumstances of the offense and the need to afford just punishment.  And Dani stands before your Honor having pleaded guilty to the one count, the sole count, of the indictment charging him with a conspiracy to defraud the United States, in violation of Section 371.  I don't want anything I say to be interpreted as minimizing Dani's conduct.  OK?  But I think it's important to put that conduct in context and consider his culpability relative to the other participants in the offense.

Let me start with Dani joining Holding.

In 2004, he went to work at Holding, where his job involved, among other things, investing assets in various parts of the world, especially in Asia.  Now, Holding also owned a private bank, PrivatBank IHAG, but it's important, your Honor, to stress -- it's important for me to stress -- that Dani did not work at PrivatBank IHAG.  He did not set its policies.  He did not oversee its bankers.  He did not deal with its clients. The bank was an island within Holding.  It had its own leadership, who were senior, experienced executives with longstanding relationships to the owner of Holding, and the owner oversaw the bank as its chairman.

Now, like other banks in Switzerland, for many years PrivatBank IHAG offered bank secrecy to depositors from around

O42WwalS

1    the world, including the United States.  And in 2008, while

2    PrivatBank IHAG was adopting what's generally referred to as a

3    disclose-or-leave policy with respect to its U.S. clients, the

4    bank's general counsel and head of compliance, Michael Gubser,

5    worked with people at Allied Finance to develop a, quote,

6    solution.  The solution was, in essence, a means of enabling

7    high-net worth clients to evade the bank's own policy, to evade

8    this new policy that the bank was adopting.  And by December of

9    2008, Mr. Gubser and Mr. Schnellmann, of Allied Finance, had

10   designed what we've come to refer to as the Singapore solution.

11        The Singapore solution, as the government goes into

12   great detail in its submission, involved a series of transfers

13   that would, in essence, enable PrivatBank IHAG to remove from

14   the client files any reference to the fact that the

15   accountholders were U.S. persons, that the ultimate beneficial

16   owners were U.S. citizens and therefore had U.S. tax

17   obligations.

18        So the idea was take an account -- and the file in the

19   account shows that it's a U.S. account -- and make it a

20   non-U.S. account.  Mr. Gubser and Mr. Schnellmann had designed

21   a way of doing that.  Their initial design, as we pointed out

22   to your Honor in our reply submission, their initial design

23   involved another Singapore asset manager.  But Mr. Gubser was

24   aware that Dani was in the process of starting a Singapore

25   asset manager for IHAG, for Holding, and that ultimately became

O42WwalS

```
1    known as Helvetic.  So in January of 2009, Mr. Gubser
2    approaches Dani and asks whether Helvetic can be incorporated
3    in the design that he and Schnellmann had already developed, so
4    basically take out an unrelated asset manager and plug in
5    Helvetic.
6            A couple of points bear emphasis here.
7            First, there's no dispute that when Dani developed
8    Helvetic it was for legitimate purposes and that Mr. Gubser
9    co-opted, hijacked the asset manager into the scheme that he
10   and Mr. Schnellmann had otherwise designed.
11           Second, Dani did not have the authority, on his own,
12   to approve the use of Helvetic in this way.  Instead, as your
13   Honor noted before, and as we've argued, he presented the issue
14   to higher-ups at Holding, and it was only after those
15   higher-ups approved Helvetic's role in the Singapore solution
16   that Dani helped coordinate the efforts of the various
17   participants in the Singapore solution.  But it was based on
18   the express approval and direction of the higher-ups at
19   Holding.
20           Now, there were two round trips that took place in
21   late 2009.  They were round trips involving client family 1 and
22   client 2.  And early in 2010, so about a year after he first
23   was approached by Mr. Gubser, Dani approved the invoices for
24   the fees associated with the transfers.  That was Dani's last
25   active involvement in the Singapore solution -- the approval of
```

O42WwalS

1  the invoices.

2        Now, I think it's undisputed that later in 2010, Dani

3  became increasingly uncomfortable with his and Helvetic's role

4  in the Singapore solution, and he attempted to persuade the

5  powers that be that the Singapore solution should be

6  terminated.  When he raised the issue, the bank executives

7  scorned Dani for being weak, and his attempt to terminate the

8  Singapore solution was rejected.  But the following year, Dani

9  came back and again attempted to persuade the others to

10 terminate the Singapore solution.  This time he was successful,

11 called the head of Helvetic, told him to get rid of the

12 American clients, and after that call, Dani had nothing further

13 to do with the Singapore solution accounts.

14       We subsequently have learned that Gubser and another

15 defendant, Ivo Bechtiger, followed that up and moved the money

16 so that the American clients could continue to conceal their

17 assets.  Now, again, nothing in my comments is intended to

18 suggest that Dani did not violate U.S. law.  But in considering

19 the offense conduct as one of the 3553(a) factors, we ask your

20 Honor to consider Dani's relative culpability.  I think that in

21 any tax evasion scheme, the most culpable participant is the

22 U.S. taxpayers; obviously, it's their obligation to pay taxes

23 that's evaded.

24       Now, the two largest accountholders were able to avoid

25 the consequences of their years of tax evasion.  Decades before

O42WwalS

Dani was even involved, before he was even employed at Holding, these two taxpayers had been cheating on their taxes.  But they were able to avoid any responsibility, culpability, even public shaming, as I've noted, by virtue of the voluntary disclosure program.

Dani, we submit, is also less culpable than the senior bank executives at PrivatBank IHAG and the financial professionals at Allied Finance who spent decades helping U.S. citizens evade their tax obligations, including through other sophisticated devices.  There were years and years of sophisticated means of concealing accounts, including Liechtenstein foundations, Panamanian cooperations, BVI corporations.  There were countless ways in which U.S. taxpayers concealed their accounts and were helped in doing so by bank executives and client relationship managers.

The senior executives at the bank and the financial professionals at Allied Finance designed the Singapore solution to enable their clients to keep the undisclosed assets at PrivatBank IHAG.  Dani never met the clients who participated in the Singapore solution, but Gubser and Peter Ruegg, the bank's deputy CEO, had longstanding relationships with those clients.  Rather than enforcing the bank's disclose-or-leave policy and push those individuals to participate in the voluntary disclosure program that was available in 2009, the bank executives developed the Singapore solution so that they

O42WwalS

1    could continue to service those clients.

2           We also ask your Honor to consider that Dani's role or

3    involvement in the Singapore solution was solely in his

4    capacity as an employee of Holding.  He did not exercise any

5    supervisory authority over the bankers.  He did not receive any

6    additional compensation or a bonus as a reward for having

7    participated.

8           Now, we respectfully disagree with the government's

9    suggestion that Dani could have prevented the Singapore

10   solution or that he had the authority to terminate it.  Dani

11   might have been able to tell Gubser that Helvetic would not

12   play a role in the Singapore solution.  He might have been able

13   to do that, but as we pointed out in our reply letter to your

14   Honor, Helvetic was not an essential cog in the scheme, in the

15   Singapore solution.  There was an original asset manager that

16   was envisioned to be used, and if Helvetic was not available,

17   there's no reason to think that Gubser and Schnellmann would

18   not have found some other asset manager or means of

19   effectuating that piece of the Singapore solution.

20          The government also argues that Dani was somehow

21   uniquely situated to end the Singapore solution.  But I think

22   that's belied by what actually happened, because in 2010, when

23   Dani tried to end the Singapore solution, his efforts were

24   rejected.  But Dani nonetheless did press to try to close the

25   Singapore solution, and he ultimately succeeded in doing so in

O42WwalS

1   2011.

2           Now, the government suggests that Dani should have

3   forced the clients to disclose their accounts to the United

4   States.  But Dani didn't know the clients.  He didn't have a

5   relationship with the clients.  What he was doing was

6   terminating his role in the conspiracy.  Now, should those

7   accounts have been disclosed?  Yes.  But Mr. Gubser and

8   Mr. Bechtiger decided to go off and continue to help the

9   clients.  But that wasn't Dani's decision.

10          I'm going to turn now, if your Honor pleases, to the

11   issue of deterrence.

12          3553(a) directs that your Honor consider both general

13   and specific deterrence in protecting the public from future

14   crimes by the defendant.  Nothing in Dani's background suggests

15   that he is at all at risk of exposing the public to further

16   criminal activity or that he needs specific deterrence in any

17   way.

18          Throughout its submission, the government argues that

19   the Court should send Dani Walchli, from Switzerland, to jail

20   to deter U.S. taxpayers from cheating on their taxes.  In the

21   *Gardellini* case, which we cited to your Honor in our reply,

22   now-Justice Kavanaugh questioned the value of general

23   deterrence and the elevated importance that the government

24   places on it in tax cases like this.  But even setting aside

25   questions of general deterrence in the ordinary case, the

O42WwalS

government makes no effort to explain how sending a Swiss

citizen, like Dani, to jail is going to deter U.S. taxpayers

from cheating on their taxes.  And the deterrence argument

rings hollow when you consider that the government offered the

U.S. taxpayers, who used offshore accounts to cheat on their

taxes, not one, not two, not three, but four opportunities to

participate in voluntary disclosure programs.  And tens of

thousands of U.S. taxpayers took advantage of those

opportunities.  And the government offered Swiss banks an

opportunity to obtain amnesty despite the fact that for years

and years and years they had benefitted from the substantial

fees that were generated by U.S. clients.

      Now, your Honor, taxpayers, to be clear, were eligible

to participate in voluntary disclosure programs regardless of

how long they had been cheating on their taxes, the size of the

accounts, the amount of taxes that were evaded or the

complexity, whether they held the account in their own name or

they had a Liechtenstein foundation as a buffer.  And banks

were eligible to participate in the Swiss bank program and

avoid any risk of prosecution.  The only criteria was that they

could not be under investigation in August of 2013, when the

program was announced.

      There were 14 banks that were under investigation at

that time.  They were category 1 banks; they were ineligible.

Every other bank in Switzerland had the opportunity to

O42WwalS

participate in the program, get a nonprosecution agreement in

exchange for disclosing certain information regarding their

offshore activities and paying a penalty -- again, unrelated to

how many U.S. clients they had, the size of their U.S.

accounts, the amount of taxes evaded or the sophistication of

the schemes.  None of that mattered.  All they had to do was

come forward.

        I am not criticizing -- and I want to be clear on

this.  I'm not criticizing the Department of Justice and the

IRS for having offered the Swiss bank program to the banks or

the voluntary disclosure programs to the U.S. taxpayers.  Those

were policy decisions they were well within their right to

make.  But having made the policy choice to immunize over

56,000 taxpayers and 84 Swiss banks, I think that says

something about general deterrence.  And I think it's

far-fetched to think that prosecuting Dani Walchli is going to

somehow send a message to the U.S. taxpayers that they now have

to comply with their tax obligations.

        As we pointed out to your Honor, in two cases in the

Eastern District of Virginia, in 2015 -- so about nine years

ago -- the Department of Justice told a district judge

sentencing two Swiss bankers that -- and I'm going to read from

the sentencing memos that were submitted -- broad participation

in the IRS voluntary disclosure programs indicates that the

message of general deterrence has been widely received by U.S.

O42WwalS

citizens seeking to return to or otherwise enter into
compliance with the U.S. tax system.

That's the Department of Justice, in 2015, telling the
judge in Virginia that essentially general deterrence has been
achieved.

Now, there's no effort to explain what happened in the
intervening nine years that causes general deterrence to now be
of the essence and to require sending Dani to jail to deter
U.S. taxpayers.

The government's deterrence argument, to be fair, is
not limited to deterring U.S. taxpayers. The government also
talks about deterring other individuals, what are generally
referred to as enablers. But in the 14 years since this case,
since the offense conduct in this case, there's been an
enormous shift in the international banking industry, and I
think it's important to recognize, as we sit here in 2024, that
the world is very different than it was in 2013, when the
government offered the Swiss bank program, or even in 2009,
when Dani first got involved in the Singapore solution.

The U.S. and Swiss governments have sought to bring
taxpayers and banks into compliance, and the United States
Congress has passed, and the Treasury department has
implemented, the Foreign Account Tax Compliance Act, generally
referred to as FATCA. And FATCA is an important piece for the
international enforcement mechanism that mitigates the risk of

O42WwalS

1    undisclosed offshore accounts.

2         So your Honor, with respect to deterrence, we

3    respectfully submit that sending Dani Walchli to jail is not

4    going to serve the interest of general deterrence.

5         The next factor I want to turn to is the need to avoid

6    unwarranted sentencing disparities among defendants with

7    similar records who have been found guilty of similar

8    conduct -- similar conduct.

9         In our submissions, we addressed parity from several

10   different perspectives.  First, we noted the judicial

11   sentencing information data that was incorporated into the PSR

12   and data published by the sentencing commission.  What both of

13   those sources demonstrate is that the majority of defendants

14   convicted of tax offenses received substantial variances below

15   the sentencing guidelines, and many of those defendants

16   received noncustodial sentences.  In fact, adjacent data

17   provides that 36 percent of defendants, with Dani's guideline

18   range, convicted of tax offenses with Dani's guideline range

19   and criminal history category, received noncustodial sentences.

20   36 percent of the 105 defendants, noncooperating defendants,

21   got noncustodial sentences.

22        We also looked at sort of the cohort of U.S. taxpayers

23   who used undisclosed accounts to cheat on their taxes, and both

24   in this district and around the country, the majority of the

25   relatively few U.S. taxpayers who have been prosecuted for

offenses relating to offshore accounts received noncustodial

sentences, and virtually all of those defendants received

substantial variances.

Finally, in our submission, we address the 18

so-called enablers who were convicted in the United States for

conduct relating to facilitating U.S. taxpayers' tax evasion.

Unlike Dani, for decades, these defendants chose to make their

living facilitating tax evasion by U.S. customers and U.S.

taxpayers. We respectfully submit that all of them were more

culpable than Dani in terms of how long they had acted to

enable the U.S. taxpayers, the number of clients that they

serviced, the size of the accounts that they serviced and the

amount of taxes that their clients evaded. And only two of the

18 were sentenced to any period of incarceration.

Now, of the three defendants who, like Dani, are not

getting credit for cooperation, only Urs Frei, of Wegelin,

received any prison time. Unlike Dani, Mr. Frei and his two

codefendants did not voluntarily come to the United States to

face the charges. They waited out the government, stayed in

Switzerland for nearly a decade before they negotiated

misdemeanor pleas.

Now, we believe that Dani is less culpable of all

three of the Wegelin defendants, but he's certainly less

culpable than Mr. Frei, and we ask your Honor to consider that

while Mr. Frei has spent years managing undeclared accounts for

O42WwalS

1  U.S. taxpayers, he ultimately serviced up to 70 clients with

2  approximately $250 million in assets.  Notwithstanding that

3  conduct, he was sentenced to two months in prison and a $10,000

4  fine.  In light of the sentences imposed on Mr. Frei and his

5  codefendants, sending Dani to jail would create an unwarranted

6  sentencing disparity, your Honor.

7      Now, in response to the parity argument, the

8  government presents a chart of 67 cases that, based on the

9  docket numbers, appear to go back to 2009.  I want to address

10  the government's chart because I think it's not reflective of

11  how courts should be considering or do consider parity.  The

12  government's chart goes back 15 years, but we looked at the

13  last 10 years.

14      In the past 10 years, over 5,000 defendants were

15  sentenced for criminal tax offenses across the United States.

16  The government's chart refers to 67 of those.  Now, most of the

17  defendants on the chart are U.S. taxpayers who evaded their own

18  tax obligations or whose conduct was otherwise not comparable

19  to Dani's.  For example, one case involved the owners of Tony

20  Luke's Cheesesteaks in south Philadelphia, who failed to report

21  more than $8 million of cash receipts and paid their employees

22  under the table.  Another involved a tax protester from Oregon

23  who cheated on his taxes for 20 years.

24      The government makes no effort, and I can't discern

25  any explanation of how the defendants in that chart, how their

conduct is somehow comparable to Dani's, such that those

sentences -- which, by the way, include a number of significant

downward variances -- but how those sentences are at all

necessary to eliminate a sentencing disparity among like

defendants who are convicted of like conduct.

Finally, your Honor, we have set forth in our papers

another aspect of sentencing parity, and that relates to the

sentences that are available to your Honor.

In its submission, the government says Dani should not

get any credit for voluntarily coming to the United States to

face the charges because that's what any U.S. citizen would be

required to do and he should be treated the same as those

people; that because a U.S. person charged with those crimes

would have to stay in the United States and answer the charges,

Dani should not get credit for coming from Switzerland to face

the charges. Your Honor, this ignores the one essential fact

of what will happen if your Honor imposes a sentence of

incarceration.

If your Honor imposes a sentence of incarceration,

Dani will be treated significantly worse than a comparable

offender who receives an identical sentence but is a U.S.

citizen. So U.S. citizens get far better treatment by the

Bureau of Prisons than a Swiss national who comes to the United

States to face charges. That's an important consideration, we

respectfully submit, your Honor. U.S. citizens convicted of

O42WwalS

tax crimes almost always go to federal prison camps, and the
conditions at those camps are significantly less onerous than
other prison facilities, including the low prison facilities
that Dani would be eligible to serve his sentence at.

Under BOP policies, Dani is ineligible for a prison
camp, which means that any period that Dani spends of
incarceration will be significantly harsher than an identical
sentence that's imposed on a U.S. citizen convicted of a tax
offense.

In addition to being more difficult, any sentence your
Honor imposes will result in Dani spending more time in custody
than a U.S. citizen who receives an identical sentence.  Upon
his conviction, Dani will be deemed a deportable alien, which
means that, unlike a U.S. citizen convicted of a tax offense,
he will be ineligible to serve the last 10 to 20 percent of his
sentence in community confinement and home confinement.  And at
the conclusion of his sentence, Dani will be transferred to ICE
custody, where he will be held pending deportation.

Now, we've discussed this issue with the government,
and they have proposed that Dani enter into an order of
judicial removal, which will shorten the amount of time that
Dani will have to spend in ICE custody.  And we appreciate the
government's efforts in this respect, but the problem is it's
actually a catch-22, because if Dani has an order of judicial
removal entered before he goes to the Bureau of Prisons, he

O42WwalS

1    will be ineligible for FIRST STEP Act credit.

2            I want to try to quantify this point for your Honor.

3            Our understanding is that if there is an order of

4    judicial removal and your Honor were to impose the six-month

5    sentence that the probation department recommends, Dani will

6    serve the full six months in a low-security facility and will

7    then be transferred to ICE custody to be deported.  By

8    contrast, a U.S. citizen who receives the same six-month

9    sentence will be eligible for 50 days of FIRST STEP Act credits

10   and could be released from his prison camp -- not a low

11   facility, a prison camp -- in a little over three months if he

12   receives the earliest possible release to a halfway house.

13           Now, we tried to resolve this issue by asking if ICE

14   would commit to allow Dani to self-deport, which we understand

15   would enable him to receive FIRST STEP Act credits and avoid

16   ICE detention and might even enable him to be designated to a

17   camp.  Unfortunately, ICE was unwilling to make that commitment

18   or, quite frankly, show any flexibility at all on the issue.

19   The only way we can see to avoid this conundrum is for the

20   Court to enter an order similar to the one that Judge Rakoff

21   entered in Frei, where he ordered that the defendant be

22   permitted to self-deport, ordered ICE not to lodge a detainer

23   and expressed the intent that the order would enable the

24   defendant to serve his sentence at a prison camp.

25           Unfortunately, your Honor, my understanding is that

O42WwalS

```
 1   even if your Honor were to enter such an order, there is no
 2   assurance that ICE and the Bureau of Prisons would follow your
 3   Honor's recommendations.  So there's no way to guarantee that
 4   this issue of parity in the sentence that is actually served is
 5   achieved.
 6            THE COURT:  I'm sorry.  Can I just ask a question.
 7            MR. TEMKIN:  Yes.
 8            THE COURT:  The Frei order by Judge Rakoff that you
 9   just described, was it an order or a recommendation?
10            MR. TEMKIN:  It was an order, and I can hand it up to
11   your Honor.
12            THE COURT:  Please do.
13            MR. TEMKIN:  May I just show the government?
14            THE COURT:  You may.
15            Thank you, counsel.
16            You can proceed.
17            MR. TEMKIN:  Your Honor, I'm going to close now by,
18   again, thanking your Honor for the time and attention that
19   you've devoted to the case and for permitting me to go on
20   longer than I had thought I would this morning.
21            I want to repeat.  We did not ask for a noncustodial
22   sentence lightly, but for all the reasons that we discuss in
23   our papers and that I've discussed today, we respectfully
24   submit that the facts of this case, considered in light of the
25   statutory factors, justify such a sentence, and we urge your
```

O42WwalS

1    Honor to balance punishment with mercy and to allow Dani to

2    return home to Switzerland with his family.

3              Thank you, your Honor.

4              THE COURT:  Thank you, counsel.

5              Let me turn to the defendant.  Would you like to make

6    a statement to the Court?

7              THE DEFENDANT:  Yes.  Yes, your Honor.

8              THE COURT:  Thank you.

9              THE DEFENDANT:  Shall I make it from here or --

10             THE COURT:  Wherever you feel most comfortable.

11             THE DEFENDANT:  Your Honor, thank you for giving me

12   the opportunity to speak to you today and for reading my

13   letter.  And please also excuse that I have a paper in front of

14   me.  I wouldn't do that normally, but this is a very difficult

15   and emotional time for me, and I just want to ensure that I

16   don't forget anything I want to speak today.

17             I want to say here and now the most important thing.

18   I deeply regret what I have done, and I want to apologize to

19   you, your Honor, to the government and to the American people.

20   I know it was wrong to have participated in helping American

21   taxpayers to continue to conceal their accounts at PrivatBank

22   IHAG.  I have no one to blame for my actions than myself.  And

23   I sincerely apologize for my role in the Singapore solution.

24             It has been a long and very difficult time for me to

25   get here today.  For me it has been ongoing for nearly 14 years

O42WwalS

now.  My actions not only caused me to feel ashamed but have

also caused sorrow and pain to my family.  I, therefore, also

want to apologize to my family -- sorry -- and tell you that

your caring love has helped me so much.

      To my wife Antoinette and our daughters Virginia and

Raffaela, my mother Margrit and her husband Jean-Pierre, my

brother Peter and my close friend Sean Kirby, thank you so much

for supporting me and being here today.

      I also want to thank John Kirby and Sherry Kirby, who

wanted to be here today, but for medical reasons,

unfortunately, they couldn't come.

      I will never be able to thank you enough for your love

and your support over the past several years.

      Virginia and Raffaela, I am so very sorry to have

brought so much suffering into your lives.  I will never be

able to forgive me for this.

      Your Honor, the only hope I have is that I'm given a

second chance, that I can close this chapter and so my family

and I move past this.

      Thank you very, very much, your Honor, for listening

to my words.

      Thank you.

      THE COURT:  Thank you.

      Counsel for the United States, does the government

wish to be heard with respect to sentencing?

O42WwalS

1              MS. DAVIS:  Yes, your Honor.

2              THE COURT:  Thank you.

3              Please proceed.

4              MS. DAVIS:  Your Honor, what the defense has urged for

5    this defendant, who engaged in some of the most brazen conduct

6    that we've seen in the Swiss banking world, is an utter lack of

7    accountability: no jail time, apparently no fine; rather, just

8    that he be able to go back to Switzerland to live his

9    comfortable life, without any cost to him other than the cost

10   of having to go through this prosecution.

11             I'd like to add some additional context to the facts

12   that were highlighted by Mr. Temkin.

13             First, it's very important to note that the

14   development of the Singapore solution and its subsequent

15   implementation happened at a time where very, very publicly the

16   United States was bringing law enforcement actions against

17   Swiss banks, the first Swiss bank being UBS.  The investigation

18   of UBS became public in mid-2008, and in February of 2009, UBS

19   entered into a deferred prosecution agreement with the United

20   States.  Along with that was what's called a John Doe summons,

21   which was directed to UBS to try to get them to disclose the

22   names of U.S. accountholders who were hiding income and assets

23   at UBS.

24             Ultimately, this procedure and the law enforcement

25   activities resulted in some names being produced to the United

O42WwalS

States.  But not all names.  Ultimately, Swiss banking secrecy
prevailed and prevails to this day in terms of the government's
ability to obtain the names of specific accountholders.  I
heard just this week from a Swiss attorney that they couldn't
disclose to us particular information that we had requested
because of Swiss bank secrecy.

Your Honor, I don't usually interject my own personal
experiences in this, but I was a manager of the Swiss bank
program on behalf of the Department of Justice tax division.  I
sat through conduct disclosure meetings for over 80 Swiss banks
who opted to participate in the Swiss bank program, and I can
tell you that the Singapore solution stood out among the
conduct that was disclosed to the United States by those Swiss
banks for its absolute brazenness in developing a brand-new
fraud scheme to help clients who were refusing to participate
in the options that were available to them, the OVDP, continued
to hide their assets and continue in that way to earn fees for
the enablers, the bankers and the fiduciary services firm.

It was brazen.  It involved not one, not two but
multiple countries, the establishment of dozens of entities in
places like BVI.  It required the agreement of Mr. Walchli as
the head of Helvetic and its participation, which, contrary to
the statement of Mr. Temkin, there was no hijacking of
Helvetic.  Mr. Gubser approached Mr. Walchli, who was the head
of Helvetic, down to choosing its logo, and Mr. Walchli

O42WwalS

1   interposed no objections to that, agreed to it, and that is how

2   Helvetic got intimately involved as a key player in this.

3        It was Helvetic in whose name the evaded taxes were

4   coming back to IHAG.  It was Helvetic in whose name the

5   accounts were held.  It was Helvetic who was overseeing the KYC

6   that was required by Singapore.  It was Mr. Walchli, who was

7   the director of Helvetic, and was the person tasked by his boss

8   to lead the charge into Asia for IHAG.  Unfortunately, that

9   charge was led on the back of the United States taxpayers.

10       And it's clear that Mr. Walchli had every intention of

11   trying to service undeclared taxpayers even after the UBS

12   deferred prosecution agreement became public.  We have to look

13   no further than exhibit 2 to the government's submission, which

14   are board meaning minutes for AFP Holding, which was the Hong

15   Kong entity that had been purchased by IHAG Holding's Asia

16   subsidiary that was being used as part of this, because the

17   money was jumping through Hong Kong and they needed entities

18   and they needed bank accounts, and that was AFP Holding's role.

19       Mr. Walchli was a member of that board, and we see the

20   minutes from May 2009, where the client structures were being

21   discussed based on charts that were provided by Mr. Walchli.

22   And it lays out five different options that might be used by

23   taxpayers to continue, using Mr. Walchli's own words, having

24   their black money remain black.

25       It's quite clear that Mr. Walchli -- you can see on

the last page, at the bottom -- was the author of those

minutes.  He understood everything about how these schemes were

supposed to work.  He's also offering up other options, like

insurance wrappers, and I can refer the Court to the deferred

prosecution agreement with Swiss Life insurance company that

was a purveyor of those insurance wrapper options that many

Swiss banks offered to their clients.  Those were the kinds of

solutions that Mr. Walchli was trying to develop, that Mr.

Walchli was entertaining as a board member of AFP Holding.

        So far from being what appears, if you take

Mr. Temkin's words, an attempt to portray Mr. Walchli as this

poor, innocent person who was swept into this unfortunate

scheme, Mr. Walchli was an essential part of the development

and implementation of this brazen tax fraud scheme.  But if you

follow Mr. Temkin's recommendation, Mr. Walchli will suffer no

accountability here in the United States criminal justice

system.

        Certainly the tools that are available to the Court

are somewhat blunt.  It's basically jail time, money.  You

know, sometimes there are other options.  But here, we submit

that the appropriate sentence is a within-guidelines sentence

that has, by virtue of the guidelines computations, already

accounted for his acceptance of responsibility and already

accounted for the fact that he is a first-time offender.  That

would help bring home the message to other offshore enablers

O42WwalS

1    that the United States is not fair game for their schemes.

2            I tell you, your Honor, notwithstanding Mr. Temkin's

3    rosy picture of the state of offshore compliance, those

4    enablers are still out there.  They are still helping United

5    States taxpayers evade their taxes, and the schemes are getting

6    more and more complex as the Department of Justice's efforts

7    have gotten deeper and deeper into their world.

8            With respect to the other Swiss enablers, there was --

9    and that model has somewhat changed -- for the longest time a

10   pretty odious business model in Switzerland, whereby much of

11   their economy was driven by servicing clients who were doing

12   nefarious things, like evading taxes, money laundering, hiding

13   income and assets from their respective governments, and the

14   Swiss bankers that Mr. Temkin referred to were employees of

15   those banks that engaged in that odious conduct.

16           The IRS has attempted in many different ways to try to

17   reach what are very, very difficult accounts to uncover.  One

18   of the primary ways is, as Mr. Temkin acknowledges, the

19   offshore voluntary disclosure program.  The fact that there

20   were tens of thousands of accountholders who came in -- and I

21   believe the amount collected through that is upwards now of $10

22   billion -- is a testament to the depth of the problem.  And

23   each one of those U.S. taxpayers was enabled by a person

24   entrenched in the Swiss banking industry.

25           Now, we acknowledge that Mr. Walchli was not a Swiss

O42WwalS

banker.  He worked for the holding company, but I don't see

that that's a meaningful distinction when you look at what he

actually did and how deeply he was involved here.  He was a key

player in this, notwithstanding Mr. Temkin's assertions that

everybody else was more culpable than he.

     We have no reason to be able to verify, other than Mr.

Walchli's words, that he tried in 2010 to put a stop to the

Singapore solution, unsuccessfully, quite apparently.  In 2011,

he did convince the bank to kick the clients out, but there

were no efforts made by Mr. Walchli or any of the other

participants to ensure that those clients became tax compliant.

Rather, what they were doing -- and I note that in 2011, four

Credit Suisse bankers were indicted -- they were getting rid of

the hot potato of those undeclared clients and, as it turns

out, assisting them overall in going to Singapore bank

accounts, in new entity names, continuing the scheme for a

number of years.

     In short, your Honor, no jail time for Mr. Walchli

would send no message whatsoever of deterrence to others

situated like him.  The fact that they've highlighted the

suffering that he has apparently undergone in the last 14

years -- and we've heard it from Mr. Walchli today, and I feel

deeply sorry for his family -- he had every opportunity to come

in, at least by 2014, when we understand that Mr. Temkin was

hired to represent him.  But rather, he did not do that.  He

O42WwalS

played a wait-and-see game, and he waited until he had lost his

motion to dismiss to plead guilty.  That's his right to do, and

we do not quarrel with that, but he should not be rewarded

somehow for the suffering that he purported to go through in

the intervening years, when the length of time was of his own

making and of his own choice.

    Your Honor, it's always a difficult thing to

contemplate the sentence of someone who otherwise appears to

have led a good, decent and honorable life.  But he did not

engage in good, decent or honorable conduct when it came to the

Singapore solution.  We still don't know why he did it.  We've

proffered to you a theory in the government's submission.

Perhaps it was nothing more than wanting the approval of his

boss.  Perhaps it was wanting to maintain his position at IHAG

Holding and not incur the wrath of the people he worked with.

But whatever it was, he had a choice.  He made it, and it

resulted in not only lost tax revenue to the United States, but

it resulted in multiple regulatory actions by the countries who

were impacted, including Germany, Singapore and Switzerland,

where FINMA made inquiries of the bank when they heard about

the Singapore solution.

    Mr. Walchli has been a very fortunate man in

comparison to so many and so many who have come before this

Court.

    We attempted to work with his lawyers regarding a

O42WwalS

```
 1    consent judicial removal order, which was rejected.  Your
 2    Honor, we believe that the only fair sentence, given all of the
 3    factors under 3553(a), is a term of imprisonment.  We submit
 4    that the appropriate term falls within the sentencing
 5    guidelines.
 6            If there are no questions, your Honor, we rest on our
 7    papers.
 8            THE COURT:  Good.  Thank you, counsel.
 9            MR. TEMKIN:  Your Honor, may I just have one moment --
10            THE COURT:  Yes.
11            MR. TEMKIN:  -- to talk with Mr. Albert and
12    Mr. Bussen?
13            THE COURT:  Yes, you may.
14            Let me do this.  I was going to propose that we take a
15    very short recess.  We've been here for a little while, and I
16    want to give everybody a chance to stretch their legs, so I'll
17    take a short, five-minute break.  Please confer during that
18    period, and I'll hear any further argument that the defense
19    wants to offer.
20            I'll see you here shortly.
21            MR. TEMKIN:  Thank you.
22            (Recess)
23            THE COURT:  Thank you.
24            Be seated.
25            Good.
```

O42WwalS

1          Thank you.

2          Counsel for defendant, anything else from you?

3          MR. TEMKIN:  Your Honor, very, very briefly.

4          First, with respect to Ms. Davis's last point about

5     the thesis that they posited for why Dani would have engaged in

6     the conduct, Dani had an enormously successful career at IHAG,

7     at Holding.  There was no financial gain, and it's speculation

8     to think that somehow these clients were essential to the

9     success of Helvetic.

10         The point that I was making with respect to Gubser's

11    co-opting of Helvetic is there's no question that Dani was

12    developing a legitimate asset manager for purposes wholly

13    unrelated to concealment, account concealment, and we know that

14    because Helvetic survived many years after those accounts were

15    closed.  So those accounts were in no way central to Helvetic,

16    and there's no reason to believe that they somehow furthered or

17    enhanced Dani's career.

18         Second, Ms. Davis was obviously very, very active in

19    the Swiss bank program, and the design of the Swiss bank

20    program was in many ways ingenious in how it pitted different

21    constituencies against one another.  I, too, was pretty active

22    in the Swiss bank program, your Honor, and I find it hard to

23    believe that this was the most brazen conduct that the 84 banks

24    that were immunized by virtue of the Swiss bank program engaged

25    in.

O42WwalS

1          Finally, with respect to the comment about FINMA,

2     FINMA is the bank regulator in Switzerland, and I understand

3     that they actually investigated all banks that participated in

4     the Swiss bank program, the conduct that was disclosed.  So I

5     don't think that there's anything special about the fact that

6     FINMA looked at the Singapore solution.

7          Your Honor, I really do appreciate the time and

8     attention that your Honor has given to this matter, and unless

9     your Honor has any questions, I'll sit down and rely on the

10     papers.

11          THE COURT:  Thank you.

12          Counsel, is there any reason why sentence should not

13     be imposed at this time?

14          MS. DAVIS:  No, your Honor.

15          MR. TEMKIN:  No, your Honor.

16          THE COURT:  Thank you.

17          I'll now describe the sentence that I intend to

18     impose, but counsel will have a final opportunity to make legal

19     objections before the sentence is finally imposed.

20          As I've stated, the guidelines range applicable to

21     this case is 18 to 24 months of imprisonment.  I've considered

22     the guidelines range.  Under the Supreme Court's decision in

23     *Booker* and its progeny, the guidelines range is only one factor

24     that I must consider in deciding the appropriate sentence.  I'm

25     also required to consider the other factors set forth in 18

O42WwalS

U.S.C. Section 3553(a). These include:

First, the nature and circumstances of the offense and the history and characteristics of the defendant;

Second, the need for the sentence imposed to (a) reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, (b) to afford adequate deterrence to criminal conduct, (c) to protect the public from further crimes of the defendant, and (d) to provide the defendant with needed education or vocational training, medical care or other correctional treatment in the most effective manner;

Third, the kinds of sentences available;

Fourth, the guidelines range;

Fifth, any pertinent policy statement;

Sixth, the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

Seventh, the need to provide restitution to any victims of the offense.

Ultimately, I'm required to impose a sentence that is sufficient but no greater than necessary to comply with the purposes of sentencing that I mentioned a moment ago.

I've given substantial thought and attention to the appropriate sentence in this case, considering all of the 3553(a) factors and the purposes of sentencing, as reflected in

1    the statute.  Based on a review of all of those factors, which

2    I'm going to discuss in much more detail in a moment, I intend

3    to impose a nonguidelines sentence of time served.  I do not

4    expect to impose a term of supervised release.  I expect to

5    impose a fine.  I do not expect to issue an order of

6    restitution.  I'm going to impose the mandatory fee of $100.

7    I'm going to discuss each of those issues with more specificity

8    after I've reviewed my reasoning, which I'm going to go into in

9    more depth now, starting with the nature of the offense.

10           Let me just start by saying the nature of

11   Mr. Walchli's crimes was very serious.  Tax fraud is a very

12   serious crime.  Many of us have heard the famous quote by

13   Justice Holmes, who wrote that "taxes are the price we pay for

14   a civilized society."  So for those of us who facilitate not

15   paying taxes, look around.  It's the price we pay for a

16   civilized society.  The people who evade that duty and people

17   like the defendant who facilitate its evasion are committing a

18   very serious crime, one that undermines a civic society.  The

19   government's work in this arena is very important.  It is

20   prosecuting serious crimes and working to stop corrosive

21   practices that undermine our civic society.

22           Now, I'm not going to try to outline all of the

23   details of the so-called Singapore solution that PB IHAG

24   developed to help some of their American clients to hide their

25   money.  It's all thoroughly explained in the presentence report

O42WwalS

1    and the various submissions by the parties.  I, like the

2    government, view it as being sophisticated, dastardly in its

3    effort to hide these clients' assets from the government.  I

4    will not recite all of its details, but I'll just say a few

5    words, in part, in order to put the defendant's participation

6    in the scheme into context.

7            As we've heard, the defendant was employed by IHAG

8    Holding, a holding company.  He started working there in 2004

9    and became a member of its executive board in 2006.  It was in

10   early 2009, in response to stepped-up enforcement in the United

11   States, that PB IHAG, a Swiss bank that was an affiliate of

12   IHAG Holding, the company for which the defendant formerly

13   worked, adopted a policy that would require Americans with

14   deposits there to disclose their accounts to the IRS or would

15   require them to leave the bank.  But the bank had three

16   significant American clients who did not want to do that.

17   Those accounts had about $60 million in them, so the company's

18   top lawyer, acting at the direction of the bank's executive

19   management and without the defendant's knowledge or

20   involvement, approached a codefendant, Mr. Schnellmann, about

21   developing the Singapore solution.  That lawyer, top lawyer,

22   worked with Mr. Schnellmann, Mr. Lampert and others at Allied

23   Finance to develop the solution which essentially involved

24   laundering money through a Singapore-based money manager, which

25   would then deposit the funds in PB IHAG in its own name -- a

O42WwalS

complex scheme involving moving money through multiple boxes internationally and obscuring the identities of the depositors. It was a sophisticated, complex scheme.

The scheme was developed and structured with the guidance of senior management at the bank, who counsel for defendant described as higher-ups, who are not before me here, and others who are being prosecuted but who have largely evaded capture. Those people developed the scheme without the defendant's involvement. Mr. Walchli got involved because several years earlier he'd been tasked with exploring ways for IHAG Holding to enter the Asian market. In doing so, he developed an asset management business, which we've heard about today, called Helvetic.

I highlight that his codefendants had another Singaporean entity in mind when they developed the scheme, and again, ironically, it was the top lawyer and risk manager at the bank who approached the defendant about using Helvetic in the scheme. Before he agreed to do so, the defendant sought the approval of higher-ups in the company's management. He also disclosed it to the company's board, and the company's board approved the conduct.

Mr. Walchli then participated in the project from about, until about 2011, or at least Helvetic did. During that period, the three U.S. families engaged in a series of complex transactions to round trip their funds to PB IHAG to avoid

O42WwalS

1    paying U.S. taxes.

2            Now, I understand that Mr. Walchli proffers that he

3    grew uncomfortable with the structure in 2010 and asked his

4    superiors to stop using the solution.  I'm told that they

5    declined to do so when he first asked.  I've heard today and in

6    the sentencing submissions that the bank's employees scorned

7    the defendant for his attempt to stop their use of the

8    solution.  Eventually, in 2011, I understand it's undisputed

9    that the defendant asked to cut Helvetic out of the Singapore

10   solution, and it was at the defendant's initiative.

11           Two of the three U.S. families for whom the Singapore

12   solution was developed ultimately participated in the IRS's

13   offshore voluntary disclosure program.  Through that program,

14   those two families disclosed their illegal offshore banking

15   activities.  They paid restitution.  They paid penalties, all

16   in exchange for amnesty and anonymity.  Because they

17   participated in the program, the principal beneficiaries of the

18   program are not being prosecuted.  One person who used the

19   solution, Mr. Chinn, was prosecuted.  He pleaded guilty,

20   forfeited a number of offshore assets and was sentenced to

21   probation with, I think, 18 months of house arrest.

22           So, this is a very serious crime.  I do not undermine

23   it.  The development and use of the Singapore solution was

24   sophisticated.  It was wrong.  It defrauded the government.

25   The defendant knowingly engaged in that complex fraud.

O42WwalS

1          At the same time, I believe that the defendant was one

2    of the least culpable people involved in the scheme.  He did

3    not develop the scheme.  It was developed by others.  He was a

4    later addition to the scheme.  He was recruited to it because

5    the business that he had developed for legitimate reasons was

6    viewed as being capable of playing a role in the scheme.  He

7    was not personally involved in the client relationships that

8    the scheme was designed to preserve.  Again, the defendant was

9    approached to participate in the scheme by the company's top

10   lawyer and compliance officer, and he sought and obtained

11   clearance from "higher-ups" and the board before he moved

12   forward.  So I recognize that he had a meaningful role, but I

13   do not believe that he was as culpable as a number of his

14   codefendants or perhaps others who have not been charged, and

15   was not nearly as culpable as the taxpayers who have been

16   granted amnesty by the government and, as a result, have not

17   faced the threat of prosecution or the collateral consequences

18   of it.

19          So, this is a serious offense, but I think it's

20   important to consider not just the overall seriousness of the

21   Singapore solution; I think it's important to target the nature

22   of the defendant's participation in it and the circumstances

23   that led to his engagement in it and the circumstances related

24   to his withdrawal from it.

25          The defendant was born in May 1967 in Zurich,

O42WwalS

Switzerland.  He's 56 years old today.  He was raised by both

of his parents there in what was described as an upper

middle-class life style.  The government describes his life as

comfortable.  His family was close-knit.  He's been married to

his wife, who is here today, since 1999.  The couple have two

adult children, who are both here.  His entire family remains

very supportive of him, as is reflected in the numerous letters

that I've received from all of them.

I've read all of the letters submitted in support of

the defendant in connection with this sentencing, and I take

from them that in many other aspects of the defendant's life,

he has been a generous, committed, hardworking person and one

that in particular in connection with his dedication to charity

and his assistance for the victims of the bus accident in India

is arguably exemplary.  His commission of this offense appears

to be aberrational.  And again, in my view, it's significant

that he participated in it only after having requested and

received the endorsement of higher-ups at his company and its

board of directors and that he did so after being solicited to

participate in it by the chief risk officer, the person charged

with compliance at the bank.

The defendant is blessed with generally good health.

He has no history of mental health issues or substance abuse

issues.  The defendant graduated from university in Switzerland

and has an MBA from the University of Rochester.  He enlisted

O42WwalS

1    in the Swiss army.  He was there for a period of six years,

2    over the course of which he achieved the title of lieutenant.

3    He has a long history of legitimate work in banking and finance

4    and I'll call it management.  He started off at ZKB before

5    moving to IHAG Holding in 2004.  He worked there for 18 years,

6    first as vice president for strategy and business development,

7    and then he moved to a position on the company's executive

8    board.  He's principally involved in business development and

9    investment strategy.  His work, as I understand it, did not

10   generally involve client relations with customers of PB IHAG,

11   the bank at the center of this scheme.

12        The defendant has no prior convictions for criminal

13   conduct.

14        Now, I've considered what is a just punishment in this

15   case.

16        I'm also required to consider the deterrent effect

17   both on Mr. Walchli personally and the need to deter others

18   from committing this type of offense, which we refer to as

19   general deterrence.

20        I think that the need for personal deterrence here is

21   very low.  I think that for a number of reasons:

22        First, the defendant committed this offense over a

23   decade ago.  We have no information that he was involved in

24   criminal conduct since he took the steps to withdraw the

25   Helvetic entity from the scheme.  The indictment in this case

O42WwalS

wasn't unsealed until about eight years after one of the

families participated in the OVDP program, presumably

disclosing this scheme, so there was not a rush to stop him.

Second, the defendant only engaged in this crime after

being requested by his employer, after receiving the express OK

from higher-ups; he did not financially benefit from the

offense.

Third, Mr. Walchli does not have a financial need to

commit further crime.

Fourth, I think that the defendant's approach to this

indictment supports the view that he has accepted

responsibility for the offense both through his willingness to

appear in the United States to face it and his subsequent

conduct and engagement since his indictment.

Now, I put little weight in the government's argument

that I should not value his willingness to come to the United

States to face the charges because he wanted to protect his

ability to travel abroad.  I think that argument undervalues

the challenges of exposing oneself to prison, and the conduct

by Mr. Walchli's codefendants illustrates what I think is the

fallacy of the argument.  They've decided to stay in

Switzerland rather than face that risk.  So I, therefore, take

that Mr. Walchli's willingness to come to the United States

demonstrates a commitment to accepting responsibility for his

negative behavior, and I think that that is worthy of note.

O42WwalS

1    And I think it supports my view that the need for personal

2    deterrence is low.  His acceptance of responsibility weighs in

3    favor of a lesser sentence.

4         Now, I've weighed the need for general deterrence in

5    this case.

6         I think that this is a factor that requires serious

7    consideration.  I agree with the government that facilitators

8    of this kind of tax fraud against the United States should be

9    deterred from that type of conduct.  Still, this is just one of

10   many factors that I must weigh in assessing the 3553(a)

11   factors, and I don't believe that it requires a greater

12   sentence in the context of the assessment of all of those other

13   factors.

14        I note, among other things, the serious collateral

15   consequences of the offense.  I accept the shame and psychic

16   toll of prosecution.  I also note the length of time between

17   the date of the conduct and today's sentencing.

18        I've considered the defendant's ability to use any

19   period of incarceration for education or vocational training,

20   medical care or other correctional treatment.

21        Given the defendant's education, job history and

22   health and his financial conditions, I think that this factor

23   weighs heavily against an incarceratory sentence.

24        I've considered the kinds of sentences available.

25        I do not believe that a term of imprisonment is

O42WwalS

1  necessary in this case.

2        I've given serious consideration to the guidelines and
3  the policy statements.

4        I believe that a nonguidelines sentence here is
5  appropriate based on my assessment of all of the 3553(a)
6  factors and the purposes of sentencing.  In the circumstances
7  of this case, my decision is based on an assessment of all of
8  those factors, but I'd like to highlight just a couple of the
9  principal reasons for my downward variance here:

10        First, I believe that the likelihood of personal
11  recidivism is extremely low;

12        Second, I think, as I'm about to comment upon, that a
13  downward variance is appropriate in order to avoid unwarranted
14  sentencing disparities; and

15        Third, I believe that a downward variance is
16  appropriate given the defendant's responsible acceptance of
17  liability or responsibility in this case and his, I accept,
18  heartfelt remorse for his decision to engage in this conduct.

19        I've considered the need to avoid unwarranted sentence
20  disparities.

21        Having considered all of the sentencing factors, I
22  believe that the sentence is appropriate for him.  This factor
23  does weigh significantly in my decision.  As I've described,
24  two of the U.S. taxpayers involved in the scheme received
25  amnesty for good, programmatic reasons.  The consequence of

O42WwalS

| | |
|---|---|
| 1 | that is that they have not suffered consequences other than the |
| 2 | need to repay the tax losses with penalties and interest. |
| 3 | The other U.S. taxpayer involved received a |
| 4 | nonincarceratory sentence.  The defendant, I believe, is among |
| 5 | the least culpable of the defendants that the government has |
| 6 | charged as a result of this conduct in this case.  None of the |
| 7 | others have yet faced jail time.  I think it would be |
| 8 | disproportionate to impose a substantial incarceratory sentence |
| 9 | on the defendant, given that those who, in my view, are |
| 10 | substantially more culpable than he have not yet been jailed. |
| 11 | I should pause here to say the fact that I'm |
| 12 | sentencing the defendant here in this way is very much a result |
| 13 | of my assessment of the totality of the circumstances.  Mr. |
| 14 | Walchli is, in my view, very much the least culpable of the |
| 15 | codefendants.  I do not expect that my assessment of all of |
| 16 | these factors would weigh in the same way with respect to the |
| 17 | codefendants who have not accepted responsibility and instead |
| 18 | have chosen to elude justice and may have been more |
| 19 | substantially implicated by their involvement in this scheme. |
| 20 | So this is a decision that applies to this defendant, given my |
| 21 | assessment of all of the factors with respect to him alone. |
| 22 | I've considered the need to provide restitution to any |
| 23 | victims of the offense. |
| 24 | This is really not a factor in this case because, as I |
| 25 | understand it, the U.S. taxpayers who participated in the |

O42WwalS

1   scheme have already satisfied the government's tax loss.

2              With that, let me ask the defendant to please rise for

3   the imposition of sentence.

4              It is the judgment of this Court that you be sentenced

5   to time served.

6              Following the guidance of Section 5D1.1(c), I'm not

7   going to impose a term of supervised release.

8              I've considered all of the factors set forth in

9   Section 5E1.2(d) and conclude that Mr. Walchli should pay a

10  fine in the amount of $50,000.  I believe that this is

11  necessary in order to ensure just punishment.  The defendant

12  has the financial means to satisfy a fine in this amount.

13  Given the nature of his offense and the financial capacity, a

14  fine in this amount, I believe, is appropriate.

15             The defendant must pay a total special assessment of

16  $100, which shall be due immediately.

17             Counsel for the United States, I understand that the

18  government is not seeking forfeiture or restitution in this

19  matter.  Is that correct?

20             MS. DAVIS:  That's correct, your Honor.

21             THE COURT:  Thank you.

22             Counsel, any view regarding the time that I should

23  establish by which the defendant must satisfy the fine?

24             Counsel for defendant.

25             MR. TEMKIN:  Your Honor, I think if we could have a

O42WwalS

| | |
|---|---|
| 1 | week, we should be able to do it much faster, but I just don't |
| 2 | know in terms of wire transfers and the like. |
| 3 | THE COURT:  That's fine. |
| 4 | The fine is payable no later than April 12, which I |
| 5 | believe is next Friday. |
| 6 | Counsel, does either counsel know of any legal reason |
| 7 | why this sentence shall not be imposed as stated? |
| 8 | Counsel for the United States. |
| 9 | MS. DAVIS:  Your Honor, the answer to that is no, but |
| 10 | I can't let one of your comments go without being addressed |
| 11 | because, frankly, it's a huge slap in the face personally and |
| 12 | to the Department of Justice that we were, quote, in no rush to |
| 13 | put a stop to this. |
| 14 | This case took thousands of hours to develop and |
| 15 | prosecute.  It took many months -- |
| 16 | THE COURT:  I'm sorry, counsel.  Let me just pause |
| 17 | you. |
| 18 | I'll give you the opportunity to criticize the Court |
| 19 | right after I finish the sentencing. |
| 20 | MS. DAVIS:  Thank you, your Honor. |
| 21 | THE COURT:  Is this something that goes to the |
| 22 | sentencing? |
| 23 | MS. DAVIS:  Not directly, your Honor. |
| 24 | THE COURT:  Thank you. |
| 25 | MS. DAVIS:  Thank you. |

O42WwalS

| | |
|---|---|
| 1 | THE COURT:  Do you wish for me to comment on this?  If |
| 2 | you want to finish your remarks, please feel free. |
| 3 | Go ahead, understanding that I will respond. |
| 4 | MS. DAVIS:  Your Honor -- |
| 5 | THE COURT:  What do you want to say to the Court? |
| 6 | MS. DAVIS:  Your Honor, it's meant with the most |
| 7 | respect, but this was not for lack of effort on the part of the |
| 8 | government. |
| 9 | THE COURT:  Did I say that, counsel? |
| 10 | MS. DAVIS:  That was what I heard, and perhaps I |
| 11 | misheard. |
| 12 | THE COURT:  Thank you. |
| 13 | What's the takeaway that you're presenting to the |
| 14 | Court, counsel for the United States?  What are you asking for? |
| 15 | MS. DAVIS:  I just want the record to be clear that |
| 16 | the government did not sit on its hands with this case, your |
| 17 | Honor. |
| 18 | THE COURT:  Thank you. |
| 19 | I'll comment on that. |
| 20 | Anything else, counsel for the United States, that's |
| 21 | pertinent to this sentencing? |
| 22 | MS. DAVIS:  No, your Honor. |
| 23 | THE COURT:  Thank you. |
| 24 | Is that pertinent to the sentencing?  Is this a legal |
| 25 | reason why the sentence should not be imposed as stated? |

O42WwalS

```
 1              MS. DAVIS:  No, your Honor.

 2              THE COURT:  Thank you.

 3              Is there anything else that the government wishes to

 4   present to the Court in connection with the sentencing?

 5              MS. DAVIS:  No, your Honor.

 6              THE COURT:  Thank you.

 7              We'll talk about this issue after the sentencing is

 8   completed.

 9              Counsel for the defendant, is there any legal reason

10   why the sentence shall not be imposed as stated?

11              MR. TEMKIN:  No, your Honor.

12              THE COURT:  Thank you.

13              The sentence as stated is imposed.  I find the

14   sentence to be sufficient but not greater than necessary to

15   comply with the purposes of sentencing set forth in 18 U.S.C.

16   Section 3553(a)(2).

17              Thank you very much.  You can be seated.

18              You have the right to appeal your conviction and

19   sentence, Mr. Walchli, except to whatever extent you may have

20   validly waived that right as a part of your plea agreement.

21   The notice of appeal must be filed within 14 days of the

22   judgment of conviction.  If you're not able to pay the cost of

23   an appeal, you may apply for leave to appeal *in forma pauperis*.

24   If you request, the clerk of court will prepare and file a

25   notice of appeal on your behalf.
```

O42WwalS

1            Good.

2            Any other applications at this time?

3            Counsel, first, for the United States.

4            MS. DAVIS:  No, your Honor.

5            THE COURT:  Thank you.

6            Counsel for defendant.

7            MR. TEMKIN:  Your Honor, we will present to your Honor

8    as soon as possible a request that your Honor exonerate the

9    bail.  So we will hopefully get that down to your Honor or

10    submit it via ECF later today, since Mr. Walchli is in the

11    country now, and I don't know if he needs to appear to address

12    the cash bail issue.

13            THE COURT:  Thank you.

14            MR. TEMKIN:  Thank you.

15            THE COURT:  Fine.  Good.

16            Counsel for the government, let's discuss.  What would

17    you like to raise with THE Court?

18            MS. DAVIS:  Nothing further, your Honor.

19            THE COURT:  Thank you.

20            To the extent that you took from my comment that I

21    take issue with the government's efforts here, that is

22    incorrect.  I hope that you appreciate that at the very

23    beginning of my comments, counsel, I specifically pointed to

24    the seriousness of this offense and I specifically applauded

25    the government's efforts to prosecute such crimes.  So I

O42WwalS

1    apologize if you and the Department of Justice, as you just

2    stated, the Department of Justice takes issue with my comments.

3    I apologize if that is the case.

4              Is it the case that the Department of Justice takes

5    issue?

6              MS. DAVIS:  Your Honor, I can only speak for myself.

7              THE COURT:  Thank you.

8              But before you spoke for the Justice Department.  Is

9    that right?

10             MS. DAVIS:  I am a representative of the Department of

11   Justice, yes, your Honor.

12             THE COURT:  Thank you.

13             Good.

14             This proceeding is adjourned.  Counsel for the

15   government we'll proceed going forward.

16             Anything else before I step down?

17             Counsel for the government.

18             MS. DAVIS:  No, your Honor.

19             THE COURT:  Thank you.

20             Counsel for defendant.

21             MR. TEMKIN:  No, your Honor.

22             THE COURT:  Very good.

23             Thank you.

24             This proceeding is adjourned.

25             (Adjourned)